UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DAVID DIBENEDETTO, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 16-cv-02429 (TSC) |
| IRANIAN MINISTRY OF INFORMATION AND SECURITY, *et al.*, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

### **MEMORANDUM OPINION**

Plaintiffs, victims of the 1983 suicide bombing of the U.S. Marine barracks in Beirut, Lebanon and their immediate family members, have sued Defendants Iranian Ministry of Information and Security ("MOIS") and the Islamic Republic of Iran pursuant to the state-sponsored terrorism exception of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602 *et seq.*, which provides a federal right of action against foreign states, *id.* § 1605A. (ECF No. 1 ("Compl.").) Defendants have not answered or otherwise participated in this litigation, although they were served with summons and a copy of the Complaint on October 18, 2017. The Clerk of the Court therefore declared them in default. (ECF No. 18 ("Clerk's Entry of Default").)

Plaintiffs move, pursuant to Federal Rule of Civil Procedure 55(b), for default judgment as to liability against Defendants. (ECF No. 19 ("Pls.' Mot. Default. J.").) They also move, pursuant to 28 U.S.C. § 1605A(e)(1), for appointment of Alan L. Balaran as special master to consider all issues regarding compensatory damages. (ECF No. 20 ("Mot. to Appt. Special Master").) For the reasons set forth below, Plaintiffs' motions are GRANTED.

1

## I. BACKGROUND

On October 23, 1983, the United States Marine barracks in Beirut, Lebanon was attacked by terrorists, resulting in the death of about 421 U.S. servicemen and injuries to many others.

This is not the first case in this court arising out of the 1983 bombing.[1] "Over two days in March 2003, the Court, [in *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46 (D.D.C. 2003)], conducted a bench trial during which it heard testimony from lay and expert witnesses and received documentary evidence concerning the horrific attack, the grave injuries many suffered, defendants' involvement in the bombing, and their support for international terrorism more broadly." *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109, 114 (D.D.C. 2012). Following the conclusion of that bench trial, the *Peterson* Court determined,

> that it is beyond question that Hezbollah and its agents received massive material and technical support from the Iranian government . . . . [and] that it is highly unlikely that this attack could have resulted in such loss of life without the assistance of regular military forces, such as those of Iran. The Court then determined, as a legal matter, that MOIS actively participated in the attack and was "acting as an agent of . . . Iran" when doing so, and thus defendants Iran and MOIS were "jointly and severally liable to the plaintiffs" for damages.

*Id.* (internal citations and quotation marks omitted). It then appointed a special master to determine the appropriate amount of damages. *Id.*

In moving for default judgment in this case, Plaintiffs ask the court to take judicial notice of the liability decisions entered in *Peterson* and *Fain*, pursuant to Federal

---

[1] *See, e.g.*, *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46 (D.D.C. 2003); *Valore v. Islamic Republic of Iran*, 478 F. Supp. 2d 101 (D.D.C. 2007); *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31 (D.D.C. 2009); *Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68 (D.D.C. 2010); *Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150 (D.D.C. 2011); *O'Brien v. Islamic Republic of Iran*, 853 F. Supp. 2d 44 (D.D.C. 2012); *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7 (D.D.C. 2012); *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109 (D.D.C. 2012); *Spencer v. Islamic Republic of Iran*, 922 F. Supp. 2d 108 (D.D.C. 2013); *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311 (D.D.C. 2014); *Bathiard v. Islamic Republic of Iran*, No. 1:16-CV-1549 (CRC), 2019 WL 3412983 (D.D.C. July 29, 2019).

Rule of Evidence 201(b), because all three cases arise out of the same core facts and circumstances. (Pls.' Mot. Default J. at 1.)

