**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DAVID DIBENEDETTO, et al.,

    Plaintiffs/Judgment Creditors,

  v.

IRANIAN MINISTRY OF INFORMATION AND
SECURITY, et al.,

    Defendants.

Case No. 1:16-cv-02429-TSC

**PLAINTIFFS' MOTION FOR ORDER AUTHORIZING THE**
**ISSUANCE OF WRIT OF ATTACHMENT AND SERVICE ON TETHER**

**INTRODUCTION**

Plaintiffs seek an order: (i) authorizing a writ of attachment to Tether (attached as Ex. 1) under § 201 of the Terrorism Risk Insurance Act ("TRIA"), Federal Rule of Civil Procedure 69(a)(1), and Section 16-546 of the District of Columbia Code; and (ii) confirming that Tether may be served under Federal Rule of Civil Procedure 4(h)(2), (f)(1), and (f)(3) via email and/or by mail or other physical delivery to its office addresses in El Salvador.

The requirements for the requested writ are satisfied here. Plaintiffs are survivors and victims of the 1983 Beirut marine barracks bombing and their family members. Plaintiffs hold final judgments against the Islamic Republic of Iran and Iranian Ministry of Information and Security awarding $362,774,953 in damages, including $81,706,070.42 in compensatory damages and $281,068,882.24 in punitive damages. *See* Dkt. Nos. 38, 52. Despite obtaining the judgments around six years ago, much of those judgments remains unsatisfied.

In addition, substantial Iranian cryptocurrency assets were recently blocked by the U.S. government and are subject to attachment in satisfaction of Plaintiffs' judgments under § 201 of TRIA—a federal law created expressly to make the blocked assets of state sponsors of terrorism available to terrorism victims. The U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") identifies the relevant cryptocurrency addresses on the SDN[1] listing for Bank Markazi, which is the Central Bank of the Islamic Republic of Iran and, at minimum, an agency or instrumentality of the Iranian government. Current digital-asset evidence shows the addresses are frozen through Tether's TRON USDT blacklist mechanism and identifies frozen balances

---

[1] OFAC maintains the Specially Designated Nationals ("SDN") List, which identifies individuals, entities, and vessels owned, controlled by, or acting on behalf of targeted countries, terrorists, or narcotics traffickers. U.S. persons are prohibited from dealing with SDNs, and their assets are blocked.

1

totaling approximately 344,211,453 USDT. For these reasons, and as explained in greater detail below, the Court should authorize issuance and service of the writ.

Finally, because priority is determined by order of service on the garnishee under D.C. Code § 16-545, Plaintiffs appreciate the Court's quick attention to and approval of Plaintiffs' motion.

<b><u>BACKGROUND</u></b>

### I.       Plaintiffs Hold a Final Terrorism Judgment Against Iran.

On February 19, 2020 this Court entered a final judgment in this case, and on December 9, 2020, this Court entered a partial final judgment for two additional plaintiffs. Dkt. Nos. 38, 52. The judgment awards $81,706,070.42 in compensatory damages and $281,068,882.24 in punitive damages, for a total award of $362,774,953, and states that each of the defendants is liable for the entire amount. *Id.*

Plaintiffs now seek attachment up to the unpaid compensatory balance as adjusted for all applicable credits (including payments from the U.S. Victims of State Sponsored Terrorism Fund), and recoverable post-judgment interest.

### II.      OFAC Identifies the Relevant TRON Addresses on Bank Markazi's SDN Listing.

USDT (Tether) is a type of blockchain-based cryptocurrency called a "stablecoin," which is designed to maintain a 1:1 value with the U.S. dollar ("Tether Token"). Issued by Tether International, S.A. de C.V. ("Tether"), Tether represents that USDT is 100% backed by reserves, including U.S. Treasury Bills. USDT is the largest stablecoin globally by market capitalization and one of the most traded cryptocurrencies. USDT operates on multiple blockchain networks, including the TRON network. A blockchain network is a decentralized, distributed digital ledger technology that records transactions across a peer-to-peer network of computers, known as nodes.