A court may take judicial notice of facts "not subject to reasonable dispute" where those facts are either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). "This ability to take notice of adjudicative facts extends to judicial notice of court records in related proceedings." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010). Consequently, in response to "the multiplicity of FSIA-related litigation in this jurisdiction, Courts in this District have thus frequently taken judicial notice of earlier, related proceedings." *Id.* (collecting cases); *see also Bathiard v. Islamic Republic of Iran*, No. 1:16-CV-1549 (CRC), 2019 WL 3412983, at *3 (D.D.C. July 29, 2019) (collecting cases). And they have done so when the proceedings have taken place in front of a different judge. *See Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 191 (D.D.C. 2017) ("Moreover, courts have taken notice of facts found in earlier proceedings in this District even when those proceedings have taken place in front of a different judge."); *see also Bathiard*, 2019 WL 3412983, at *3 (taking judicial notice of factual findings from a hearing before another judge).

Having reviewed the pleadings filed in connection with this matter, and the *Peterson* and *Fain* decisions, the court finds it appropriate to take judicial notice here. In so doing, the court is mindful that although it may bypass "the formality of having that evidence reproduced," it must still reach its own independent findings of fact and conclusions of law in the cases before it. *Rimkus*, 750 F. Supp. 2d at 172.

## II. FINDINGS OF FACT

Before entering default judgment, in accord with 28 U.S.C. § 1608, a court must ensure that Plaintiffs have established a right to relief "by evidence satisfactory to the court." 28 U.S.C. § 1608(e). "This requirement imposes a duty on FSIA courts to not simply accept a complaint's unsupported allegations as true, and obligates courts to 'inquire further before entering judgment' against parties in default." *Rimkus*, 750 F. Supp. 2d at 171 (citing *Oveissi v. Islamic Republic of Iran*, 498 F. Supp. 2d 268, 272 (D.D.C.2007)). Therefore, in addition to taking judicial notice, in a FSIA case a court must examine "uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence," as well as testimony and documentation in the form of affidavits. *Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68, 74 (D.D.C. 2010) (internal quotation marks and citations omitted).

Taking into consideration the facts established in Plaintiffs' proffered affidavits as well as the decisions in *Peterson* and *Fain*, the court will make findings of fact. In so doing, the court does not attempt to replicate the fulsome accounts of the 1983 bombing in earlier decisions, and instead notes only what is required to support its conclusions of law.[2]

### A. **Plaintiffs**

Plaintiff Adam Webb was born in the United States of America and has at all times been a United States citizen. (ECF No. 19-2 ("Affidavits Pt. 1") at 1.) On October 23, 1983, he was serving as a Lance Corporal in the Marine Corps and was stationed in Beirut as a member of the

---

[2] Heeding the D.C. Circuit's guidance in *Maalouf v. Islamic Republic of Iran*, the court will not determine whether Plaintiffs' action is timely pursuant to the ten-year statute of limitations prescribed in 28 U.S.C. § 1605A(b). 923 F.3d 1095, 1115 (D.C. Cir. 2019) ("We therefore conclude that when an entirely absent defendant has forfeited the FSIA terrorism exception's statute of limitations, the defense is excluded from the case and may not be raised by the court *sua sponte*.").

24th Marine Amphibious Unit ("MAU").  (*Id.*)  He was injured physically and emotionally by the attack.  (*Id.* at 2.)  His wife, mother, the estate of his late father, his siblings, and the estate of his late son are also Plaintiffs in this litigation.  (*Id.* at 3, 10, 20, 39; ECF No. 19-3 ("Affidavits Pt. 2") at 17, 32, 48.)

Plaintiff Lorenzo Almanza was born in the United States of America and has at all times been a United States citizen.  (Affidavits Pt. 2 at 4.)  On October 23, 1983, he was serving as a Petty Officer in the Navy and was stationed in Beirut.  (*Id.*)  He was injured physically and emotionally by the attack.  (*Id.* at 5–6.)  His mother, siblings, and estate of his late brother are also Plaintiffs in this litigation.  (*Id.* at 1, 6, 14, 24; Affidavits Pt. 1 at 4, 32.)

Plaintiff Richard Zierhut was born in the United States of America and has at all times been a United States citizen.  (Affidavits Pt. 2 at 27.)  On October 23, 1983, he was serving as a Lance Corporal in the Marine Corps and was stationed in Beirut.  (*Id.*)  He was injured physically and emotionally by the attack.  (*Id.* at 29.)