2

On April 23, 2026, USDT's issuer Tether publicly announced that it had worked with the U.S. Government to freeze $344 million USDT across two addresses in coordination with OFAC and U.S. law enforcement. Ex. C. Tether stated that the freeze was executed after the digital currency addresses were identified, preventing further movement of funds, and that the freeze followed information shared by U.S. authorities about unlawful conduct associated with those addresses. *Id.*

OFAC's April 24, 2026 sanctions-list update identified Bank Markazi Jomhouri Islami Iran as an SDN under the IRAN, IFSR, IRGC, and SDGT programs.[2] Ex. A. OFAC lists Bank Markazi under aliases including Bank Markazi Iran, Central Bank of Iran, and Central Bank of the Islamic Republic of Iran. *Id.* OFAC's listing states that Bank Markazi is linked to the Islamic Revolutionary Guard Corps-Qods Force and Hizballah. *Id.*; *see* Ex. 3 (Maile Decl.) ¶¶ 28–29.

OFAC's listing identifies the following two "Digital Currency Address - TRX" identifiers for Bank Markazi:

**TNiq9AXBp9EjUqhDhrwrfvAA8U3GUQZH81**

**TTiDLWE6fZK8okMJv6ijg42yrH6W2pjSr9**

OFAC's listing of these addresses on Bank Markazi's SDN entry, together with Tether's coordinated contract-level freeze, shows that the identified property interests are blocked or frozen under IEEPA-based sanctions authorities. The applicable regulations block property and interests in property of the designated person that are in the United States, or within the possession or control of any United States person, and prohibit such property from being transferred, paid, exported,

---

[2] These terms represent a network of U.S. sanctions and designations aimed at Iran's military and financial operations, primarily targeting the Islamic Revolutionary Guard Corps (IRGC). Key components include the **IRGC**, **SDGT** (terrorist designations), **IFSR** (banking sanctions), and **IRAN**-related initiatives to cut off funding for proxy groups and weapon programs.

withdrawn, or otherwise dealt in. *See* 31 C.F.R. § 560.211(a) (Iranian Transactions and Sanctions Regulations); 31 C.F.R. § 594.201(a) (Global Terrorism Sanctions Regulations).

The OFAC "TRX" label identifies the relevant blockchain-address type; the value at issue is USDT on TRON, not native TRX. Ex. B. Digital-asset evidence shows that, on April 23, 2026 at 12:02:36 UTC, both OFAC-listed addresses were frozen at the smart-contract level through the official TRON USDT contract, TR7NHqjeKQxGTCi8q8ZY4pL8otSzgjLj6t, which emitted an AddedBlackList event for each address. *Id.*

The freeze of address TNiq9AXBp9EjUqhDhrwrfvAA8U3GUQZH81 was recorded in transaction ebe670f1518f67077d28ec4b54dd0d236a5f1edfa90651524aeb42a21e6975fe, and the freeze of address TTiDLWE6fZK8okMJv6ijg42yrH6W2pjSr9 was recorded in transaction 295cd606150289dc18d9e0e4d9503adb9d1b10bde9c314158f9cfa7c9928b09a. *Id.*; Ex. 3 (Maile Decl.) ¶¶ 13, 16.

The attached digital-asset details identify frozen balances of approximately 212,922,653 USDT and 131,288,800 USDT, respectively, for a total of approximately 344,211,453 USDT. Ex. B; Ex. 3 (Maile Decl.) ¶ 17.

## III.    The Garnishee Controls the Attached Property.

Garnishee Tether International, S.A. de C.V. is identified in Tether's Terms of Service as the issuer and counterparty for the Tether Token. Ex. E. To the extent any affiliated Tether entity asserts possession, custody, control, charge, or administration over responsive property or records, the Garnishee's sworn answers can identify that entity and the nature of its asserted role.

Tether's legal terms state that each Tether Token is "100% backed by an amount of assets ('**Reserves**') equal to the stated value of the Tether Token," and that such reserves "are comprised of cash, cash equivalents and other assets and may include loan receivables and other assets from"

Tether. Ex. E.  The holder of a Tether Token has the ability and right to redeem the Tokens for fiat currency. *Id.*  Tether also states that it may delay or suspend access to services, including purchases and redemptions, as directed by a government, when a wallet is subject to pending litigation, investigation, or government proceedings, or when providing services would be contrary to law. *Id.*

The history of the April 23, 2026 freeze confirms Tether's ability to control the transferability of the digital assets at the contract level. The official TRON USDT contract blacklisted the two addresses, thereby preventing ordinary private-key transfers of the USDT held at the addresses. Ex. B. In other U.S. enforcement matters, filings have described Tether freezing USDT, destroying frozen USDT through an issuer smart-contract function (commonly called "burning"), and reissuing equivalent USDT to government-controlled wallets pursuant to warrants or other legal process. Ex. F; *see* Exs. U–Z, AA–AC, AE; Ex. 3 (Maile Decl.) ¶¶ 18–21. Those facts support treating Tether as a garnishee for property interests, credits, issuer-administered rights, redemption rights, reserve-backed rights, records, and substitute property within its possession, custody, control, charge, or administration.