On October 23, 1983, Steven Forrester was deployed with the United States Marine Corps in Beirut.  (Affidavits Pt. 1 at 7.)  He was killed in the bombing.  (*Id.* at 8.)  His sister, Angela Forrester, who was born in the United States of America and has at all times been a United States citizen, is a Plaintiff in this litigation along with Steven Forrester's mother, brother, wife, children, and estate.  (*Id.* at 9, 13, 25, 36; Affidavits Pt. 2 at 7, 10. 45.)

On October 23, 1983, Thomas DiBenedetto was deployed with the United States Marine Corps in Beirut.  (Affidavits Pt. 1 at 16.)  He was killed in the bombing.  (*Id.* at 17.)  His brother, David DiBenedetto, who was born in the United States of America and has at all times been a United States citizen, is a Plaintiff in this litigation along with Thomas DiBenedetto's estate and his other siblings.  (*Id.* at 19, 29, 42; Affidavits Pt. 2 at 41.)

5

On October 23, 1983, Lex Trahan was deployed with the United States Marine Corps in Beirut. (Affidavits Pt. 2 at 21.) He was killed in the bombing. (*Id.* at 22.) His father, Percy Trahan, who was born in the United States of America and has at all times been a United States citizen, is a Plaintiff in this litigation along with Lex Trahan's estate and mother. (*Id.* at 22, 38.)

On October 23, 1983, Mark Payne was deployed with the United States Marine Corps in Beirut. (Affidavits Pt. 2 at 35.) He was killed in the bombing. (*Id.* at 36.) His mother, Sandra Lainhart, who was born in the United States of America and has at all times been a United States citizen, is a Plaintiff in this litigation along with Mark Payne's estate. (*Id.*)

### B. **Defendants**

Defendant Iran "has been designated a State Sponsor of Terrorism (SST) for providing support for acts of international terrorism" since January 19, 1984. U.S. Dep't of State, Fact Sheet, Designation Of The Islamic Revolutionary Guard Corps (2019), https://www.state.gov/designation-of-the-islamic-revolutionary-guard-corps; *see also Fain*, 856 F. Supp. 2d at 116 ("Defendant Iran is a foreign state and has been designated a state sponsor of terrorism pursuant to section 69(j) of the Export Administration Act of 1979, 50 U.S.C. § 2405(j), continuously since January 19, 1984." (internal quotation marks omitted)).

Defendant MOIS served as Iran's "intelligence agency" that "acted as a conduit for the Islamic Republic of Iran's provision of funds to Hezbollah, [and] provided explosives to Hezbollah," and at all relevant times "exercised operational control over Hezbollah."[3] *Peterson*, 264 F. Supp. 2d at 53. It was not a "rogue agency." *Id.*

---

[3] Hezbollah is a separate entity formed under the auspices of government of Iran. *Peterson*, 264 F. Supp. 2d at 50. Its primary objective was framed as: "to engage in terrorist activities in furtherance of the transformation of Lebanon into an Islamic theocracy modeled after Iran." *Id.* at 51.

## C. The Attack on the Marine Barracks in Beirut, Lebanon

On October 23, 1983, Hezbollah operatives drove an explosive-laden truck into the Marine barracks in Beiruit. *Id.* at 56. When the truck reached the center of the barracks, a bomb detonated. *Id.* The explosion was "equal to between 15,000 to 21,000 pounds of TNT" and "the largest non-nuclear explosion that had ever been detonated on the face of the Earth." *Id.* The force ripped locked doors from their doorjambs 256 feet away and the "four-story Marine barracks was reduced to fifteen feet of rubble." *Id.*

At the time of the explosion "the members of the 24th MAU, and the service members supporting the unit, were clearly non-combatants operating under peacetime rules of engagement" in Beirut. *Id.* at 50. As a result of the explosion, 241 service members were killed and many others were severely injured. *Id.* at 58.