## ARGUMENT

**I.      Federal and District of Columbia Law Authorize a Writ of Attachment in Aid of Execution.**

Plaintiffs are entitled to attach Iran's blocked assets to satisfy their judgment. To do so, Plaintiffs must obtain a writ of execution from this Court in accordance with District of Columbia and any applicable federal law. *See* Fed. R. Civ. P. 69(a)(1) (the "procedure on execution [of a money judgment] . . . must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies").

D.C. law enables a judgment creditor to reach the "personal property of a debtor held by a third party" by requesting "the court to issue a writ of attachment," as "[s]ervice of the writ on the garnishee creates a valid lien in favor of the judgment creditor." *Consumers United Ins. Co. v. Smith*, 644 A.2d 1328, 1351-52 (D.C. Cir. 1994) (citing D.C. Code §§ 16-542, 16-546). D.C. Code § 16-542 expressly authorizes post-judgment attachment. And D.C. Code § 16-546 provides that an attachment is levied upon defendant's credits held by a garnishee by serving the garnishee with the writ of attachment, accompanying interrogatories, and a notice that the defendant's property or credits in the garnishee's hands are seized by virtue of the attachment. D.C. Code §§ 16-542, 16-546.

## II.    TRIA Authorizes Attachment in Aid of Execution Against Blocked Assets of Iran and Its Agencies or Instrumentalities.

Congress enacted § 201 of the Terrorism Risk Insurance Act of 2002 ("TRIA"), for the express purpose of allowing Plaintiffs and other victims of state-sponsored terrorism to execute upon blocked assets—like the Iranian funds at issue here—to satisfy precisely the types of judgments that Plaintiffs hold against Iran. TRIA § 201(a) provides that, "notwithstanding any other provision of law . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based on an act of terrorism . . . the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment." TRIA, Pub. L. No. 107-297, § 201(a) (2002) (codified at 28 U.S.C. § 1610 note).

To attach property under TRIA, a plaintiffs must show: (1) they hold judgments under 28 U.S.C. § 1605A or §1605(a)(7)[3]; (2) the defendants are a "terrorist party" or an "agency or

---

[3] Because Plaintiffs have sought to garnish Iranian assets under TRIA § 201(a)—and not under 28 U.S.C. § 1610—no § 1610(c) certification is required. *See, e.g.*, *Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713, 730 (11th Cir. 2014) ("Claimants also assert that, pursuant to the FSIA, specifically 28 U.S.C. § 1610(c), Plaintiffs

instrumentality of that terrorist party"; and (3) that the defendants' properties are "blocked assets." *Kirschenbaum v. 650 Fifth Ave. & Related Props*., 830 F.3d 107, 131 (2d Cir. 2016), *abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018); *see also Peterson v. Islamic Republic of Iran*, 938 F. Supp. 2d 93, 96-97 (D.D.C. 2013). Each of these elements is met here.

### A. Iran Is a Terrorist Party, and Bank Markazi Is, at Minimum, an Agency or Instrumentality of Iran.

Iran is a "terrorist party" under TRIA because it is a U.S. government designated state sponsor of terrorism. *See* TRIA § 201(d)(4); U.S. Dep't of State, Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran, 49 Fed. Reg. 2836 (Jan. 23, 1984). Plaintiffs' judgment is based on Iran's liability as a state sponsor of terrorism under 28 U.S.C. § 1605A and includes $81,706,070.42 in compensatory damages. Dkt. Nos. 68, 52.

In addition, Bank Markazi is Iran's central bank and, at minimum, an "agency or instrumentality" of Iran. OFAC identifies Bank Markazi by aliases including "Central Bank of Iran" and "Central Bank of the Islamic Republic of Iran." Ex. A. OFAC has determined that "[t]he Central Bank of Iran (Bank Markazi Iran) is an agency, instrumentality and controlled entity of the Government of Iran for all purposes under this part." 31 C.F.R. § 535.433.