## D. Iranian Involvement in the Attack

Before the attack, MOIS directed the Iranian ambassador to Syria to contact a terrorist leader and "instruct him to have his group instigate attacks against the multinational coalition in Lebanon, and 'to take spectacular action against the United States Marines.'" *Id.* at 54. Following MOIS' directive, the Iranian ambassador to Syria instructed an Iranian Revolutionary Guard Corp. Officer to attend a meeting with Hezbollah operatives at which the attack on the Marine barracks was planned. *Id.* at 54–55.

Iran then provided Hezbollah and its agents with "massive material and technical support" to assist with the attack on the Marine barracks. *Id.* at 58. The quantity of bulk form pentaerythritol tetranitrate, the sophistication of the attack, and "the devastating effect of the detonation of the charge indicates that it is highly unlikely that this attack could have resulted in

such loss of life without the assistance of regular military forces, such as those of Iran." *Id.* at 56–58.

## III. CONCLUSIONS OF LAW

Based on these findings of fact, the court reaches the following conclusions of law:

### A. Jurisdiction

"The FSIA provides a basis for asserting jurisdiction over foreign nations in the United States." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 87 (D.C. Cir. 2002). It grants U.S. district courts original jurisdiction, without regard to the amount in controversy, over any (1) "nonjury civil action" (2) "against a foreign state" for (3) "any claim for relief in personam," so long as the state is (4) "not entitled to immunity." 28 U.S.C. § 1330(a). Here, each of these requirements is readily met.

First, no party has sought a jury trial in this matter and because this is a FSIA case, they are not "entitled to [a jury trial] under the Seventh Amendment." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 65 (D.D.C. 2010).

Second, both Defendants—Iran and MOIS—are foreign states. The definition of foreign state encompasses both a "political subdivision of a foreign state" and any "agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). An agency or instrumentality of a foreign state is defined as an entity "(1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States . . . nor created under the laws of any third country." *Id.* §§ 1603(a)–(b). Applying these definitions, "courts in this jurisdiction have been directed to ask whether an entity 'is an integral part of a foreign state's

political structure'; if so, that defendant is treated as a foreign state for FSIA purposes." *Anderson*, 753 F. Supp. 2d at 79 (quoting *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 300 (D.C. Cir. 2005)).  Iran clearly satisfies the definition, and MOIS qualifies because it is "a division of the state of Iran that acted as a conduit for the state's provision of funds to terrorist organizations, including Hezbollah." *Anderson*, 753 F. Supp. 2d at 79.

Third, as discussed in note 4 *infra*, the court has personal jurisdiction over Iran and MOIS as legal persons rather than property.  Therefore, this action is appropriately *in personam*, as opposed to *in rem*.

Fourth, Defendants are not entitled to immunity.  In fact, under the FSIA terrorism exception, Defendants waived immunity.  The terrorism exception provides that foreign states shall not be immune in cases in which: (1) "money damages are sought," (2) "against a foreign state" for (3) "personal injury or death" that (4) "was caused" (5) "by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act." U.S.C. § 1605A(a)(1).  Factor one is met because Plaintiffs seek only monetary damages as relief.  (*See* Compl. ¶ 74.)  Factor two is met because, as explained above, both Iran and MOIS are foreign states.  Factor three has been established through the Complaint, which contains actions for personal injury, and is further supported by affidavits submitted by the servicemen and their relatives.  (*See* Compl; Affidavits Pt. 1; Affidavits Pt. 2.)  Factor four—causation—has been established through uncontroverted evidence that Iran controlled, funded, and supported Hezbollah vis-à-vis the MOIS.  In addition, both Defendants participated in the planning and execution of the attack.  And the fifth and final factor is met because the 1983 bombing constituted an extrajudicial killing, and Defendants provided financial and military assistance to the Hezbollah operatives.  *See* 28 U.S.C. § 1605A(h)(7) (providing that

extrajudicial killing is defined as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples"); 28 U.S.C. § 1605A(h)(3) (providing that material support is defined as "any property, tangible or intangible . . . expert advice or assistance . . . weapons, lethal substances, explosives, personnel").