This Court has likewise recognized that Bank Markazi is so "sufficiently controlled by Iran" as to be an "agent[] of the state" that is "barely distinguishable from an executive

---

should have served a copy of the default judgment required by 28 U.S.C. § 1608(e) on Claimants. Here, Claimants are wrong for a number of reasons. First, § 1610(c) governs 'attachment[s] or execution[s] referred to in subsections (a) and (b) of this section.' The attachments and executions here were obtained pursuant to TRIA § 201, not 28 U.S.C. § 1610(a) or (b).'"). In contrast to 1610(c), TRIA does not mention service of a judgment or § 1608(e); it applies whenever "a person has obtained a judgment against a terrorist party." TRIA § 201(a). TRIA further indicates that it applies "[n]otwithstanding any other provision of law." Id. at 722; see also Case 1:14-cv-01752-RCL Document 106 Filed 05/11/26 Page 16 of 18 16 Greenbaum v. Islamic Republic of Iran, 67 F.4th 428, 432 (D.C. Cir. 2023) (holding that this language "clearly requires courts to disregard other statutory provisions that conflict with the scope of the TRIA").

department," such that "no further minimum contacts analysis is required, and the Court may exercise personal jurisdiction over [Defendants] based solely on service under 28 U.S.C. § 1330." *Hake v. Bank Markazi Jomhouri Islami Iran*, No. 17-cv-114, 2022 WL 4130837, at *13 (D.D.C. Sept. 12, 2022); *see also Holladay v. Islamic Republic of Iran*, 523 F. Supp. 3d 100, 114 (D.D.C. 2021) (concluding that "Bank Markazi is an agency or instrumentality of Iran"); *Est. of Hartwick v. Islamic Republic of Iran*, No. 18-CV-1612, 2021 WL 6805391, at *6 (D.D.C. Oct. 1, 2021) (describing evidence that Iran is Bank Markazi's sole shareholder); *Cf. Peterson v. Islamic Republic of Iran*, No. 10-cv-4518, 2013 WL 5538652, at *3 (S.D.N.Y. Oct. 8, 2013) ("Bank Markazi does not dispute that it is an instrumentality of Iran.").

Accordingly, the blocked assets of Bank Markazi are the blocked assets of an "agency or instrumentality" of Iran for purposes of TRIA § 201(a).

## B. The OFAC Listing and Tether Freeze Reflect That the Assets Are Blocked Assets Under TRIA.

In addition, the Tether Funds are "blocked assets," and thus subject to attachment under TRIA. TRIA generally defines "blocked asset" as "any asset seized or frozen by the United States under Section 5(b) of the Trading with the Enemy Act or under Sections 202 and 203 of [IEEPA]." TRIA § 201(d)(2)(A). IEEPA authorizes the President to block property and interests in property to address national emergencies involving foreign threats, and OFAC implements those blocking authorities through sanctions programs and the SDN List. *See* 50 U.S.C. §§ 1701–1702; 31 C.F.R. §§ 560.211(a), 594.201(a).

OFAC has placed Bank Markazi under sanctions programs including the SDGT program, which is grounded in Executive Order 13224. Ex. A. In addition, OFAC's April 24, 2026 update added the two specific TRON digital-currency addresses at issue here to Bank Markazi's SDN listing. *Id*. That listing, together with Tether's coordinated contract-level freeze reflects that the

8

identified property interests are blocked or frozen under IEEPA-based sanctions authorities. *See* 31 C.F.R. §§ 560.211(a), 594.201(a).

The address-level freeze reflects that the specific assets have in fact been frozen. Tether announced that it supported the U.S. Government in freezing $344 million USDT across two addresses in coordination with OFAC and U.S. law enforcement. Ex. C. The blockchain evidence identifies those addresses as the same two addresses listed by OFAC for Bank Markazi, shows AddedBlackList events at the official TRON USDT contract for each address, and identifies a total frozen amount of approximately 344,211,453 USDT. Ex. B. The assets have been made non-transferable through an issuer-level blacklist function following coordination with U.S. authorities. That is further evidence that the assets and related issuer-administered rights are "seized or frozen by the United States" under IEEPA-based sanctions authorities within the meaning of TRIA.