Thus, the court has jurisdiction over Plaintiffs' claims;[4] and the claims shall be heard.[5]

## B. <u>Liability</u>

To prevail on a private right of action under the FSIA, a plaintiff must establish that the foreign state engaged in "(1) 'an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act' where (2) the act was

---

[4] The court has personal jurisdiction over each Defendant. Pursuant to 28 U.S.C. § 1330(b), "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of this title." The court has concluded that it has subject matter jurisdiction and Plaintiffs served the Complaint on Defendants on October 18, 2017, in accordance with the FSIA. (ECF No. 16 ("Return of Service").)

[5] Pursuant to 28 U.S.C. § 1605A(a)(2), the court shall hear a claim if (1) the foreign state was designated as "a state sponsor of terrorism" at either the time that a terrorist act occurred "or was so designated as a result of such act," and "either remains so designated when the claim is filed . . . or was so designated within the 6-month period before the claim is filed"; (2) the claimant or victim was, at the time of the incident, a U.S. national, a member of the armed service, a government employee, or government contractor acting within the scope of the employee's employment; and (3) where the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate. 28 U.S.C. § 1605A(a)(2). Here, "Iran was designated by the U.S. Secretary of State as a sponsor of terrorism, partially in response to the Beirut bombing." *Fain*, 856 F. Supp. 2d at 120 (referencing *U.S. Dep't of State, Determination Pursuant to* Section 6(i) *of the Export Administration Act of 1979—Iran*, 49 Fed. Reg. 2836, Jan. 23, 1984). And Iran was listed as a state sponsor of terrorism in both 2016 and 2017. *See* U.S. Department of State, Country Reports on Terrorism 2017 (2018); U.S. Department of State, Country Reports on Terrorism 2016 (2017). Further, as established by the affidavits, all Plaintiffs are United States citizens. Finally, Plaintiffs did not have a duty to arbitrate because the attack occurred in Lebanon and the suit is against Iran.

committed, or the provision provided, by the foreign state or an official, employee, or agent of the foreign state if the act (3) 'caused' (4) 'personal injury or death' (5) 'for which courts of the United States may maintain jurisdiction under this section for money damages.'" *Fain*, 856 F. Supp. 2d at 120–21 (quoting 28 U.S.C. §§ 1605A(a)(1) & (c)).

### 1. Defendants engaged in an extrajudicial killing and provided material support.

Based on the findings of fact above and the detailed, uncontroverted account in *Peterson*, the court finds that Defendants are liable for engaging in the October 23, 1983 extrajudicial killing and for providing material support to the Hezbollah operatives.

The FSIA borrows the definition for the term "extrajudicial killing" from the Torture Victim Protection Act of 1991, which provides that an extrajudicial killing is "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Torture Victim Protection Act of 1991 § 3(a), 28 U.S.C. § 1350 note. Here, the factual findings show that Iran used MOIS to control Hezbollah. *Peterson*, 264 F. Supp. 2d at 53. U.S. intelligence intercepted a message from MOIS to the Iranian ambassador to Syria instructing the ambassador to conduct an act against the U.S. Marines, which ultimately led to a meeting in which the attack on the Marine barracks was planned. *Id.* at 54–55. There is no evidence that a court authorized this action. Additionally, "the order to use force against members of an international peacekeeping force was in direct contravention of civil guarantees recognized as indispensable to all free and civilized peoples." *Fain*, 856 F. Supp. 2d at 121.

With respect to material support, the FSIA provides that "material support or resources" in the FSIA context will have the same meaning as that prescribed in 18 U.S.C. § 2339A, which defines material support or resources as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1). Here, "MOIS acted as a conduit for the Islamic Republic of Iran's provision of funds to Hezbollah, [and] provided explosives to Hezbollah." *Peterson*, 264 F. Supp. 2d at 53. Further,

> the evidence shows that the explosive materials used in the attack were of a type and grade that would only have been available to the perpetrators of the attack through direct cooperation of the Iranian government, and that these materials could only have been used as effectively as they were with military assistance and training, which was provided by MOIS.

*Fain*, 856 F. Supp. 2d at 122.

Accordingly, this court finds that Iran and MOIS engaged in an extrajudicial killing and provided material support or resources to facilitate the killing.