The D.C. Circuit's analysis in *Levin* confirms this conclusion. There, the court held that funds blocked by OFAC under IEEPA remained "frozen" and therefore "blocked" under TRIA even after OFAC had issued a restrictive forfeiture license. *Est. of Levin v. Wells Fargo Bank, N.A.*, 156 F.4th 632, 640 (D.C. Cir. Sept. 26, 2025). Even so, Plaintiffs are not aware, on the present record, of any OFAC license authorizing transfer, redemption, destruction, reissuance, or distribution of the attached assets; the assets remain fully immobilized on the blockchain through the coordinated OFAC/Tether freeze.

**C.  The Evidence Reflects that the Assets Are Property of Bank Markazi and Iran.**

As detailed above, OFAC's listing identifies the two TRON addresses as digital-currency address identifiers for Bank Markazi, which is the Central Bank of Iran and an agency, instrumentality, and controlled entity of the Iranian government. Ex. A; *see also* 31 C.F.R. § 535.433. That official designation, and Tether's freeze of cryptocurrency addresses at the request

9

of the U.S. government, reflect that the USDT at the addresses and related issuer-administered or reserve-backed rights are property or interests in property of Bank Markazi and Iran.

The showing of Iranian control is strengthened by OFAC's listing of Bank Markazi under the IRAN, IFSR, IRGC, and SDGT programs, OFAC's statement that Bank Markazi is linked to the IRGC-Qods Force and Hizballah, and the contract-level freeze executed after U.S. authorities identified the addresses. Exs. A, B.

### IV.    The Court Has Jurisdiction and Authority to Require Tether's Compliance as Garnishee.

The Court has jurisdiction over Tether and the authority to require its compliance as garnishee of the assets. Federal Rule of Civil Procedure 69 permits enforcement proceedings in the court that entered the judgment. *See* Fed R. Civ. P. 69(a)(1) ("A money judgment is enforced by a writ of execution . . . . The procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies."). District of Columbia attachment procedure authorizes service on a garnishee holding property or credits subject to attachment. *See* D.C. Code § 16–546 ("An attachment shall be levied upon credits of the defendant, in the hands of a garnishee, by serving the garnishee with a copy of the writ of attachment and of the interrogatories accompanying the writ, and a notice that any property or credits of the defendant in his hands are seized by virtue of the attachment.").

Tether International, S.A. de C.V. is global company that is domiciled in El Salvador. Ex. D. Tether can be served either domestically in the United States or abroad. For instance, Federal Rule of Civil Procedure 4(h)(2), which governs service outside of the United States of corporations, in turn incorporates Rule 4(f). Fed. R. Civ. P. 4(h)(2) (providing that "[u]nless federal law provides otherwise . . . , a domestic or foreign corporation . . . must be served: . . . at a place

10

not within any judicial district of the United States, in any manner prescribed by Rule 4(f) for serving an individual, except personal delivery under (f)(2)(C)(i).”). Rule 4(f) provides for several methods of non-U.S. service, including (i) “by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents”; and (ii) “by other means not prohibited by international agreement, as the court orders.” Fed. R. Civ. P. 4(f)(1), (3).

El Salvador became a contracting party to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents (“Hague Convention”), effective October 1, 2024. Ex. G. The Hague Convention is multilateral treaty that “was intended to provide a simpler way to serve process abroad, to assure that defendants sued in foreign jurisdictions would receive actual and timely notice of suit, and to facilitate proof of service abroad.” *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 698 (1988).

The Hague Convention permits service via “postal channels”—which this Court has understood to include both traditional mail, as well as email. *SEC v. Campo*, No. CV 24-2198, 2025 WL 2603613, at *2-4 (D.D.C. Sept. 9, 2025).[4] According to the Hague Convention’s website, El Salvador does not appear to have objected to service via “postal channels,” which is reflected in Article 10(a) of the Hague Convention. Ex. G. In addition, the 2003 Special Commission to the Hague Convention found that “the transmission of documents internationally for the purposes of