2. <u>Defendants provided provisions and Defendants' agent committed the extrajudicial killing</u>.

As discussed above, Defendants supported Hezbollah during the relevant period. With respect to the 1983 bombing, Hezbollah operatives executed the attack following direct orders from Defendants; thereby rendering Hezbollah an agent of Defendants. *Peterson*, 264 F. Supp. 2d at 54–55. "Under such circumstances, [D]efendants may be held vicariously liable for the extrajudicial killing perpetrated by the bombers." *Fain*, 856 F. Supp. 2d at 122.

3. <u>Defendants are liable under several theories of relief</u>.

Plaintiffs seeking relief under § 1605A must submit a theory of liability to justify recovery. The D.C. Circuit has advised that although the claims presented by plaintiffs under § 1605A are federal questions, the court should not "fashion a complete body of federal law,"

*Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 332 (D.C. Cir. 2003); therefore, in the FSIA context, courts in this district rely on "well-established principles of law" in the Restatement (Second) of Torts, *see In re Islamic Republic of Iran Terrorism Litigation*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009). The theory of liability in this case, as well as in the preceding litigation on the Marine barracks attack, is "through the lens of civil tort liability." *See Rimkus*, 750 F. Supp. 2d at 176. Plaintiffs articulate five bases for relief: (i) wrongful death, (ii) survival, (iii) battery, (iv) assault, and (v) intentional infliction of emotional distress.

### i. Wrongful death

Plaintiffs, on behalf of estates, bring wrongful death claims on behalf of Thomas DiBenedetto, Lex Trahan, Steven Forrester, and Mark Payne. (Compl. ¶¶ 57–60.)

"A decedent's heirs at law, through the decedent's estate, may bring a wrongful death action under section 1605A(c) 'for economic losses which result from a decedent's premature death.'" *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 335 (D.D.C. 2014) (quoting *Valore*, 700 F. Supp. 2d at 78). "Where defendants are liable for a decedent's extrajudicial killing, . . . they may be held 'liable for the economic damages caused to decedents' estates.'" *Id.*

Because Defendants are liable for the deaths of Thomas DiBenedetto, Lex Trahan, Steven Forrester, and Mark Payne arising out of the bombing on the Marine barracks, Plaintiffs have proven the validity of their wrongful death theory.

### ii. Survival

Plaintiffs, on behalf of estates, also allege survival claims on behalf of Thomas DiBenedetto, Lex Trahan, Steven Forrester, and Mark Payne. (Compl. ¶¶ 61–62.)

13

A survival claim is one brought by a decedent's estate on behalf of the decedent for the pain and suffering endured after the injury, but before death. *See* Restatement (Second) of Torts § 926. To succeed on a survival claim, a plaintiff must show that the decedent's death was "anything but instantaneous." *Valore*, 700 F. Supp. 2d at 77.

Therefore, to the extent that Plaintiffs are able to demonstrate to the special master that Thomas DiBenedetto, Lex Trahan, Steven Forrester, and Mark Payne did not die instantaneously, they are entitled to recovery. *See id.* (dismissing survival claim with prejudice where "special masters who took evidence in the[] cases were unable to conclude that decedents' deaths were anything but instantaneous").

   iii.  *Battery*

Plaintiffs Adam Webb, Lorenzo Almanza, and Richard Zierhut plead claims of battery against Defendants. (Compl. ¶¶ 65–67)

To establish liability on the battery claims, each Plaintiff must show that Defendants acted "intending to cause a harmful or offensive contact . . ., or an imminent apprehension of such a contact" and "a harmful contact with" those attacked "directly or indirectly result[ed]." Restatement (Second) of Torts § 13. Harmful contact results when there is "any physical impairment of the condition of another's body, or physical pain or illness." *Id*. § 15.

As already determined, Defendants intended to cause harmful contact to Plaintiffs when they directed and aided the attack on the Marine barracks. Indeed, "acts of terrorism, are, by their very nature, intended to harm and to terrify by instilling fear of such harm." *Valore*, 700 F. Supp. 2d at 77. Therefore, accepting as true Webb, Almanza, and Zierhut's sworn statements

14

that they suffered physical injuries from the attack, (*see* Affidavits Pt. 1; Affidavits Pt. 2),[6] the court finds Defendants liable for battery.