---

[4] *See also, e.g.*, *Agha v. Jacobs*, No. 07-cv-1800, 2008 WL 2051061, at *2 (N.D. Cal. May 13, 2008) (“[Plaintiff]’s attempt to distinguish email and facsimile from the ‘postal channels’ referred to in the text of Article 10 is unavailing.”); *Media Trademark & Licensing Ltd. v. COINGEEKLTD.COM*, No. 21-cv-00214, 2021 WL 2895289, at *5 (D. Ariz. July 9, 2021) (recognizing that the Hague Convention’s inclusion of telegram as a postal channel supports the position that email is a postal channel); *Elobied v. Baylock*, 299 F.R.D. 105, 108 (E.D. Pa. 2014) (“In particular, in Article 10, the Convention provides for service on a person located abroad through ‘postal channels,’ an expression which might be interpreted to allow for service via e-mail.” (citation omitted)).

the Convention can and should be undertaken by IT-Business methods including e-mail."[5] And the 2024 Special Commission unambiguously concluded "that Article 10(a) includes transmission and service by e-mail, insofar as such method is provided by the law of the State of origin and permitted under the law of the State of destination."[6]

Because attachment priority under D.C. Code § 16-545 is based on the timing of service, Plaintiffs request a confirmatory order under Rule 4(f)(3) that they may serve the Garnishee Tether via (i) email at Tether's official address for law enforcement requests; or, alternatively, (ii) mail or another form of physical delivery. Rule 4(f)(3) permits service "by other means not prohibited by international agreement, as the court orders." Courts have broad discretion to authorize alternative service under Rule 4(f)(3), including service by email, when traditional methods would be impracticable or unduly slow. *See, e.g.*, *Celgard, LLC v. SK Innovation Co*., 792 F.3d 1373, 1378 (Fed. Cir. 2015) (upholding service by email under Rule 4(f)(3)); *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1015, 1017 (9th Cir. 2002) (Rule 4(f)(3) is "neither a 'last resort' nor 'extraordinary relief'" but "one means among several" for effecting service abroad (internal citations omitted)).

In order to remove any doubt as to the effectiveness of service, in *SEC v. Campo*, this Court authorized email service under Rule 4(f)(3)—despite recognizing that email service was *also* permitted under Rule 4(f)(1) and the Hague Convention. *See Campo*, 2025 WL 2603613, at *4

---

[5] Special Commission on the Practical Operation of the Hague Apostille, Evidence, and Service Conventions, Conclusions and Recommendations ¶ 56 (2003), https://assets.hcch.net/docs/0edbc4f7-675b-4b7b-8e1c-2c1998655a3e.pdf.

[6] Special Commission on the Practical Operation of the Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, the Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters, and the Convention of 25 October 1980 on International Access to Justice, Conclusions & Recommendations (C&R) ¶ 105 (2024), https://assets.hcch.net/docs/6aef5b3a-a02c-408f-8277-8c995d56f255.pdf.

("All of that said, even if email does not count as a 'postal channel,' the Court would *still* find that the SEC's service on Campo was proper under Rule 4(f)(3)."). Plaintiffs request similar relief here.

In addition, this Court may exercise personal jurisdiction over the Garnishee Tether. Federal Rule of Civil Procedure 4(k)(2) supplies a federal long-arm basis for federal-law proceedings "(1) for a claim arising under federal law, (2) where a summons has been served, (3) if the [garnishee] is not subject to the jurisdiction of any single state court, (4) provided that the exercise of federal jurisdiction is consistent with the Constitution (and laws) of the United States." *Mwani v. bin Laden*, 417 F.3d 1, 10 (D.C. Cir. 2005).

In contrast to state courts, "the Constitution confers upon the Federal Government" broad "nationwide and extraterritorial authority." *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 15 (2023); *see also id.* at 23 (holding that "the Due Process Clause of the Fifth Amendment does not incorporate the Fourteenth Amendment minimum contacts standard"). In *Fuld*, the Supreme Court recently held that two "nonsovereign foreign entities, both of which have been subject to a series of congressional enactments aimed at deterring terrorism," had "meaningful contacts, ties, and relations with the United States" sufficient to fall within any constitutional limits on personal jurisdiction. *Id.* at 21 (cleaned up); *see also id.* at 24 ("the Federal Government has an exceedingly compelling interest, as part of its comprehensive efforts to deter international terrorism, in providing a forum for American victims to hold the perpetrators of such acts accountable").

Tether has engaged in a sustained pattern of conduct purposefully directed at the United States, including based on the following:

- Tether is registered with the U.S. Financial Crimes Enforcement Network (FinCEN) as a money services business (MSB). Ex. D.