> *iv. Assault*

Plaintiffs Adam Webb, Lorenzo Almanza, and Richard Zierhut plead claims of assault against Defendants. (Compl. ¶¶ 68–70.)

To succeed on a claim of assault, Plaintiffs must establish that Defendants intended to "cause a harmful or offensive contact with . . ., or an imminent apprehension of such a contact" and as a result put Plaintiffs in "imminent apprehension." Restatement (Second) of Torts § 21(1).

Here, given the magnitude of the explosion, there is no question that Defendants intended to injure Plaintiffs and place them in a state of fear. As stated in *Fain*, "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm." 856 F. Supp. 2d at 123. Therefore, accepting as true Webb, Almanza, and Zierhut's sworn statements that they were placed in fear and apprehension of harm as a direct result of the attack, (*see* Affidavits Pt. 1; Affidavits Pt. 2),[7] the court finds Defendants liable for assault.

---

[6] Adam Webb suffered acromioclavicular joint separation and broken bones in his foot. (Affidavits Pt. 1 at 2.) Lorenzo Almanza's injuries included, "fractured left tibia, fractured right tibia, fractured pelvis, amputated right foot at the metatarsals, right foot drop, fused ankle right foot, osteomyelitis right tibia, foreign body left eye, hearing loss and tinnitus in right ear." (Affidavits Pt. 2 at 5.) Richard Zierhut "suffered permanent physical injuries, including hearing loss and scars from superficial wounds." (*Id.* at 29.)

[7] Adam Webb felt the blast in his chest and experienced "the sensation of falling through a tube or hole"; he suffers from "anxiety, trouble sleeping, and PTSD" and he does not do well in crowds, in large buildings, or with flash photography. (Affidavits Pt. 1 at 2.) After the explosion, Lorenzo Almanza woke up buried, and began to panic and yell for help; he still suffers from severe emotional stress. (Affidavits Pt. 2 at 5–6.) Richard Zierhut was awake when the explosion occurred and thought the base was "under a full siege" and that they were going to be "overrun"; he still suffers from "serious emotional injuries, including PTSD." (*Id.* at 28–29.)

### v. *Intentional infliction of emotional distress – Survivors and Relatives*

1. Survivors

Plaintiffs Adam Webb, Lorenzo Almanza, and Richard Zierhut plead claims of intentional infliction of emotional distress against Defendants. (Compl. ¶¶ 71–72.)

To succeed on an intentional infliction of emotional distress claim, Plaintiffs must show that Defendants "by extreme and outrageous conduct intentionally or recklessly cause[d] severe emotional distress." Restatement (Second) of Torts § 46(1). In addition, if Plaintiffs demonstrate that bodily harm resulted from Defendants' conduct, Defendants are liable for the resulting emotional distress and subsequent bodily harm. *See id.*

Those who engage in terrorism endeavor to be extreme and outrageous, thereby instilling the optimum fear into victims and forcing emotional trauma upon them. *See Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009) ("Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress.") (citation omitted). The unprecedented bombing of the Marine barracks was patently extreme and outrageous. Therefore, accepting as true Webb, Almanza, and Zierhut's sworn statements that they suffered emotional distress as a direct result of the attack, (*see* Affidavits Pt. 1; Affidavits Pt. 2),[8] the court finds Defendants liable.

---

[8] In addition to the emotional distress described in note 7 *infra*, the survivors suffered in the following ways: Adam Webb turned to alcohol and has battled alcoholism for much of his life; Lorenzo Almanza feels ashamed of his amputation and becomes "frustrated and angry" over his limitations; Richard Zierhut suffers substance abuse as a result of his experience in the attack. (Affidavits Pt. 1 at 2–3; Affidavits Pt. 2 at 5–6, 29–30.)

2. Relatives

The immediate family members of Mark Payne, Lex Trahan, Steven Forrester, Thomas DiBenedetto, Adam Webb, Lorenzo Almanza, and Richard Zierhut bring intentional infliction of emotional distress claims against Defendants. (Compl. ¶¶ 63–64, 73–74.)