- Tether has repeatedly publicized and documented direct, operational collaboration with U.S. federal law-enforcement entities and alignment with OFAC sanctions compliance. For instance, in December 2023, Tether published letters sent to the Senate Banking Committee

13

and the House Financial Services Committee detailing cooperation with DOJ, USSS, and ongoing efforts to collaborate with the FBI; it also announced a policy to freeze secondary-market wallets on the OFAC Specially Designated Nationals (SDN) list. These letters expressly state Tether's intent "to be a world class partner to the U.S." and to "expand dollar hegemony globally," evidencing purposeful U.S. engagement. Exs. H, P.

- In January 2026, Tether announced U.S. Alloy (USAT), a "Made in America" stablecoin program to serve the U.S. market, with Anchorage Digital Bank, a U.S. federally chartered trust bank, as the issuer and qualified custodian—an explicit U.S.-targeted product and banking relationship. The initial availability of USAT on Kraken—an exchange serving U.S. clients—was announced at launch, demonstrating immediate U.S. distribution channels through a U.S.-serving platform. In connection with USAT, Tether also disclosed plans for a U.S. office, and named a U.S. policy advisor to support U.S. engagement and strategy. Exs. I, J, S.

- Tether's reserves are "U.S. Treasury-heavy," and its U.S. Treasury holdings are custodied and managed by Cantor Fitzgerald, a prominent U.S.-based primary dealer that trades directly with the Federal Reserve. Exs. K, L, R.

- Tether has proactively lobbied in Washington, D.C. and filed congressional correspondence, and it is currently the subject of congressional oversight. Exs. M, N, O, Q, T, AD.

- Former Tether executive Phil Potter lived in and worked out of a home located in the United States. Exs. AK, AL.

- Current Tether executives have attended events in the United States, including Tether CEO Paolo Ardoino's attendance at the Cantor Fitzgerald Global Technology Conference in New York in March 2025, a Bitcoin Policy Institute-organized fireside chat in March 2025, multiple main-stage sessions at the Bitcoin 2025 conference in Las Vegas in May 2025, at the White House signing of the GENIUS Act in July 2025, and at the Bitcoin 2026 conference in Las Vegas in April 2026. Exs. AF, AH, J, AI, AG.

Tether's extensive aggregate contacts with the United States place it firmly within any broad limits that may exist on U.S. federal courts' exercise of personal jurisdiction.

In addition, this Court may exercise personal jurisdiction over Tether. *First*, Plaintiffs garnishment of the Token assets at issue involves Tether conduct that is specifically directed at the District of Columbia. Tether froze the assets at the direction of the Department of the Treasury's OFAC, which is located in Washington, D.C. Ex. C. In addition, Tether has had extensive contacts with and purposefully and repeatedly engaged in conduct within the District of Columbia. This

14

includes: (a) retaining federally registered lobbyists to advocate before the U.S. Senate and House on stablecoin legislation, Exs. M, N, O, (b) meeting in person with lawmakers on Capitol Hill, Exs. P, Q, and (c) engaging in direct, formal correspondence with the Senate Banking Committee and the House Financial Services Committee about its Bank Secrecy Act/anti–money-laundering program and sanctions controls, Ex. AD. *Second*, in the alternative, to the extent Tether is "not subject to [the] jurisdiction [of] any state[] court," this Court may exercise personal jurisdiction consistent with Federal Rule of Civil Procedure 4(k)(2). Fed. R. Civ. P. 4(k)(2).

<u>**CONCLUSION**</u>

For all of the foregoing reasons, Plaintiffs respectfully request an order granting the following relief:

1. Granting Plaintiffs' request to issue the proposed writ of attachment to the garnishee Tether (attached as Ex. 1);

2. Authorizing service on Tether under Federal Rule of Civil Procedure 4(h)(2), (f)(1), and (f)(3), (a) via email to Tether's law-enforcement-requests address, inforequests@tether.to; and/or (b) by mail or other physical delivery to its office addresses in El Salvador.

Respectfully submitted,

By: /s/ Robert A. Braun

Robert A. Braun (D.C. Bar No. 1023352)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Eighth Floor
Washington, DC 20005
(202) 408-4600
RBraun@cohenmilstein.com

Counsel for Plaintiffs