As discussed above, a claim of intentional infliction of emotional distress succeeds where a defendant "by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress." Restatement (Second) of Torts § 46(1). However, when the conduct is directed at a third person, the defendant may be liable "if he intentionally or recklessly causes severe emotional distress (a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or (b) to any other person who is present at the time, if such distress results in bodily harm." *See id.* at § 46(2)(a)–(b).

Although none of the Plaintiffs bringing this claim were in Beirut during the attacks, courts in this district have found that because terrorist attacks are specifically designed to inflict the most intense form of severe emotional distress via extreme and outrageous conduct, non-present plaintiffs can recover if they are a member of the victim's immediate family. *See Valore*, 700 F. Supp. 2d at 79–80 ("One therefore need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result."); *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 400 (D.D.C. 2015) (explaining that presence requirement is not imposed in terrorism context). This court agrees with earlier decisions finding that the 1983 Beirut bombing qualifies as an extreme and outrageous act that invokes the theory of recovery for non-present plaintiffs, *see, e.g.*, *Valore*, 700 F. Supp. 2d 79–80; therefore,

Defendants are liable to the relatives of the survivors and decedents for the mental anguish set forth in their affidavits.[9]

    4. <u>Plaintiffs suffered both personal injury and death</u>.

As discussed in Part III.B.3 *supra*, Plaintiffs have brought an action for claims of wrongful death, survival, battery, assault, and intentional infliction of emotional distress, which fulfill the "personal injury or death" requirement.

    5. <u>Plaintiffs have established jurisdiction and seek only monetary damages</u>.

As discussed in Part III.A, the court has jurisdiction over Defendants in this action and Plaintiffs seek only monetary compensation. Accordingly, as all elements required to prove liability have been met, it is appropriate to hold Defendants liable under the FSIA.

**C. <u>Damages</u>**

Under the FSIA, Plaintiffs can recover for "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605(A)(c). In obtaining recovery from Defendants, Plaintiffs "must prove that the consequences of the foreign state's conduct were 'reasonably certain' (*i.e.*, more likely than not) to occur, and must prove the amount of damages by a 'reasonable estimate' consistent with this [Circuit]'s application of the American rule on damages." *Roth*, 78 F. Supp. 3d at 402.

Although the court has found Defendants liable for the claims brought by Plaintiffs, it lacks the evidence necessary to calculate damages. The FSIA provides that "[t]he courts of the United States may appoint special masters to hear damage claims brought under this section." 28 U.S.C. § 1605A(e)(1). In appointing a special master, "the court must consider the fairness of

---

[9] The court has reviewed the affidavits and found that they support a finding of liability. However, given the number of relatives and supporting statements, the court will not recount the statements here.

18

imposing the likely expenses on the parties and must protect against unreasonable expense or delay." Fed. R. Civ. Pro. 53(a)(3). Here, there is no concern of either undue expenses for the parties (special masters are compensated from the Attorney General's Victims of Crime Fund) or unreasonable delay (a special master will help to expedite resolution of this claim). Therefore, the court finds it appropriate to appoint a special master to recommend compensatory damages.

Plaintiffs have moved this court to appoint Alan Balaran, who has submitted the requisite curriculum vitae and affidavit, to consider all issues related to compensatory damages as to each of Plaintiffs' claims. (Mot. to Appt. Special Master.) In addition, Balaran, who has served as a special master in similar cases involving Iran, has agreed to abide by the Administrative Plan Governing Special Masters that has been deemed sufficient in similar litigation.

Therefore, pursuant to 28 U.S.C. § 1605A(e)(1), the court will appoint Balaran as special master and direct him to prepare a report regarding compensatory damages. Upon receipt of the report regarding compensatory damages, the court will consider the appropriate level of punitive damages, if any.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for default judgment as to liability and Plaintiffs' motion for the appointment of a special master as to compensatory damages are GRANTED.

A corresponding order shall issue separately.

Date: September 30, 2019

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge