UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DAVID DIBENEDETTO, et al.,

    Plaintiffs/Judgment Creditors,

  v.                                                                Case No. 1:16-cv-02429-TSC

IRANIAN MINISTRY OF INFORMATION
 AND SECURITY, et al.,

    Defendants.

**DECLARATION OF ROBERT A. BRAUN**

I, Robert A. Braun, declare under 28 U.S.C. § 1746 as follows:

1.    I am a partner at Cohen Milstein Sellers & Toll, PLLC, which represents the Plaintiffs in this matter.

2.    Attached as Exhibit A is a true and correct copy of OFAC's April 24, 2026 OFAC Sanctions List sanctions-list update for Bank Markazi Jomhouri Islami Iran, identifying two "Digital Currency Address - TRX" entries:

- TNiq9AXBp9EjUqhDhrwrfvAA8U3GUQZH81

- TTiDLWE6fZK8okMJv6ijg42yrH6W2pjSr9

The OFAC materials identify Bank Markazi under the IRAN, IFSR, IRGC, and SDGT programs and state that Bank Markazi is linked to the Islamic Revolutionary Guard Corps-Qods Force and Hizballah.

3.    Attached as Exhibit B is a true and correct copy of digital-asset evidence and blockchain records verifying the current USDT balances, token contract, and freeze or blacklist status for the two addresses. The digital-asset details identify approximately 212,922,653 USDT frozen at address TNiq9AXBp9EjUqhDhrwrfvAA8U3GUQZH81 and approximately

1

131,288,800 USDT frozen at address TTiDLWE6fZK8okMJv6ijg42yrH6W2pjSr9, for a combined frozen amount of approximately 344,211,453 USDT.

4.     The same digital-asset details reflect that both addresses were frozen on April 23, 2026 at 12:02:36 UTC. The freeze of address TNiq9AXBp9EjUqhDhrwrfvAA8U3GUQZH81 was recorded in transaction ebe670f1518f67077d28ec4b54dd0d236a5f1edfa90651524aeb42a21e6975fe. The freeze of address TTiDLWE6fZK8okMJv6ijg42yrH6W2pjSr9 was recorded in transaction 295cd606150289dc18d9e0e4d9503adb9d1b10bde9c314158f9cfa7c9928b09a.

5.     Attached as Exhibit C is a true and correct copy of Tether's April 23, 2026 public statement concerning its support for the U.S. Government in freezing $344 million USDT across two addresses in coordination with OFAC and U.S. law enforcement.

6.     Attached as Exhibit D is a true and correct copy of FinCEN's MSB Registration Status Information for Tether International, S.A. de C.V. It lists Tether International, S.A. de C.V. as a money transmitter in the United States.

7.     Attached as Exhibit E is a true and correct copy of Tether's Terms of Service.

8.     Attached as Exhibit F is a true and correct copy of 24-cv-02828.

9.     Attached as Exhibit G is a true and correct copy of the El Salvador - Central Authority & Practical Information page on the Hague Convention website, accessed as https://www.hcch.net/en/states/authorities/details3/?aid=1213.

10.     Attached as Exhibit H is a true and correct copy of Tether's December 15, 2023 press release publicizing letters shared with the U.S. Senate Committee on Banking, Housing, and Urban Affairs and the U.S. House Financial Services Committee.

11.     Attached as Exhibit I is a true and correct copy of Tether's January 27, 2026 announcement of U.S. Alloy (USAT), the federally regulated dollar-backed stablecoin.

12.     Attached as Exhibit J is a true and correct copy of a September 12, 2025 Fortune Article describing plans to open U.S. office in the U.S.

13.     Attached as Exhibit K is a true and correct copy of a November 24, 2024 Fortune article describing Tether as using Cantor Fitzerald LP's custody business to hold "billions of dollars of US Treasuries."

14.     Attached as Exhibit L is a true and correct copy of a December 10, 2024 CoinDesk article describing Cantor Fitzgerald as Tether's primary U.S. dealer.

15.     Attached as Exhibit M is a true and correct of Tether Holdings' lobbying profile on Open Secrets in 2025.

16.     Attached as Exhibit N is a true and correct copy of Tether's LD-2 Disclosure Form dated July 16, 2025.

17.     Attached as Exhibit O is a true and correct copy of search results for Tether in Registrations & Quarterly Activity on LDA.gov on May 11, 2026.

18.     Attached as Exhibit P is a true and correct copy of an April 14, 2025 CoinEdition article describing Tether CEO Paolo Ardoino's meeting with U.S. lawmakers.

19.     Attached as Exhibit Q is a true and correct copy of a May 29, 2025 Politico article describing Tether's lobbying in Washington D.C.

20.     Attached as Exhibit R is a true and correct copy of a November 25, 2024 CoinDesk article describing a lending initiative between Tether and Cantor Fitzgerald.

21.     Attached as Exhibit S is a true and correct copy of a July 19, 2025 CoinDesk article describing Tether's work to enter the U.S.

3

22.     Attached as Exhibit T is a true and correct copy of an April 30, 2026 press release from the U.S. Senate Committee on Banking, Housing, and Urban Affairs on a letter sent to Tether.

23.     Attached as Exhibit U is a true and correct copy of a November 20, 2023 Reuters article reporting that Tether froze $225 million linked to human trafficking.

24.     Attached as Exhibit V is a true and correct copy of a March 8, 2024 CoinDesk article reporting that Tether froze $225 million linked to human trafficking syndicate amid DOJ investigation.

25.     Attached as Exhibit W is a true and correct copy of a press release from New York State Attorney General dated February 23, 2021 describing the investigation into Tether.

26.     Attached as Exhibit X is a true and correct copy of a September 14, 2021 CoinDesk article reporting on Tether and Bitfinex's settlement agreement terms.

27.     Attached as Exhibit Y is a true and correct copy of a settlement agreement signed on February 17, 2021 between New York Attorney General and Tether.

28.     Attached as Exhibit Z is a true and correct copy the U.S. Commodity Futures Trading Commission's ("CFTC") Order dated October 15, 2021.

29.     Attached as Exhibit AA is a true and correct copy of an October 15, 2021 CFTC press release describing its order filing and settling charges against Tether.

30.     Attached as Exhibit AB is a true and correct copy of a Wilkie Farr & Gallagher LLP Client Alert reporting on the CFTC enforcement actions against Tether and the agency's broad jurisdiction in crypto.

31.     Attached as Exhibit AC is a true and correct copy of CFTC's annual enforcement results published on October 20, 2022.

32.     Attached as Exhibit AD is a true and correct copy of a December 16, 2023 article from Stablecoins announcing that Tether has sent letters to U.S. Senate Committee on Banking, Housing, and Urban Affairs and the U.S. House Financial Services Committee outlining its commitment to working with law enforcement.

33.     Attached as Exhibit AE is a true and correct copy of a December 17, 2023 CryptoSlate article reporting that Tether has frozen $435 million for the U.S. DOJ, FBI, and Secret Service.

34.     Attached as Exhibit AF is a true and correct copy of a March 12, 2025 CoinDesk article reporting on Tether's Paolo Ardoino's statements at the Cantor Conference.

35.     Attached as Exhibit AG is a true and correct copy of Tether CEO Paolo Ardoino speaking at the 2025 DC Blockchain Summit.

36.     Attached as Exhibit AH is a true and correct copy of a May 30, 2025 Forbes Digital Assets article reporting that Tether intends to invest billions in Bitcoin mining.

37.     Attached as Exhibit AI is a true and correct copy of April 7, 2026 Bitcoin article reporting that Paolo Ardoino is confirmed as a Bitcoin 2026 speaker.

38.     Attached as Exhibit AJ is a true and correct copy of an April 7, 2026 Bitcoin Magazine article stating that Paolo Ardoino is confirmed Bitcoin 2026 speaker.

39.     Attached as Exhibit AK is a true and correct copy of June 22, 2018 Reuters article reporting that Phil Potter is a U.S. citizen who worked at Morgan Stanley.

40.     Attached as Exhibit AL is a true and correct copy of a Crunchbase profile of Phil Potter as being based in the United States accessed on May 11, 2026 as https://www.crunchbase.com/person/philip-potter-bf61.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 14th Day of May, 2026, in Washington, D.C.


    /s/ Robert A. Braun

Robert A. Braun

# EXHIBIT A



# Sanctions List Search

Specially Designated Nationals and Blocked Persons list ("SDN List") and all other sanctions lists administered by OFAC, including the Foreign Sanctions Evaders List, the Non-SDN Iran Sanctions Act List, the Sectoral Sanctions Identifications List, the List of Foreign Financial Institutions Subject to Correspondent Account or Payable-Through Account Sanctions and the Non-SDN Palestinian Legislative Council List. Given the number of lists that now reside in the Sanctions List Search tool, it is strongly recommended that users pay close attention to the program codes associated with each returned record. These program codes indicate how a true hit on a returned value should be treated. The Sanctions List Search tool uses approximate string matching to identify possible matches between word or character strings as entered into Sanctions List Search, and any name or name component as it appears on the SDN List and/or the various other sanctions lists. Sanctions List Search has a slider-bar that may be used to set a threshold (i.e., a confidence rating) for the closeness of any potential match returned as a result of a user's search. Sanctions List Search will detect certain misspellings or other incorrectly entered text, and will return near, or proximate, matches, based on the confidence rating set by the user via the slider-bar. OFAC does not provide recommendations with regard to the appropriateness of any specific confidence rating. Sanctions List Search is one tool offered to assist users in utilizing the SDN List and/or the various other sanctions lists; use of Sanctions List Search is not a substitute for undertaking appropriate due diligence. The use of Sanctions List Search does not limit any criminal or civil liability for any act undertaken as a result of, or in reliance on, such use.

Download the SDN List                          Sanctions List Search: Rules for use                          Visit The OFAC Website

Download the Consolidated Non-SDN List                                                                Program Code Key

---

**Details:**

| | | | |
|---|---|---|---|
| **Type:** | Entity | **List:** | SDN |
| **Entity Name:** | BANK MARKAZI JOMHOURI ISLAMI IRAN | **Program:** | IRAN; IFSR; IRGC; SDGT |
| | | **Remarks:** | (Linked To: ISLAMIC REVOLUTIONARY GUARD CORPS (IRGC)-QODS FORCE; Linked To: HIZBALLAH) |

**Identifications:**

| Type | ID# | Country | Issue Date | Expire Date |
|---|---|---|---|---|
| Secondary sanctions risk: | section 1(b) of Executive Order 13224, as amended by Executive Order 13886 | | | |
| Digital Currency Address - TRX | TNiq9AXBp9EjUqhDhrwrfvAA8U3GUQZH81 | | | |
| Digital Currency Address - TRX | TTiDLWE6fZK8okMJv6ijg42yrH6W2pjSr9 | | | |

| Additional Sanctions Information - | Subject to Secondary Sanctions |
|---|---|

**Aliases:**

| Type | Category | Name |
|---|---|---|
| a.k.a. | strong | CENTRAL BANK OF THE ISLAMIC REPUBLIC OF IRAN |
| a.k.a. | strong | BANK MARKAZI IRAN |
| a.k.a. | strong | CENTRAL BANK OF IRAN |

**Addresses:**

| Address | City | State/Province | Postal Code | Country |
|---|---|---|---|---|
| PO Box 15875/7177, 144 Mirdamad Blvd | Tehran | | | Iran |
| 213 Ferdowsi Avenue | Tehran | | 11365 | Iran |
| Mirdamad Blvd, 144 - P.O. Box 15875/7/77 | Tehran | | | Iran |

Back

SDN List last updated on: 4/24/2026 2:01:01 PM
Non-SDN List last updated on: 1/8/2026 10:05:51 AM

# EXHIBIT B

 **TRONSCAN**

TRX: $0.3511 (+0.17%)

🔍 Search by Token / Account / Contract / Transaction / Block                    /    All ⌄

# Transaction Details  ‹  ›

TRLi4KskHxfACnxKzLrf2wNHauWUQpwziN 📋

triggered the smart contract    Tether    :

SC  TBPxhVAsuzoFnKyXtc1o2UySEydPHgAT    Tether: Multi...  📋

| ? | Hash: | ebe670f1518f67077d28ec4b54dd0d236a5f1edfa90651524aeb42a21e6975fe 📋 |
|---|---|---|
| ? | Result: | ✓ SUCCESSFUL |
| ? | Block & Time: | 82092618 📋 ｜ 18 days ago ｜ 2026-04-23 12:02:36 (UTC) ⑤ |
| ? | Status: | CONFIRMED  Confirmed by over 200 blocks |
| ? | Confirmed SRs: | 19 |

☐  Kraken    CryptoGuyInZA    Poloniex    TRONALLIANCE    ⌄
Energy Fee Limit: 1,000 TRX

⌄  314          143,931

   Bandwidth    Energy

Overview    Internal Transactions (1)    Event Logs (3)

A total of  3  event log(s)

*0*

Address        SC  Tether: MultisigWallet 📋

Events         **Confirmation(index_topic_1 address sender, index_topic_2 uint256 transactionId)**

Topics

   0    4a504a94899432a9846e1aa406dceb1bcfd538bb839071d49d1e5e23f5be30ef

   1    [ DECode ⌄ ]    TRLi4KskHxfACnxKzLrf2wNHauWUQpwziN

   2    [ DECode ⌄ ]    8491

*1*

Address        SC  USDT Token 📋

Events         **AddedBlackList(index_topic_1 address _user)**

Topics

   0    42e160154868087d6bfdc0ca23d96a1c1cfa32f1b72ba9ba27b69b98a0d819dc

   1    [ DECode ⌄ ]    TNiq9AXBp9EjUqhDhrwrfvAA8U3GUQZH81

*2*

This website uses cookies to enhance your experience. By continuing to browse, you agree to its Terms of Service and Privacy Policy.    Got It

5/11/26, 7:56 PM

Transaction 295cd606150289dc18d9e0e4d9503adb9d1b10bde9c314158f9cfa7c9928b09a | TRONSCAN

 **TRONSCAN**

TRX: $0.3511 (+0.17%)

🔍 Search by Token / Account / Contract / Transaction / Block          / 　　All ⌄

## Transaction Details  ‹  ›

TRLi4KskHxfACnxKzLrf2wNHauWUQpwziN 🗐

triggered the smart contract    Tether    :

SC  TBPxhVAsuzoFnKyXtc1o2UySEydPHgAT    Tether: Multi...  🗐

| ? Hash: | 295cd606150289dc18d9e0e4d9503adb9d1b10bde9c314158f9cfa7c9928b09a 🗐 |
|---|---|
| ? Result: | ✓ SUCCESSFUL |
| ? Block & Time: | 82092618 🗐  \|  18 days ago  \|  2026-04-23 12:02:36 (UTC) ↺ |
| ? Status: | CONFIRMED   Confirmed by over 200 blocks |
| ? Confirmed SRs: | 19 |

☐　Kraken　　CryptoGuyInZA　　Poloniex　　TRONALLIANCE　　⌄
Energy Fee Limit: 1,000 TRX

⌄ 314　　143,931

Bandwidth　Energy

__Overview__　　__Internal Transactions (1)__　　Event Logs (3)

A total of  3  event log(s)

*0*

| Address | SC  Tether: MultisigWallet 🗐 |
|---|---|
| Events | **Confirmation(index_topic_1 address sender, index_topic_2 uint256 transactionId)** |

Topics

| 0 | 4a504a94899432a9846e1aa406dceb1bcfd538bb839071d49d1e5e23f5be30ef |
|---|---|
| 1 | DECode ⌄  TRLi4KskHxfACnxKzLrf2wNHauWUQpwziN |
| 2 | DECode ⌄  8492 |

*1*

| Address | SC  USDT Token 🗐 |
|---|---|
| Events | **AddedBlackList(index_topic_1 address _user)** |

Topics

| 0 | 42e160154868087d6bfdc0ca23d96a1c1cfa32f1b72ba9ba27b69b98a0d819dc |
|---|---|
| 1 | DECode ⌄  TTiDLWE6fZK8okMJv6ijg42yrH6W2pjSr9 |

*2*

This website uses cookies to enhance your experience. By continuing to browse, you agree to its Terms of Service and Privacy Policy.    Got It

# EXHIBIT C

# tether.

←

OTHERS                                                                                    APRIL 23, 2026

# Tether Supports Freeze of More Than $344 Million in USD₮ in Coordination with OFAC and U.S. Law Enforcement

**23 April 2026** - Tether announced today that it has supported the U.S. Government in freezing $344 million USD₮ across two addresses. The freeze was executed after the addresses were identified, preventing further movement of funds.

The freeze follows information shared with Tether by several U.S. authorities about activity tied to unlawful conduct. When wallets are identified as connected to sanctions evasion, criminal networks, or other illicit activity, Tether can move to restrict those assets. That work has become a routine part of the company's response to lawful requests from authorities in the U.S. and abroad. To date, Tether works with more than 340 law enforcement agencies in 65 countries. In practice, this means coordinating directly with investigators during active cases, rather than reacting after funds have been dispersed.

Tether maintains a zero-tolerance policy toward the criminal use of our financial products, including USDT, and has long followed OFAC guidelines regarding the Specially Designated Nationals (SDN) List. We work closely with law enforcement globally to identify and, upon request, freeze assets to prevent further movement when they are linked to illegal activity or illicit actors.

Tether works with more than 340 law enforcement agencies across 65 countries. That cooperation has supported more than 2,300 cases globally, including over 1,200 tied to U.S. law enforcement, and has led to the freezing of more than $4.4 billion in assets, including over $2.1 billion connected to U.S. authorities.

Public blockchains also give investigators and issuers something cash cannot, which is a visible trail. Transactions can be followed, wallets can be flagged, and assets can be frozen before they are moved further.

"USD₮ is not a safe haven for illicit activity," said **Paolo Ardoino, CEO of Tether**. When credible links to sanctioned entities or criminal networks are identified, we act immediately and decisively. Recent events have shown what happens when platforms fail to move quickly, enforcement breaks down, users are exposed, and trust erodes. Our approach is different. We combine blockchain transparency with real-time monitoring and direct coordination with law enforcement to stop funds before they can move. That's a responsibility we take seriously as one of the largest issuers in the market."

This latest action is part of a broader pattern of cooperation between Tether and U.S. law enforcement authorities. The U.S. Department of Justice previously acknowledged Tether's support in enforcement actions that resulted in the seizure of nearly $61 million and approximately $225 million tied to pig butchering fraud. Those cases, like this one, show that digital assets on public blockchains are not beyond reach when issuers and law enforcement work together.

# EXHIBIT D

**Financial Crimes Enforcement Network
Department of the Treasury**

MSB Registration Status Information

Date:  04/26/2026

Information contained on this transcript has been provided to FinCEN by the money services business registrant. FinCEN does not recommend, approve, or endorse any business that registers as a money services business. Any such claim and similar claims are false and may be part of a scam or attempt to deceive consumers.

The MSB Registrant Search Web page, which is updated on a weekly basis, contains entities that have registered as Money Services Businesses (MSBs) pursuant to the Bank Secrecy Act (BSA) regulations at 31 CFR 1022.380(a)-(f), administered by the Financial Crimes Enforcement Network (FinCEN).

Information contained on this site has been provided by the MSB registrant.  FinCEN does not verify information submitted by the MSB. Information provided on this site reflects only what was provided directly to FinCEN.  If an error or incomplete information is detected on this site, the registrant should follow the appropriate instructions for correcting a Registration of Money Services Business (RMSB) form.

MSB Registration Number: 31000292945094
Registration Type: Initial Registration
Legal Name: TETHER INTERNATIONAL S.A. DE C.V.
DBA Name:


Street Address: Final Av. La Revolucion, Col San Benito Edif. Centro Corporativo Presidente Plaza Nivel 12 Oficina 2
City: San Salvador Centro
State:
Zip: 01101


Foreign location:  EL SALVADOR


MSB Activities:
        Money transmitter
States of MSB Activities:
        Florida
All States & Territories & Foreign Flag:  Foreign


Number of Branches:  0
Authorized Signature Date: 02/16/2025
Received Date:  02/16/2025

# EXHIBIT E

# Legal



**1- Terms of Service**    2- Privacy Statement    3- Anti-Spam Policy    4· ›

Last updated: February 26th, 2026

**IMPORTANT: These Token Terms of Sale and Service govern the Tether Tokens, Tether Tokens Wallets and the Services (each as defined below). By purchasing or redeeming Tether Tokens, obtaining a Tether Tokens Wallet or accessing or using any of the Services, you acknowledge that you have read, understand, and completely agree to be bound by these Terms. If you do not agree to these Terms, as amended or modified by any subsequent amendment, change or update: (a) do not purchase or redeem Tether Tokens and (b) do not access the Site, access or use a Tether Tokens Wallet or use any of the Services. These Terms may be amended, changed, or updated by Tether at any time and without prior notice to you.**

**Only Persons (as defined below) who meet the requirements of these Terms are permitted to access the Site or use the Services. Any Person who is not eligible that utilizes the Services or who accesses the Site will be in breach of these Terms and may have any Fiat, Digital Tokens (each as defined below), funds, proceeds or other property, confiscated.**

These Terms apply to users of tether.to and app.tether.to (all pages, excluding gold.tether.to and any of its subpages and alloy.tether.to and any of its subpages, at such addresses are sometimes referred to as the "**Site**"). You should read these Terms carefully to determine which provisions apply to you. These Terms will continue to apply to you in respect of all the Services. By purchasing or redeeming a

Tether Token through the Site or transferring Tether Tokens into or from a Tether Tokens Wallet (collectively or individually, the "**Services**"), the user (referred to herein as "**user**," "**you**" or "**your**") agrees to these Terms.

These Terms, together with the Incorporated Materials (as defined below), constitute the entire agreement and understanding with respect to the access or use of any or all of the Services, and any access or use of the Site, between you and Tether International, S.A. de C.V. (formerly Tether International Limited) or any successor provider of the Services (together with any successors or assigns, "**Tether**"). Each of you and Tether are a "**Party**" and, collectively, the "**Parties**."

**NOTICE OF ASSIGNMENT**: Prior to 27 January 2025, these Terms constituted a contract between certain users of the Service ("**Prior TL Users**") and Tether Limited. As of and with effect from 27 January 2025: (1) Tether Limited assigned, granted, conveyed and transferred to Tether all of Tether Limited's right, title and interest in and to these Terms in respect of any Prior TL Users, and Tether has accepted such assignment; (2) Tether has agreed to acquire and perform all of Tether Limited's duties, liabilities and obligations under these Terms; (3) Tether is substituted for Tether Limited as a party to, and is bound by these Terms, and any references to Tether Limited in any prior versions of these Terms are to be read and construed as references to Tether; and (4) all rights of action and remedies vested in Tether Limited pursuant to these Terms shall vest in Tether. By utilising any of the Services on or after 27 January 2025, each Prior TL User irrevocably and unconditionally consents to the foregoing novation and assignment and releases and forever discharges Tether Limited from all further obligations arising under the Terms, whether present or future, actual or contingent.

For users of the Service who were not Prior TL Users, there is no change in counterparty. However, please note that Tether International Limited has redomiciled from the British Virgin Islands to the Republic of El Salvador, and is now named Tether International, S.A. de C.V.

The following documents are incorporated into these Terms by reference: the Risk Disclosure Statement; the Anti-Spam Policy; the Law Enforcement Requests Policy; and the Fee Schedule (the "**Incorporated Materials**"). Also, these Terms should be read in conjunction with the Privacy Statement and the Cookies Notice. In particular, please note that all transactions involving the Tether Tokens may be subject to fees levied by Tether as set out and updated in the Fees Schedule from time to time or as otherwise agreed between you and Tether. In the event of any inconsistency between these Terms, the Incorporated Materials and any other pages, policies,

terms, conditions, licences, limitations, or obligations contained within or on the Site, these Terms shall prevail. The information provided at tether.to/en/transparency and its subpages is provided to the public as part of Tether's continued commitment to transparency and is not a part of these Terms.

**PLEASE REVIEW THE ARBITRATION PROVISION SET FORTH BELOW CAREFULLY, AS IT WILL REQUIRE ALL PERSONS TO RESOLVE DISPUTES ON AN INDIVIDUAL BASIS THROUGH FINAL AND BINDING ARBITRATION AND TO WAIVE ANY RIGHT TO PROCEED AS A REPRESENTATIVE OR CLASS MEMBER IN ANY CLASS OR REPRESENTATIVE PROCEEDING. BY UTILISING THE SERVICES, YOU EXPRESSLY ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTAND ALL THESE TERMS AND HAVE TAKEN TIME TO CONSIDER THE CONSEQUENCES OF THIS IMPORTANT DECISION**.

The Tether Tokens and Services are not appropriate for Persons who do not possess the appropriate level of knowledge and experience to deal in them. Tether is under no obligation to assess the suitability of the Tether Tokens or Services for users and any comment or statement which may be made by Tether or any Associate as to the suitability of the Services to you should under no circumstances be considered as investment or legal advice and should not be received or relied upon as such. For further information on the risks of holding Tether Tokens and utilising the Services, you can review the Risk Disclosure Statement here.

The access or use of the Site and any of the Services is void where such access or use is prohibited by, would constitute a violation of, or would be subject to penalties under applicable Laws, and shall not be the basis for the assertion or recognition of any interest, right, remedy, power, or privilege.

1. **Interpretation**

    1.1. **Definitions**: In these Terms and all documents incorporated herein by reference, the following words have the following meanings unless otherwise indicated:

    1.1.1. "**Affiliate**" means, in relation to a Person, a direct or indirect subsidiary of that Person, a holding company of that Person, and any other subsidiary of that holding company;

    1.1.2. "**AML**" means anti-money laundering, including, all Laws applicable to the Parties prohibiting money laundering or any acts or attempted acts to conceal or disguise the identity or origin of;

change the form of; or move, transfer, or transport, illicit proceeds, property, funds, Fiat, or Digital Tokens, including the promotion of any unlawful activity such as fraud, tax evasion, embezzlement, insider trading, financial crime, bribery, cyber theft or hack, narcotics trafficking, weapons proliferation, terrorism, or Economic Sanctions violations, which may also require internal controls to detect, prevent, report, and maintain records of suspected money laundering or terrorist financing;

1.1.3.  "**Anti-Corruption**" means all Laws applicable to each Party prohibiting corruption or bribery of Government Officials, kickbacks, inducements, and other related forms of commercial corruption or bribery;

1.1.4.  "**Associates**" means each and every one of Tether's Affiliates and each of its and its respective Affiliates' shareholders, directors, officers, Affiliates, employees, contractors, agents, partners, insurers, and attorneys;

1.1.5.  "**Canadian Person**" means:

   1.1.5.1.  a resident of any province or territory of Canada;

   1.1.5.2.  any Person established or organised in or under the Laws of Canada or any province or territory of Canada;

   1.1.5.3.  any estate of a decedent who was a resident of any province or territory of Canada; or

   1.1.5.4.  any Person established or organised outside Canada or any province or territory of Canada, in which any of the Persons described in paragraphs 1.1.5.1 to 1.1.5.3 (and in the case of Person(s) described in 1.1.5.2., provided that such Person(s) are themselves actively carrying on business in Canada), whether singularly or in the aggregate, directly or indirectly (i) holds a 50 percent or greater equity interest by votes or value, (ii) holds a majority of seats or memberships on the board of directors of the entity, or (iii) authorises, establishes, directs, or otherwise controls the actions, policies, personnel decisions, or day-to-day operations of the Person;

1.1.6.   "**Controlling Person**" means any Person who owns more than a 25 percent interest in any Person or Affiliate of that Person;

1.1.7.   "**Copyrights**" has the meaning set out in paragraph 10.2 of these Terms;

1.1.8.   "**CRS**" means the common reporting standard or the Standard for Automatic Exchange of Financial Account Information;

1.1.9.   "**CTF**" means counter-terrorist financing;

1.1.10.   "**Digital Tokens**" means a digital representation of value that functions as (i) a medium of exchange; (ii) a unit of account; (iii) a store of value, and/or (iv) other similar digital representations of rights or assets, typically including blockchain-based assets or rights including sovereign cryptocurrency or virtual currency such as bitcoins, and Tether Tokens;

1.1.11.   "**Digital Tokens Address**" means an alphanumeric identifier that represents a potential destination for a Digital Tokens transfer, which typically is associated with a user's Digital Tokens Wallet;

1.1.12.   "**Digital Tokens Wallet**" means a software application (or other mechanism) that provides a means for holding, storing, and transferring Digital Tokens, including a user's Digital Tokens Address, Digital Tokens balance, and cryptographic keys;

1.1.13.   "**Economic Sanctions**" means financial sanctions, trade embargoes, export or import controls, anti-boycott, and restrictive trade measures enacted, administered, enforced, or penalised by any applicable Laws;

1.1.14.   "**Eligible Contract Participant**" has the meaning set out in Section 1a(18) of the United States Commodity Exchange Act and Rule 1.3 of the United States Commodity Futures Trading Commission, each as amended;

1.1.15.   "**FATCA**" means the United States Foreign Account Tax Compliance Act, as enacted by Title V, Subtitle A of the Hiring Incentives to Restore Employment Act, P.L 111-147 (2010), as amended;

1.1.16. "**FATF**" means the Financial Action Task Force;

1.1.17. "**FIA**" means the Financial Investigation Authority of the British Virgin Islands;

1.1.18. "**Fiat**" means the money or currency of any country or jurisdiction that is:

    1.1.18.1. designated as legal tender; and,

    1.1.18.2. circulated, customarily used, and accepted as a medium of exchange in the country or jurisdiction of issuance;

1.1.19. "**FinCEN**" means the Financial Crimes Enforcement Network of the U.S. Department of the Treasury;

1.1.20. "**Government**" means any national, federal, state, municipal, local, or foreign branch of government, including any department, agency, subdivision, bureau, commission, court, tribunal, arbitral body, or other governmental, government appointed, or quasi-governmental authority or component exercising executive, legislative, juridical, regulatory, or administrative powers, authority, or functions of or pertaining to a government instrumentality, including any parasternal company, or state-owned (majority or greater) or controlled business enterprise;

1.1.21. "**Government Approval**" means any authorisation, licence, permit, consent, approval, franchise, concession, lease, ruling, certification, exemption, exception, filing or waiver by or with any Government necessary to conduct the business of either Party or the execution, delivery and performance of any of the Services or any transaction entered into under these Terms;

1.1.22. "**Government Official**" means an officer or employee of any Government, a director, officer, or employee of any instrumentality of any Government, a candidate for public office, a political party or political party official, an officer or employee of a public international organisation, and any Person who is acting in an official capacity for any of the foregoing, even if such Person is acting in that capacity temporarily and without compensation;

1.1.23. "**Laws**" means all laws, statutes, orders, regulations, rules, treaties, and/or official obligations or requirements enacted, promulgated, issued, ratified, enforced, or administered by any Government that apply to you or the Site;

1.1.24. "**Losses**" means, collectively, any claim, application, loss, injury, delay, accident, cost, business interruption costs, or any other expenses (including attorneys' fees or the costs of any claim or suit), including any incidental, direct, indirect, general, special, punitive, exemplary, or consequential damages, loss of goodwill or business profits, work stoppage, data loss, computer failure or malfunction, or any and all other commercial losses;

1.1.25. "**Marks**" has the meaning set out in paragraph 10.1 of these Terms;

1.1.26. "**OFAC**" means Office of Foreign Assets Control of the U.S. Department of the Treasury;

1.1.27. "**Person**" includes an individual, association, partnership, corporation, company, other body corporate, trust, estate, and any form of organisation, group, or entity (whether or not having separate legal personality);

1.1.28. "**Personal Information**" has the meaning set out in the Privacy Statement;

1.1.29. "**Prohibited Jurisdiction**" means Cuba, the Democratic People's Republic of Korea (North Korea), Iran, Syria, Crimea (a region of Ukraine annexed by the Russian Federation), the self-proclaimed Donetsk People's Republic (a region of Ukraine), the self-proclaimed Luhansk People's Republic (a region of Ukraine), Kherson (a region of Ukraine) and Zaporizhzhia (a region of Ukraine);

1.1.30. "**Prohibited Person**" means any U.S. Person (except for Eligible Contract Participants agreed by Tether, in its sole discretion); any Canadian Person; any Singaporean Person; the Government of Venezuela; any resident of, or Government or Government Official of, or any person in any Prohibited Jurisdiction and any Sanctioned Person;

1.1.31. "**Prohibited Use**" has the meaning set out in paragraph 8 of these Terms;

1.1.32. "**Reserves**" has the meaning set out in paragraph 4.1 of these Terms;

1.1.33. "**Sanctioned Person**" refers to any Person or Digital Tokens Address that is: (i) specifically listed in any Sanctions List; (ii) directly or indirectly owned 50 per cent or more by any Person or group of Persons in the aggregate, or a Digital Tokens Wallet associated with such Person or Persons, referred to in any Sanctions List, or Government or Government Official of any Prohibited Jurisdiction; or (iii) subject to any Government Approval or otherwise sanctioned, restricted or penalised under applicable Economic Sanctions, AML or CTF Laws;

1.1.34. "**Sanctions List**" means the "Specially Designated Nationals and Blocked Persons" ("**SDN**") List and the Non–SDN List, including the "Sectoral Sanctions Identifications List", published by OFAC; the Section 311 Special Measures for Jurisdictions, Financial Institutions, or International Transactions of Primary Money Laundering Concern published by FinCEN; or under Economic Sanctions, AML, or CTF Laws of or by Governments of the United States, the Republic of El Salvador, the British Virgin Islands (including any sanctioned, restricted, or debarred party list under the Laws of the United Kingdom and applicable in the British Virgin Islands), the United Nations, or any other jurisdiction or Government, as applicable to you or to Tether or the Services, as amended, supplemented, or substituted from time to time;

1.1.35. "**Singaporean Person**" means:

1.1.35.1. a resident of Singapore;

1.1.35.2. any Person established or organised in or under the Laws of Singapore;

1.1.35.3. any estate of a decedent who was a resident of Singapore;

1.1.35.4. any fund established or organised outside of Singapore where the Persons that principally provide trading

instructions or make investment decisions for the fund do so from Singapore; or

1.1.35.5. any Person established or organised outside Singapore, in which any of the foregoing, whether singularly or in the aggregate, directly or indirectly (i) holds a 50 per cent or greater equity interest by votes or value, (ii) holds a majority of seats or memberships on the board of directors of the entity, or (iii) authorises, establishes, directs, or otherwise controls the actions, policies, personnel decisions, or day-to-day operations of the Person;

1.1.36. "**Tax Information Exchange Laws**" means Laws relating to the exchange of information relating to taxes between Governments, including FATCA and CRS;

1.1.37. "**Terms**" means these terms and conditions of sale and service, as they may be changed, amended, or updated from time to time, including the following Site policies and pages: the Risk Disclosure Statement; the Anti-Spam Policy; the Law Enforcement Requests Policy; and the Fee Schedule;

1.1.38. "**Territory or Insular Possession of the United States**" means the Commonwealth of Puerto Rico; the U.S. Virgin Islands; Guam; the Commonwealth of the Northern Mariana Islands; and all other territories and possessions of the United States, other than the Indian lands (as that term is defined in the Indian Gaming Regulatory Act);

1.1.39. "**Tether Token**" means the Digital Token referencing a unit of Fiat issued and redeemed by Tether;

1.1.40. "**Tether Tokens Wallet**" means the Digital Tokens Wallet provided to a user by Tether as the means for purchasing and redeeming Tether Tokens in connection with the Services, subject to these Terms;

1.1.41. "**United States**" or "**U.S.**" means the several states of the United States and the District of Columbia;

1.1.42. "**U.S. Account**" means any account that is held by one or more U.S. Persons or non-U.S. entities that have one or more Controlling

Persons who is a U.S. Person.

1.1.43. "**U.S. Citizen or U.S. Resident**" includes any U.S. citizen, U.S. lawful permanent resident, individual who meets the "substantial presence" test described in section 7701(b)(3) of the U.S. Internal Revenue Code of 1986 (as amended), protected individual under section 1324b(a)(3) of the U.S. Immigration and Nationality Act, or individual who holds a passport issued by the United States Government;

1.1.44. "**U.S. Financial Institution**" means any U.S. Person and any of its affiliates, branches, offices, or agents incorporated, organized, or located in the United States or Territory or Insular Possession of the United States that is engaged in the business of: (i) accepting deposits, (ii) making, granting, transferring, holding, or brokering remittances, loans, or credits, or (iii) purchasing or selling foreign exchange, securities, commodity futures or options, or procuring purchases and sellers thereof, whether as principal or agent, and this term applies to affiliates, branches, offices, and agencies of any foreign financial institution that are located in the United States or Territory or Insular Possession of the United States, but not such foreign financial institution's affiliates, branches, offices, or agencies located outside the United States and Territory or Insular Possession of the United States;

1.1.45. "**U.S. Person**" means:

1.1.45.1. a U.S. Citizen or U.S. Resident;

1.1.45.2. a corporation, partnership, or other entity established or organised in or under the Laws of the United States;

1.1.45.3. any estate: (i) of a decedent who was a U.S. Citizen or U.S. Resident at the time of death; (ii) of which any executor or administrator is a U.S. Person (unless this executor or administrator is a professional fiduciary and shares with a non-U.S. Person investment discretion with respect to the assets of an estate that is governed by non-U.S. law); (iii) which is administered under the laws of the United States; and (iv) with assets located in the United States;

1.1.45.4. any trust if (i) a court within the United States is able to exercise primary supervision over the administration of the trust, and (ii) one or more U.S. Persons have the authority to control all substantial decisions of the trust;

1.1.45.5. any Person organised or incorporated outside the United States and the Territory or Insular Possession of the United States in which any of the foregoing, whether singularly or in the aggregate, directly or indirectly (i) holds a 50 percent or greater equity interest by votes or value, (ii) holds a majority of seats or memberships on the board of directors of the entity, or (iii) authorises, establishes, directs, or otherwise controls the actions, policies, personnel decisions, or day-to-day operations of the Person; or

1.1.45.6. any pension plan for the employees, officers or principals of a legal entity described in paragraph 1.1.45.2, unless the pension plan is primarily for foreign employees of such entity;

1.1.46. "**User Insolvency Event**" means if you are subject to any of the following insolvency events: (i) you stop or suspend payment of any of your debts or are unable to, or admit your inability to, pay your debts as they fall due; (ii) you commence negotiations, or enter into any composition, compromise, assignment or arrangement, with one or more of your creditors with a view to rescheduling any of your indebtedness (because of actual or anticipated financial difficulties); (iii) a moratorium is declared in respect of any of your indebtedness; (iv) any action, proceedings, procedure or step is taken in relation to: (a) a composition, compromise, assignment or arrangement with any of your creditors; or (b) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of you or any of your assets; (v) the value of your assets is less than your liabilities (taking into account contingent and prospective liabilities); or (vi) any event occurs in relation to you that is analogous to those set out in paragraphs (i) to (v) (inclusive) above in any jurisdiction;

1.1.47. "**User Wallet**" means any Digital Tokens Wallet utilised by a user to transact in or hold Tether Tokens, including a Tether Tokens Wallet;

1.1.48. "**Virus**" means any harmful or surreptitious code with a purpose to, effect of or that could be reasonably be expected to: (i) cause any unplanned interruption of the operation of a website (such as the Site), software or computer system, (ii) unauthorised use of a website (such as the Site), software or computer system, (iii) altering, destroying, or inhibiting the use of a website (such as the Site), software or computer system; or (iv) block access to, or prevent the use or accessibility of a website (such as the Site), software or computer system. Viruses include malware, trojan horses, system monitors/keyloggers, dialers, adware, and adware cookies lockup, time bomb, key lock device program, or disabling code; and

1.1.49. "**you**" or "**your**" means the user.

1.2. **Headings**: The headings and sub-headings in these Terms are for ease of reference only and are not to be taken into account in the construction or interpretation of any provision or provisions to which they refer.

1.3. **Extended Meanings**: Unless otherwise specified in these Terms, words importing the singular include the plural and vice versa and words importing gender include all genders. The word "include," "includes" or "including" will be interpreted on an inclusive basis and be deemed to be followed by the words "without limitation."

1.4. **Governing Law**: These Terms shall be governed by and construed and enforced in accordance with the Laws of the British Virgin Islands, and shall be interpreted in all respects as a British Virgin Islands contract. Any dispute, controversy, claim or action arising from or related to your access or use of the Site or the Services or these Terms likewise shall be governed by the Laws of the British Virgin Islands, exclusive of choice-of-law principles.

2. **Right to Use the Service**: If you (a) have a Tether Tokens Wallet, (b) are not a Prohibited Person, (c) do not operate your Tether Tokens Wallet for the benefit of a Prohibited Person, and (d) consent to and comply with these Terms, Tether grants you the limited right to use the Services. The right to use the Services is a personal, restricted, non-exclusive, non-transferable, non-sublicensable,

revocable, limited licence, and it is subject to the limitations and obligations in these Terms. Nothing in these Terms gives you any licence (other than as set out in this paragraph), right, title, or ownership of, in, or to the Site, any of the Services, the Copyrights or the Marks. Tether may suspend or terminate your access to the Site or any of the Services, freeze any Tether Tokens held by you, or terminate your Tether Token Wallet, as required by applicable Law or where Tether, in its sole discretion, determines it is prudent to do so or where you have violated, breached, or acted in a manner inconsistent with any provision of these Terms or Applicable Law.

3. **Restrictions on Prohibited Persons.** Every Prohibited Person is strictly prohibited from directly or indirectly holding, owning or operating a Tether Tokens Wallet in any way or otherwise transacting on or using the Services.

   3.1. No Tether Tokens Wallet may be operated for and no order or transaction in a Tether Tokens Wallet may be for the financial or other benefit of a Prohibited Person.

   3.2. With respect to any Person organised or incorporated outside the United States and the Territory or Insular Possession of the United States, the prohibitions in paragraphs 3 and 3.1 are governed by the terms of paragraph 1.1.45.5 and will be applied at the entity level.

   3.3. For the avoidance of doubt, U.S. Persons (except for Eligible Contract Participants agreed by Tether, in its sole discretion) are prohibited from directly or indirectly holding, owning or operating a Tether Tokens Wallet or Tether Tokens in any way or otherwise transacting on or using any Tether Tokens, the Site or any Services. In addition, where you are not a U.S. Person, but Tether knows or has reason to know that you make a deposit, withdrawal, or transfer of Fiat or Digital Tokens to, from, or through any U.S. Financial Institution to facilitate the provision of the Services, then you may be prohibited from using the Services, at the sole discretion of Tether.

4. **About Tether Tokens**:

   4.1. **Issuances and Redemptions**. Issuances and redemptions of Tether Tokens may be completed with Tether pursuant to these Terms. Tether Tokens may also be used, kept, or exchanged online wherever parties are willing to accept Tether Tokens. Tether may from time to time make Tether Tokens available for purchase subject to minimum purchase and

other requirements. Where Tether makes Tether Tokens available to purchase through the Site, and subject to compliance with these Terms, the purchase price payable by a user for one Tether Token will be one unit of the Fiat currency to which it is pegged (for the USD₮ Tether Token, 1 USD for 1 USD₮; for the MXN₮ Tether Token, 1 Mexican Peso (MXN) for 1 MXN₮), plus fees, where applicable. Each Tether Token in circulation is 100% backed by an amount of assets ("**Reserves**") equal to the stated value of the Tether Token. Tether Tokens are denominated in a specific Fiat currency. For example, if you purchase 100 USD₮, Reserves valued at US$100.00 back those Tether Tokens. The Reserves are comprised of cash, cash equivalents and other assets and may include loan receivables and other assets from Affiliates. Tether Tokens are backed by Tether's Reserves, including Fiat, but Tether Tokens are not Fiat themselves. Issuances and redemptions of Tether Tokens are administered by Tether. Tether may from time to time make redemptions of Tether Tokens through the Site subject to minimum redemption amounts and other requirements. Subject to compliance with these Terms, the redemption price payable by Tether for one Tether Token will be one unit of the Fiat currency to which it is pegged (for the USD₮ Tether Token, 1 USD for 1 USD₮; for the MXN₮ Tether Token, 1 Mexican Peso (MXN) for 1 MXN₮; and for the CNH₮ Tether Token, 1 offshore Chinese yuan (CNH) for 1 CNH₮) less fees, where applicable. The Fiat currency payable on redemption will be paid to the bank account in your name designated by you via the process specified by Tether. Tether Tokens may be issued on multiple blockchain protocols. In order to cause Tether Tokens to be issued or redeemed by Tether, you must be a verified customer of Tether. The right to purchase Tether Tokens or have Tether Tokens redeemed is a contractual right personal to you. Tether Tokens are not legal tender and are not backed by any Government or protected through any insurance provided by Tether or any of its Affiliates. Tether Tokens are not subject to Federal Deposit Insurance Corporation or Securities Investor Protection Corporation protections, or to analogous protections in other jurisdictions. As previously announced, Tether ceased to redeem: (a) USD₮ pursuant to these Terms on the Omni, Bitcoin Cash SLP, Kusama, EOS, and Algorand blockchains effective as of September 1, 2025; and (b) EUR₮ pursuant to these Terms effective as of November 27, 2025 .

4.2. **Forks**. Tether Tokens are or may be issued on various decentralised and open source blockchains and protocols. Blockchains and protocols can sometimes experience events called "forks" where an alternative version of a blockchain or protocol is created. Where forks occur, it is possible that multiple versions of a Digital Token available on such blockchain or protocol could be created, for example, one on each fork. Due to the nature of Tether Tokens, if a fork creates two or more Digital Tokens which purport to be a Tether Token, it is only possible for one of those Digital Tokens to be a Tether Token. Where a blockchain or protocol on which Tether Tokens are issued is forked, Tether may elect to suspend the Services temporarily or for an extended period of time on little or no notice. As a result, in the event of a fork only the Digital Tokens on the particular blockchain or protocol that Tether or its Affiliate announces on the Site as being supported by Tether or such Affiliate are Tether Tokens. Any other Digital Tokens resulting from the fork are not Tether Tokens.

4.3. **Support for Blockchains and Protocols**. Tether is under no obligation to support, or to maintain support for, any particular blockchain or protocol, including any particular blockchain or protocol or any Digital Tokens, including as a result of a fork of a blockchain, the identification of a security issue, community support or otherwise. Tether may determine, in its sole discretion, whether to support a particular fork of a blockchain or protocol or whether to cease support for all versions of a particular blockchain or protocol (whether as a result of a fork, the identification of a security issue, community support or otherwise). Where Tether determines to cease support for a particular blockchain or protocol (whether as a result of a fork, the identification of a security issue, community support or otherwise), you must take any and all actions reasonably necessary to effectuate the migration of your Tether Token to a supported blockchain or protocol identified by Tether. Tether assumes no liability or responsibility whatsoever arising out of or relating to your failure to effectuate such migration of your Tether Token to another blockchain or protocol identified by Tether.

4.4. **No Liability for Withdrawal of Support**. Tether assumes no liability or responsibility whatsoever for any Losses or other issues that might arise from Tether electing to support or not support a particular blockchain or protocol, any forked version of any particular blockchain or protocol or any Digital Tokens resulting from a fork of a blockchain or protocol.

4.5. **Risk of Wrapped or Bridged Tokens**: It is also possible that a third-party could create a Digital Token which claims to be an alternative version of Tether Tokens, such as by "wrapping" or "bridging" Tether Tokens. These Digital Tokens are not Tether Tokens. They are not sold or issued through the Site or supported by Tether, they cannot be redeemed with Tether or otherwise used with the Site and Tether assumes no liability or responsibility whatsoever for any Losses or other issues that might arise from use of such Digital Tokens.

4.6. **Incurrence of Liability and Passage of Title**: The Parties hereby agree that (i) Tether has obtained authorisation as a Stablecoin Issuer and Digital Assets Service Provider under the El Salvador Regulations for Issuance of Stablecoin Public Offerings and is subject to the regulatory requirements specified by the National Commission of Digital Assets of El Salvador; (ii) each Party incurs liability irrevocably for: (x) the sale and purchase of Tether Tokens through the Site upon the satisfaction of the conditions to purchase through the Site, and, (y) the redemption of Tether Tokens through the Site upon the satisfaction of the conditions to redeem through the Site in each case, such transactions deemed to be located within the Republic of El Salvador; and (iii) title in the Tether Tokens passes from Tether to a verified customer of Tether when Tether initiates transmission of the Tether Tokens to a User Wallet designated by such customer, such initiation deemed to be from the Republic of El Salvador.

5. **Transfer of Tether Tokens; Mechanics**: Your Digital Tokens Address and associated User Wallet are controlled by your private key and your Digital Tokens Address and associated User Wallet, including the ability to access Tether Tokens through the Site, may be stolen or lost and otherwise unrecoverable if the private key is compromised or lost. You accept all consequences of sending Tether Tokens off of, or otherwise interacting with, the Site. Tether Token transactions are not reversible. Once you send Tether Tokens to an address, whether intentionally or by a fraudulent or accidental transaction, you accept the risk that you may lose access to, and any claim on, those Tether Tokens indefinitely or permanently. Further, Tether does not guarantee the security or functionality of third-party software or technology , which may fail or malfunction.

6. **Suspension of Services.** You acknowledge that Tether may delay or suspend your access to the Site or the Services (including in respect of purchases and

redemptions), and through that your ability to interact with the Site or the Services at its sole discretion, including in the event that Tether determines that you have engaged in a Prohibited Use; when Tether suspects that there has been a violation of these Terms; if Tether believes that providing any Service to you (including any purchase or redemption) would be contrary to Law; when Tether is directed to do so by any Government; if your Tether Tokens Wallet or other User Wallet is subject to pending litigation, investigation, or Government proceedings; when Tether believes that someone is attempting to gain unauthorised access to your Tether Tokens Wallet or other account or wallet; or circumstances in which Tether believes that providing any Service to you (including any purchase or redemption) would otherwise expose Tether or any Associate to legal liability or unacceptable risk.

7. **Mandatory Resolution of Disputes Through Arbitration**:

7.1. **Covered Claims.** Except for excluded claims described below in paragraph 7.2, Tether and you each agree that any dispute, claim or controversy arising out of or relating to (a) these Terms or the existence, breach, termination, enforcement, interpretation or validity thereof, or (b) your Tether Tokens Wallet or the operations and services of the Site or any Services, or (c) your access to or use of the Site or any Services at any time, will be subject to and finally resolved by confidential, binding arbitration on an individual basis and not in a class, representative or consolidated action or proceeding. If you are subject to the Laws of the United States of America, the interpretation and enforceability of this arbitration provision will be governed by the U.S. Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. Arbitration will be conducted through the use of videoconferencing technology (unless both arbitration parties agree that an in-person hearing is appropriate given the nature of the dispute) before a single arbitrator in accordance with the International Institute for Conflict Prevention and Resolution International Non-Administered Arbitration Rules, as amended from time to time (the "**CPR Rules**"). The sole arbitrator selected by the arbitration parties must be a licenced attorney in England and Wales or the British Virgin Islands with at least fifteen (15) years of experience in commercial disputes. If the arbitration parties do not jointly appoint an arbitrator within thirty (30) days of the commencement of the arbitration, any vacancies will be filled by an arbitrator meeting the above qualifications selected by the International Institute for Conflict Prevention and Resolution. Judgment upon the

award rendered by the arbitrator may be entered by any court having jurisdiction thereof. If the arbitral parties do not promptly agree on the seat of arbitration if an in-person hearing is selected, the seat will be London, United Kingdom. The language of the arbitral proceedings will be English. No discovery shall be conducted except by agreement of the parties or after approval by the arbitrator, who shall attempt to minimise the burden of discovery. The arbitrator may award any relief that a court of competent jurisdiction could award, including attorneys' fees when authorised by Laws, and the arbitral decision may be enforced in court. For claims less than U.S.$15,000, Tether will reimburse you for all initiating filing fees. Should you be deemed the losing party, the filing fees reimbursed by Tether will be added to the final arbitrator's costs and fees award. The prevailing party, will be entitled to its costs of the arbitration (including the arbitrator's fees) and its reasonable attorney's fees and costs.

7.2. **Excluded Claims**. The following claims and causes of action will be excluded from arbitration as described in paragraph 7.1: causes of action or claims in which either party seeks injunctive or other equitable relief for the alleged unlawful use of its intellectual property, including without limitation copyrights, trademarks, trade names, trade secrets, or patents or its confidential information or private data. Nothing in this paragraph 7 will prevent Tether from seeking any other form of injunctive relief in any court of competent jurisdiction, whether or not interim relief has also been sought from the arbitrator.

7.3. **Delegation**. The arbitrator will have the power to hear and determine challenges to its jurisdiction, including any objections with respect to the formation, existence, scope, enforceability or validity of the arbitration agreement. This authority extends to jurisdictional challenges with respect to both the subject matter of the dispute and the parties to the arbitration. Further, the arbitrator will have the power to determine the existence, validity, or scope of the contract of which an arbitration clause forms a part. For the purposes of challenges to the jurisdiction of the arbitrator, each clause within this paragraph 7 will be considered as separable from any contract of which it forms a part. Any challenges to the jurisdiction of the arbitrator, except challenges based on the award itself, will be made not later than the notice of defence or, with respect to a counterclaim, the reply to the counterclaim; provided, however, that if a

claim or counterclaim is later added or amended such a challenge may be made not later than the response to such claim or counterclaim as provided under the CPR Rules.

7.4. **Class Action Waiver**. You and Tether expressly intend and agree that: (a) class action and representative action procedures are hereby waived and will not be asserted, nor will they apply, in any arbitration pursuant to these Terms; (b) neither you nor Tether will assert class action or representative action claims against the other in arbitration or otherwise; (c) each of you and Tether will only submit their own, individual claims in arbitration and will not seek to represent the interests of any other person, or consolidate claims with any other person; (d) nothing in these Terms will be interpreted as your or Tether's intent to arbitrate claims on a class or representative basis; and (e) any relief awarded to any one user of the Site or the Services cannot and may not affect any other user of the Site or the Services. No adjudicator may consolidate or join more than one Person's or party's claims and may not otherwise preside over any form of a consolidated, representative, or class proceeding.

7.5. **Confidentiality**. The Parties will maintain the confidential nature of the arbitration proceeding and any award, including the hearing, except as may be necessary to prepare for or conduct the arbitration hearing on the merits, or except as may be necessary in connection with a court application for a preliminary remedy, a judicial challenge to an award or its enforcement, or unless otherwise required by Law or judicial decision.

7.6. <u>**JURY TRIAL WAIVER**</u>**: TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING OF ANY KIND WHATSOEVER ARISING OUT OF OR RELATING TO THESE TERMS OR ANY BREACH THEREOF, ANY USE OR ATTEMPTED USE OF THE SITE OR THE SERVICES BY YOU, AND/OR ANY OTHER MATTER INVOLVING THE PARTIES.**

8. **Prohibited Uses**: You may not use the Services to engage in the categories of activity set forth below ("**Prohibited Uses**"). If you are uncertain as to whether your use of the Services involves a Prohibited Uses or have any other questions about how these requirements apply to you, then please contact us by visiting https://cs.tether.to/. By using the Services, you confirm that you will not engage in any of the following Prohibited Uses:

8.1. use the Site or any Services in order to disguise the origin, ownership, control or nature of illicit proceeds of, or to further, any breach of applicable Laws, or to transact or deal in any contraband;

8.2. use the Site or any Services if any applicable Laws, including AML Laws, CTF Laws, Anti-Corruption Laws, and Economic Sanctions Laws, prohibit, penalise, sanction, or expose Tether or any of its Associates to liability for any Services furnished or offered to you or your Tether Tokens Wallet(s) under these Terms;

8.3. use the Site or any of the Services, or any financial services of any U.S. Financial Institution in connection with the Site or any of the Services, whether or not an Affiliate of Tether or any Associate, to facilitate, approve, evade, avoid, violate, attempt to violate, aid or abet the violation of, or circumvent any applicable Laws, including AML Laws, CTF Laws, Anti-Corruption Laws, and Economic Sanctions Laws;

8.4. use the Site or any Services to evade taxes under the Laws of any applicable jurisdiction;

8.5. purchase, redeem, or transfer Tether Tokens or otherwise transact on the Site, or use any Services with, anything other than Fiat, funds, a Digital Tokens Address, digital wallet, keys, property, or Digital Tokens that have been legally obtained by you and that belong to you;

8.6. use the Site or any Services to interfere with or subvert the rights or obligations of Tether or any Associate, any other user of the Site or any other Person;

8.7. present misleading or inaccurate information to the Site or to Tether or any Associate or take advantage of any technical glitch, malfunction, failure, delay, default, or security breach;

8.8. use the Site or any Services to engage in conduct that is detrimental to Tether, any Associate, any other user of the Site or the Services or any other Person;

8.9. falsify any account, Site registration or administration details provided to Tether or any Associate, impersonate another Person or misrepresent your affiliation with a Person;

8.10. falsify or materially omit any information or provide misleading or inaccurate information requested by Tether or any Associate, including at registration or during the course of administering any Services to you;

8.11. cause injury to, or attempt to harm, Tether, any Associate or any Person through your access of the Site or any Services;

8.12. promote discrimination based on race, religion, nationality, disability, sexual orientation, gender or gender identity, or age;

8.13. have more than one account and more than one Tether Tokens Wallet on the Site, or use any Tether Tokens Wallet on a one-time, 'throwaway' basis; any such additional Tether Tokens Wallets or one time 'throwaway' Tether Tokens Wallet may be terminated or suspended at the absolute discretion of Tether;

8.14. where you are subject to prohibitions or restrictions as set forth in paragraph 2, access the Site or use any Services utilising any virtual private network, proxy service, or any other third party service, network, or product with the effect of disguising your IP address or location, or access the Site or use any Services from, or being subject to, the jurisdiction of any Prohibited Jurisdiction or Government or Government Official thereof;

8.15. utilise a Tether Tokens Wallet, any Services or the Site for the financial or other benefit of a Prohibited Person;

8.16. utilise a User Wallet for the financial or other benefit of any Person in any jurisdiction in which any of the Services or the Site are unlawful; or

8.17. violate, promote, or cause a violation of, or conspire or attempt to violate these Terms or applicable Laws.

If Tether determines or suspects that you have engaged in any Prohibited Use, Tether may address such Prohibited Use through an appropriate sanction, in its sole and absolute discretion. Such sanction may include making a report to any Government, law enforcement, or other authorities, without providing any notice to you about any such report; freezing or confiscation of any Fiat, funds, property, proceeds, Tether Tokens or any Digital Tokens in any Tether Tokens Wallet or other User Wallet; blacklisting any Digital Tokens Address which holds Tether Tokens; and/or suspending or terminating your access to the Site and

any Services or Fiat, funds, property, proceeds, Tether Tokens or any Digital Tokens in any Tether Tokens Wallet.

Tether may, at its sole and absolute discretion, seize and deliver your property to any applicable Government, law enforcement, or other authorities where circumstances warrant or in accordance with Laws. In addition, should your actions or inaction result in Loss being suffered by Tether or any Associate, you shall pay an amount to Tether and each Associate so as to render Tether and any Associate whole, including the amount of taxes or penalties that might be imposed on Tether or any Associate.

9. **Due Diligence Generally, Anti-Money Laundering and Counter-Terrorist Financing and Sharing of Information**: Tether is committed to providing safe, compliant, and reputable Services and to identify, detect, prevent, and report on money laundering, terrorist financing, and other improper activities under applicable AML Laws, CTF Laws, Anti-Corruption Laws, and Economic Sanctions Laws. Accordingly, Tether insists on a comprehensive and thorough user due diligence process and ongoing analysis and reporting. By agreeing to these Terms and utilising, or seeking to utilise, the Services, you shall affirmatively certify that you are not a Prohibited Person, that you are not utilising any Tether Tokens Wallet for the benefit of a Prohibited Person, and must provide promptly all information requested and necessary to satisfy due diligence requirements and obligations pursuant to applicable Laws and the compliance policies or procedures of Tether or any of its Affiliates. Additionally, Tether or any of its Affiliates may assess whether you are a U.S. Person, whether your account would be regarded as a U.S. Account or whether you have made, will make, or intend to make, a deposit, withdrawal or transfer to, from, or through any Prohibited Jurisdiction or any U.S. Financial Institution, and if applicable, you must provide all information requested and necessary to satisfy due diligence requirements and obligations pursuant to applicable Laws and the compliance policies or procedures of Tether. You agree to provide promptly any documentation, information, or records requested by Tether at any time, including a self-certification permitting the determination of tax residence and status under Tax Information Exchange Laws. Such information may include self-certifications as to Controlling Persons and beneficial ownership of one or more legal entities. Tether expects to retain certain information, documentation, and records on file pursuant to applicable Laws and its contractual relationships, and Tether hereby expressly reserves the

right to keep such information, documentation, and records. Additionally, Tether monitors for and assesses suspicious or sanctionable transactions under applicable AML, CTF, Anti-Corruption, and Economic Sanctions Laws, as well as undertakes mandatory reporting to FinCEN, OFAC, FIA, and international regulators. These undertakings shall apply even when you suspend or terminate your relationship with Tether or abandon your application to have a Tether Token Wallet or transfer all Tether Tokens from your User Wallet. Our policies apply to any and all Digital Tokens, Fiat, and other funds or property being processed on or through the Site or by any of you, your Affiliates, or Tether or any Associate.

Without limitation to the remedies available to Tether pursuant to paragraph 16 (*No Waiver; Available Remedies*), Tether reserves the right to bar transactions from or to, to undertake enhanced due diligence, or to suspend or terminate access to the Site or the administration of Services, or the creation or administration of any Tether Tokens Wallet for or with, any user for any reason (or for no reason) at any time, including the provisions of paragraphs 8 and 11, subject to any limitations imposed by applicable Laws. Without limiting the generality of the foregoing, this includes any transfer, transaction, business, or dealing with a: (i) Sanctioned Person; (ii) Prohibited Jurisdiction or a citizen or resident of, Government or Government Official of, or Person in or subject to jurisdiction of, any Prohibited Jurisdiction; (iii) U.S. Person or any Person acting through any U.S. Financial Institution (except for Eligible Contract Participants agreed by Tether, in its sole discretion); (iv) Canadian Person; (v) Singaporean Person; (vi) Person from or in any jurisdiction that does not meet international AML–CTF standards (including any jurisdiction identified by the FATF as high-risk, non-cooperative, or strategically deficient jurisdictions, or jurisdictions under increased monitoring,); (vii) Person that is or formerly was a Government Official or Politically Exposed Person within the meaning of the FATF's 40 Recommendations; (viii) Person that presents a risk of any exposure to penalties, sanctions, or other liabilities under AML Laws, CTF Laws, Anti-Corruption Laws, Economic Sanctions Laws, tax Laws or any other Laws, in each case, that may apply to you or to Tether or any Associate; (ix) Person that Tether determines is acting in the United States or Territory or Insular Possession of the United States in violation of, causing any other Person, including Tether or any Associate, to violate, attempting or conspiring to violate, or evading or circumventing these Terms or applicable Laws; and (x) Person that fails to meet any user due diligence standards, requests, or requirements of Tether, or otherwise appears to be of high risk, including any

of the foregoing factors. In lieu of refusing registration, access or ongoing administration of your Tether Tokens Wallet or the Services, Tether may, in its sole discretion, perform enhanced due diligence procedures. At all times, you may be subject to enhanced due diligence procedures in your use of the Site and the Services. If you decline to provide requested due diligence information or otherwise do not reply timely or substantively with the documentation or data requested, Tether has the absolute discretion to immediately suspend or terminate any of the Services to you and your use of the Site.

10. **Intellectual Property**:

10.1. The trademarks, service marks, and trade names, including both word marks and design marks (the "**Mark(s)**") are used by Tether under licence. You agree not to appropriate, copy, display, reverse engineer, or use the Marks or other content without express, prior, written permission from Tether or the owner of the Marks, including as a domain name, as social media profile/handle, on a website, in an advertisement or other marketing, as or in connection with a phone number, as or in connection with an email address, in internet search results, in meta data or code, or in any other manner.

10.2. Unless otherwise indicated, all materials on the Site are used by Tether under licence ("**Copyrights**"). You agree not to appropriate, copy, display, or use the Copyrights or other content without express, prior, written permission from Tether or the applicable owner;

10.3. You may link to the Site's homepage or other pages, provided you do so in a way that is fair and legal and does not damage Tether's reputation or take advantage of it, but you must not establish a link in such a way as to suggest any form of association, approval, or endorsement on Tether's part without prior, express, written consent;

10.4. The Site may provide certain social media features that enable you to link, send communications, or display certain content from the Site. You may use these features solely as they are provided by Tether. You may not establish a link from any website that is not owned by you, cause the Site or portions of it to be displayed on or by any other site (for example, framing, deep linking, or in-line linking), or otherwise take any action with respect to the materials on the Site that is inconsistent with any other provision of these Terms;

10.5.  You must not register, record, or otherwise control any domains, social media handles/profiles, Marks or other trademark or service mark registrations, trade names or any other intellectual property rights featuring intellectual property owned by Tether or any Associate or its or their licensor(s) directly or through a third party ("**Prohibited Assets**"). If Tether becomes aware that you own or control any Prohibited Assets, the Prohibited Asset(s) will be automatically transferred and assigned to Tether, its nominated Associate or its licensor(s) under these Terms. You agree to execute all instruments and documents and do such additional acts as Tether, its Associate(s) or its licensor(s) may deem necessary or desirable to record and perfect the assignment of rights under this paragraph 10.5. If Tether, its Associate(s) or its licensor(s) are unable for any reason to secure your timely signature to any document it is entitled to under this paragraph 10.5 within fourteen days, you hereby irrevocably designate and appoint Tether, its Associates and its licensor(s) and their duly authorised directors, officers and agents as your attorney-in-fact, with full power of substitution to act for and on your behalf and instead of you to execute and file any such document(s) and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by you; and

10.6.  The Site and Services are protected by copyright, trademark, trade secret and other intellectual property or proprietary rights Laws in various jurisdictions. All rights not expressly granted to you in these Terms are reserved by Tether or its licensor(s). Except as expressly authorised by Tether, you will not (i) license, sublicense, rent, sell, resell, transfer, assign, distribute, or otherwise commercially exploit or make available to any Person all or any part of the Site or Services in any way; (ii) copy, modify, republish, distribute, or make derivative works based upon all or any part of the Site or Services; (iii) "frame" or "mirror" all or any part of the Site or Services on any other server or wireless or internet-based device; or (iv) reverse engineer or access all or any part of the Site or its Services in order to (a) build a competitive product or service, (b) build a product or service using similar ideas, features, functions, or graphics of all or any part of the Site or Services, or (c) copy any ideas, features, functions, or graphics of all or any part of the Site or Services.

11. **Your Representations and Warranties**: You represent and warrant to Tether on the date of your acceptance or deemed acceptance of these Terms and each day on which you utilise or access the Services, in each case with reference to the facts and circumstances existing at such date, as follows:

11.1.   that, if you are an individual user, you are 18 years of age or older and that you have the capacity to contract under applicable Laws;

11.2.   that, if you are registering to use or using the Site on behalf of a legal entity, (i) such legal entity is duly organised and validly existing under the applicable Laws of the jurisdiction of its organisation; and (ii) you, and any individuals utilizing the Services on behalf of the legal entity are duly authorised by such legal entity to act on its behalf;

11.3.   that you understand the risks associated with using the Services, that you are not prohibited or restricted from accessing the Site or using the Services by paragraph 2 of these Terms, and that you are not otherwise prohibited by applicable Laws from using, or acting for the benefit of another Person that is prohibited or restricted from using, the Site;

11.4.   that you have had the opportunity to seek legal, accounting, taxation and other professional advice regarding these Terms and the Services;

11.5.   that you will not use the Site or any Services in order to conceal or disguise the origin, ownership, control, or nature of proceeds of crime or terrorist financing or corruption related to any Person or Government Official under any applicable Laws, or property subject to Economic Sanctions, frozen assets, or to further, any breach of applicable Laws, including AML Laws or CTF Laws, or to deal in any unlawful Digital Tokens, Fiat, property, funds, or proceeds;

11.6.   that you will not transact on the Site or use any Services with anything other than Fiat, funds, or Digital Tokens that have been legally obtained by you and that belong to you, and that are free and clear of all liens, claims, and encumbrances;

11.7.   that you are currently in compliance with, and must, at your own cost and expense, comply with all Laws that relate to or affect the Services conducted under these Terms, including AML Laws, CTF Laws, Anti-Corruption Laws, Economic Sanctions Laws, Tax Information Exchange Laws or other tax Laws;

11.8.   that you consent to any and all tax and information reporting under AML Laws, CTF Laws, Anti-Corruption Laws, Economic Sanctions Laws, Tax Information Exchange Laws or other tax Laws as Tether may reasonably determine;

11.9.   that neither you nor any of your Affiliates shall use any Digital Tokens, Fiat, property, proceeds or funds subject to the Services directly or indirectly (i) on behalf of or for the benefit of a Prohibited Person or any Person subject to the jurisdiction of a Prohibited Jurisdiction, except where authorised under any Government Approval or not restricted by applicable Laws; (ii) in violation of or as prohibited, restricted, or penalised under applicable Economic Sanctions Laws; or (iii) in any way that would violate, be inconsistent with, penalised under, or cause the omission of filing of any report required under applicable AML Laws, CTF Laws, or Economic Sanctions Laws;

11.10.   that you have not (i) violated; (ii) been fined, debarred, sanctioned, the subject of Economic Sanctions-related restrictions, or otherwise penalised under; (iii) received any oral or written notice from any Government concerning actual or possible violation by you under; or (iv) received any other report that you are the subject or target of sanctions, restrictions, penalties, or enforcement action or investigation under, any applicable Laws, including AML Laws, CTF Laws, Anti-Corruption Laws, or Economic Sanctions Laws;

11.11.   that neither you nor any of your Affiliates is: (i) itself or owned (beneficially or of record) or controlled by a Sanctioned Person; (ii) involved in any transaction, transfer, or conduct, whether or not by using or receiving the Services or the Site, that is likely to result in you or your Affiliates or your or your Affiliate's shareholders, directors, officers, employees, agents, or partners becoming a Sanctioned Person; (iii) residing or domiciled in, or transferring Digital Tokens, Fiat, funds, or property to, from, or through any User Wallet, Digital Tokens Address or engaging in any transaction on the Site from a Prohibited Jurisdiction; (iv) a Government or Government Official of a Prohibited Jurisdiction or (v) otherwise a Prohibited Person;

11.12.   that neither you nor any of your Affiliates or your or your Affiliate's shareholders, directors, officers, employees, agents, or partners has directly or indirectly offered, promised, given, or authorised any

payment, or offered, promised, given, or authorised the giving of anything else of value, including any Digital Tokens or Fiat, to a Government Official or individual employed by another entity in the private sector in violation of any applicable Anti-Corruption Laws;

11.13.    that you will not falsify any Site or Services registration or administration details provided to Tether;

11.14.    that you will not falsify or materially omit any information or provide misleading or inaccurate information requested by Tether in the course of, directly or indirectly relating to, or arising from your activities on the Site or use of any Services, including at registration or during administration or other due diligence processes, and that if any information provided to Tether becomes incorrect or outdated, including information relating to your ownership, you will promptly provide corrected information to Tether;

11.15.    that you shall employ reasonable anti-Virus, anti-malware and other software and techniques to protect you and your Tether Tokens Wallet from being the victim of a hack or of other malicious actions, so as to protect the integrity of your Tether Tokens Wallet and to keep such Tether Tokens Wallet and the access to the Site from your account out of the reach of other Persons;

11.16.    that you shall not introduce or transmit any Virus into the Site or Tether and its Affiliates' computer systems;

11.17.    that you acknowledge and agree that Fiat, Digital Tokens or other property reflected in your Tether Tokens Wallet are not segregated assets held in your name or for your benefit but reflected only in the books and records of Tether;

11.18.    that you acknowledge and agree that any instructions received or undertaken through the Site with your login credentials or from your authorised e-mail address on file with Tether are deemed to be valid, binding, and conclusive regardless of whether there is any error resulting from an instruction made by you or on your behalf, any error resulting, directly or indirectly, from fraud or the duplication of any instruction made by you or on your behalf or the malfunction of any device or compromise of credentials used by you to deliver instructions and that

Tether may act upon those instructions without any liability or responsibility attaching to it;

11.19.  that you will fairly and promptly report all income associated with your activity on the Site pursuant to applicable Laws and pay any and all taxes thereon;

11.20.  that you will determine whether taxes apply to any transactions you initiate or receive and, if so, to report and/or remit the correct tax to the appropriate tax authority;

11.21.  that you are not subject to a User Insolvency Event, and have no reason to believe that you will be subject to a User Insolvency Event in the following six (6) months; and

11.22.  that you will accurately and promptly inform Tether if you know or have reason to know whether any of the foregoing representations or warranties no longer is correct or becomes incorrect.

12.  **No Representations and Warranties by Tether**: Tether makes no representations, warranties, covenants or guarantees to you of any kind and, to the extent permitted by applicable Laws, Tether expressly disclaims all representations, warranties, covenants or guarantees, express, implied or statutory, with respect to the Site and the Services. The Site and the Services are offered strictly on an as-is, where-is basis and, without limiting the generality of the foregoing, are offered without any representation as to merchantability or fitness for any particular purpose. Tether does not guarantee the security or functionality any third-party software or technology. Tether may also provide access to features or services that are identified as "beta" or pre-release. Without limiting the preceding sentences in this paragraph 12, you understand that such services are still in development, may have bugs or errors, may be incomplete, may materially change prior to a full commercial launch, or may never be released commercially. You acknowledge that Tether is relying upon your representations, warranties, acknowledgements, and agreements as a condition to providing the Services, and without your representations, warranties, acknowledgements, and agreements, Tether would not provide you with any Services or recognise you as the holder of Tether Tokens.

13.  **Site Content**. Tether strives to provide accurate and reliable information on its Site. However, such information may not always be complete, correct or up-to-

date. Without limitation, any relevant information document, whitepaper, reserves report, or similar documentation (an "**Information Document**") required to be published by Tether pursuant to applicable Laws only speaks as at the date of such Information Document. Expectations, projections and other forward-looking statements are not guarantees of future performance and actual results and future events could differ materially. Forward-looking statements are subject to risks including those described in the Risk Disclosure Statement and unknown risks and uncertainties. Tether undertakes no obligation to update or revise publicly any statements on the Site or any Information Document, except where required by applicable Law. The Site and the Information Documents do not form part of, and are not incorporated by reference into, these Terms. In the event of any inconsistency between the Site or the Information Documents and these Terms, these Terms shall prevail.

14. **No Advice**: Tether does not provide any investment, portfolio management, legal, accounting, tax or other advice, or advice on trading techniques, models, algorithms, or any other schemes. All information provided in connection with your access and use of the Services is for informational purposes only and should not be construed as professional advice. You should not take, or refrain from taking any action based on any information contained on the Site or any other information that we make available at any time. Before you make any financial, legal, or other decisions involving the Services, you should seek independent professional advice from an individual who is licensed and qualified in the area for which such advice would be appropriate. These Terms are not intended to, and do not, create or impose any fiduciary duties on us. You further agree that the only duties and obligations that we owe you are those set out expressly in these Terms.

15. **Limitation of Liability and Release: <u>IMPORTANT</u>:** To the maximum extent permitted by applicable Law, you irrevocably agree and acknowledge that neither Tether nor any Associate assumes any liability or responsibility for and neither Tether nor any Associate shall have any liability or responsibility for any Losses directly or indirectly arising out of or related to:

    15.1.  any breach by you of these Terms;

    15.2.  the Site, and your use of it, except as explicitly provided for in these Terms;

    15.3.  the Services, and your use of any of them, except as explicitly provided for in these Terms;

15.4. any failure by you or any Affiliate to comply with applicable Laws;

15.5. any information or materials available through the Site, including any Information Document, whether originating from Tether or any Associate or any other Person;

15.6. the real or perceived value of any Tether Tokens or other Digital Tokens traded or utilised on the Site, or the price of any Tether Tokens or other Digital Token displayed on the Site at any time;

15.7. any inaccurate, misleading, or incomplete statement by Tether or any Associate or on the Site regarding your Tether Tokens Wallet or any other User Wallet, whether caused by Tether's negligence or otherwise;

15.8. any failure, delay, malfunction, interruption, or decision (including any decision by Tether or any Associate to vary or interfere with your rights) by Tether or any Associate in operating the Site or providing any Service;

15.9. any stolen, lost, or unauthorised use of your Tether Tokens Wallet information, any breach of security or data breach related to your User Wallet information, or any criminal or other third party act affecting Tether or any Associate;

15.10. Tether electing to support or not support a particular blockchain or protocol, any forked version of any particular blockchain or protocol or any Digital Tokens resulting from a fork of a blockchain or protocol;

15.11. your failure to effectuate the migration of your Tether Token to another blockchain or protocol identified by Tether;

15.12. any offer, representation, suggestion, statement, or claim made about Tether, the Site, or any Service by Tether or any Associate;

15.13. any delay in transferring in or out, or loss of value of Tether Tokens resulting from failure or insolvency of any third party, or from the theft of such assets, or from freezes, seizures or other legal process asserted by a Government;

15.14. another Person using your Digital Tokens Address or your account on the Site, with or without your knowledge;

15.15. any claim that any Tether Tokens to which you claim legal or beneficial ownership are legally or beneficially owned by any Person other than

you;

15.16.   any third-party transactions, products or services, whether or not using the Site or any of the Services; and

15.17.   any loss of value of Tether Tokens or loss of Tether Tokens due to the failure or malfunction of third-party software or technology.

**You hereby agree to release Tether and each Associate from liability for any and all such Losses, and you shall indemnify and save and hold Tether and each Associate harmless from and against all such Losses. To the maximum extent permitted by applicable Law, the foregoing limitations of liability, releases and indemnities shall apply whether the alleged liability or Losses are based on contract, negligence, tort, unjust enrichment, strict liability, violation of Law or regulation, or any other basis, even if Tether or the Associates have been advised of or should have known of the possibility of such Losses and damages, and without regard to the success or effectiveness of any other remedies.**

**THERE IS NO GUARANTEE AGAINST LOSSES FROM USING THE SITE, THE SERVICES, YOUR TETHER TOKENS OR A USER WALLET.**

16.   **No Waiver; Available Remedies**: Any failure by Tether or any Associate to exercise any of its rights, powers, or remedies under these Terms, or any delay by Tether or any Associate in doing so, does not constitute a waiver of any such right, power, or remedy. The single or partial exercise of any right, power, or remedy by Tether or any Associate does not prevent any of them from exercising any other rights, powers, or remedies. The remedies of Tether and each Associate are cumulative with and not exclusive of any other remedy conferred by the provisions of these Terms, or by Law or equity. You agree that the remedies to which Tether and each Associate is entitled include: (i) injunctions to prevent breaches of these Terms and to enforce specifically the terms and provisions hereof, and you waive the requirement of any posting of a bond in connection with such remedies; (ii) the right to recover the amount of any Losses by set off against any amounts that Tether would otherwise be obligated to pay you; and (iii) the right to either freeze your Tether Tokens or seize and recover against any of your Tether Tokens, other Digital Tokens, Fiat or other funds, or your interests therein, that are held by Tether or any Associates.

17. **Force Majeure**: Tether is not responsible for damages caused by delay or failure to perform undertakings under these Terms when the delay or failure is due to fires; strikes; floods; bank failures; Digital Token market collapse or fluctuations; power outages or failures; acts of God or the state's enemies; acts of any Government or Government Official; any and all market movements, shifts, or volatility; computer, server, or Internet malfunctions; internet disruptions, viruses, and mechanical power, or communications failures; security breaches or cyberattacks; criminal acts; delays or defaults caused by common carriers; acts or omissions of other Persons; or, any other delays, defaults, failures or interruptions that cannot reasonably be foreseen or provided against or that are otherwise outside Tether's control. In the event of force majeure, Tether is excused from any and all performance obligations under these Terms.

18. **Assignment; Third Party Rights**: These Terms, the Incorporated Materials and any of the rights, duties, and obligations contained or incorporated herein or therein, are not assignable by you without prior written consent of Tether. These Terms, the Incorporated Materials and any of the rights, duties, and obligations contained or incorporated herein or therein, are freely assignable by Tether, in whole or in part, without notice or your consent (for clarity, this assignment right includes the right for Tether to assign any claim, in whole or in part, arising hereunder). Any attempt by you to assign these Terms or any Incorporated Materials without written consent is void. Subject to the foregoing, these Terms and the Incorporated Materials, and any of the rights, duties, and obligations contained or incorporated herein or therein, shall be binding upon and inure to the benefit of the heirs, executors, administrators, personal or legal representatives, successors and assigns of you and of Tether. None of the provisions of these Terms or any Incorporated Materials, or any of the rights, duties, and obligations contained or incorporated herein or therein, are for the benefit of or enforceable by any creditors of you or Tether or any other persons, except such as inure to a successor or assign in accordance herewith and as provided in the following sentence. The Associates of Tether are intended third-party beneficiaries of the rights and privileges expressly stated to apply to the Associates hereunder and shall be entitled to enforce such rights and privileges (including those rights and privileges set out in paragraphs 7, 8, 9, 13 and 15 as if in direct privity under these Terms, subject to the conditions and limitations hereof including those relating to the resolution of disputes. No consent of any Person is required for any modification or amendment to these Terms.

19. **Severability**: If any provision of these Terms or part thereof, as amended from time to time, is determined to be invalid, void, or unenforceable, in whole or in part, by any court of competent jurisdiction, such invalidity, voidness, or unenforceability attaches only to such provision to the extent of its illegality, unenforceability, invalidity, or voidness, as may be, and everything else in these Terms continues in full force and effect.

20. **Effect of Redemption**: These Terms shall continue to apply notwithstanding the redemption of any Tether Token or the withdrawal of any Tether Token from a Tether Tokens Wallet.

21. **Sharing of Personal Information**: In providing the Services (including processing transfers of Fiat or Tether Tokens as part of the Services), Tether or its Associates may be required to share your user information with other contractual third parties, including financial institutions, or as required under applicable Laws. Further, from time to time, Tether and its Associates receive information requests from Governments, law enforcement agencies and courts around the world. In this context, Tether or any Associate thereof might be ordered to share and/or will provide on a voluntary basis, if this appears reasonable and necessary, your Personal Information with/to law enforcement agencies, the Persons identified by a court and/or a Government. You hereby consent to the sharing of your Personal Information as further detailed in these Terms, the Privacy Statement and, where applicable, the Law Enforcement Requests Policy and grant full permission and authority for Tether and its Associates to share this information with such contractual third parties, or as required under applicable Laws or demanded upon a lawful request by any Government, and release Tether and each Associate from any liability, error, mistake, or negligence related thereto.

22. **Electronic Communications and Acceptance**: You agree and consent to receive electronically all communications, agreements, documents, receipts, notices and disclosures that Tether may provide in connection with these Terms through publication on any part of the Site or to your authorised e-mail address on file with Tether. Such notices shall be deemed effective and received by you on the date on which the notice is published on any part of the Site or on which the e-mail is sent to such authorised e-mail address. These Terms may be accepted electronically, and it is the intention of the Parties that such acceptance shall be deemed to be as valid as an original signature being applied to these Terms.

# The Future of Money

**Sign Up**

# EXHIBIT F

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | |
| **v.** | **Case No. 1:24-cv-2828-RCL** |
| **APPROXIMATELY 1,694,395.463328 OF TETHER CRYPTOCURRENCY**, | |
| *Defendant*. | |

<u>**MEMORANDUM OPINION & ORDER**</u>

The United States seeks the forfeiture of the funds linked to an alleged hack committed by North Korean military operatives on November 1, 2022. The Defendant Property consists of a type of virtual currency called Tether, which was seized from five digital wallet addresses controlled by members of North Korean military hacking groups known as the Lazarus Group, or Advanced Persistent Threat 38 (collectively, "APT38 hackers"). Before the Court is the government's motion for default judgment against the Defendant Property. Mot. for Default J., ECF No. 10. For the reasons that follow, the Court will grant the motion.

**I.    BACKGROUND**

Since as late as 2014, APT38 hackers have engaged in cyberattacks against U.S. and foreign companies. Compl. ¶ 15. Around November 1, 2022, these hackers stole virtual currency worth approximately $28 million from what the complaint refers to as "COMPANY-1." *Id.* ¶ 16. The hackers laundered the currency through three mechanisms described below: virtual currency exchanges, a mixing service, and virtual currency bridges. *Id.* But despite these efforts, law enforcement was able to trace some of the stolen funds to five digital wallets containing the Defendant Property.

1

**A. Blockchain Primer**

Given the somewhat complicated nature of connecting the initial theft with the Defendant Property, the Court begin with the basics. Unlike traditional fiat currencies, virtual currencies are not typically issued by governments or banks but are instead generated by and operate on systems called "blockchains"—which are decentralized digital ledgers that record transactions in linked blocks across many computers. Because each block is cryptographically linked to the previous one and this link is replicated across many independent computers, blockchains are highly tamper-resistant since these features make it exceedingly difficult to alter the ledger across the entire network. *See* Nat'l Inst. of Standards & Tech., *Blockchain Technology Overview* ii, iv–v, (2018), https://nvlpubs.nist.gov/nistpubs/ir/2018/nist.ir.8202.pdf [https://perma.cc/P7EQ-LS5A].

There is no single blockchain, and much like how domestic currencies are generally accepted at home but not abroad, different virtual currencies are "native" to blockchains, meaning they are siloed absent technological solutions. Compl. ¶¶ 18, 25. One such solution is a blockchain bridge, otherwise known as a cross-chain bridge, which connects two blockchains and allows users to send virtual currency from one chain to another. *Id.* ¶¶ 28–29.

Virtual currency addresses, which are represented by a string of letters and numbers, permit a person to send and receive virtual currency much like a bank account number. *Id.* ¶ 21. These addresses can be stored in virtual currency wallets. *Id.* ¶ 23. These wallets are sometimes hosted by exchanges that retain the customer's funds until the customer is ready to transact with them. *Id.* ¶ 24. To the extent these exchanges operate in the United States, they are legally required to conduct due diligence and have anti-money laundering programs in place. *Id.*

Transactions sometimes occur by way of "smart contracts," which are programs stored on the blockchain that run when predetermined conditions are met. *Id.* ¶ 27. Smart contracts allow

parties to automatically execute agreements without any intermediary's involvement. *Id.* The Ethereum network, the native blockchain for the stolen currency in this case, functions based on smart contracts. *Id.*

While the decentralization of the blockchain inherently lends itself to avoiding the supervision of the state, bad actors have developed additional laundering tools to further this goal. One such tool commonly used by the APT38 hackers is "virtual currency mixers," which allow users, for a fee, to send virtual currency to designated recipients in a matter designed to conceal the source. *Id.* ¶ 30.

But even with this arsenal of tools, bad actors do not always avoid the long arm of the law. By analyzing the blockchain ledger, law enforcement can often identify the owner of a particular virtual currency address, determine additional addresses controlled by the same owner, and deconstruct transactions to determine the parties involved. *Id.* ¶¶ 31–32.

### B. Tracing the Funds of the 2022 Cyberattack

In late 2022, APT38 hackers stole from COMPANY-1 about $28 million-worth of USDC and ETH—two types of virtual currency native to the Ethereum Network. *Id.* ¶ 33. The hackers then laundered the stolen funds in the following three stages. First, they converted the USDC to ETH on a virtual currency exchange, leaving only ETH to launder. *Id.* ¶ 34. Second, the hackers deposited all the ETH into a virtual currency mixer called "Tornado Cash" and laundered the stolen funds into new addresses. *Id.* ¶¶ 35–37. Third, the laundered funds were funneled through virtual currency bridges to convert them into USDT (also known as Tether) on the Tron network. *Id.* ¶¶ 38–44.

Despite these maneuvers, law enforcement was able to trace some of the funds through the mixer and the bridges by reviewing certain connections between the addresses associated with the

deposits and withdrawals. These connections included: "(1) the timing of transfers (some within minutes of each other), (2) the use of the same virtual currency cross-chain bridging services (such as Celer Network Bridge and SWFT.pro), (3) stolen funds being transferred to the same blockchain (the Tron blockchain), (4) certain transaction fees being funded by the same address, and (5) virtual currency on the Tron blockchain being sent to the same consolidation address." *Id.* ¶ 36. Using these techniques, law enforcement traced the stolen funds to more than thirty addresses holding USDT, and of these addresses the government was able to freeze five of them. *Id.* ¶¶ 39, 41–42.[1] The Defendant Property consists of USDT found in these five virtual currency addresses. *Id.* ¶¶ 38–44.

### C. Procedural History

On October 4, 2024, the United States filed a verified complaint for forfeiture, alleging that the Defendant Property should be forfeited to the government under 18 U.S.C. §§ 981(a)(1)(A) and (C). *See* Compl. The United States posted notice on http://www.forfeiture.gov for thirty consecutive days beginning March 3, 2025. ECF No. 6. The deadline for responding to the notice, May 1, 2025, came and went without any party filing a claim to the property. Mot. for Default J. ¶ 2. The government also attempted to identify all known potential claimants and give them notice of the action but found no person who reasonably appeared to be a potential claimant. *Id.* On June 3, 2025, the Clerk of Court entered default as to all potentially interested parties. ECF No. 9.

## II. LEGAL STANDARDS

District courts may enter default judgment against defendants who have failed to appear and defend the case against them. *Izaguirre v. Hunter Allied of Maryland, Inc.*, No. 18-cv-965,

---

[1] These addresses are: (1) TF3JRez3XpJJYDCJ4hPtA1BTyxRurYsHTd (holding about 267,002 USDT); (2) TBAB ZTh7p3tZGMnMefQkjqZuuyQK4iBCkS (holding about 504,883 USDT); (3) TFeDK4Wea8ciDLaUe5W2QRSw9 WvSqzV4p2 (holding about 794,636 USDT); (4) TT8WVp65uEJM4xdAkx2hJerQX5moeZYUEw (holding about 90,408 USDT); (5) TN6iW22qfXM2c6L8amCvcGx3WcvTShvbMP (holding about 37,464 USDT).

4

2019 WL 5597281, at *2 (D.D.C. Oct. 30, 2019).  To obtain default judgment, a plaintiff must follow a two-step process.  First, the plaintiff must ask the Clerk of Court to enter a default against the defendant.  *See* Fed. R. Civ. P. 55(a).  Upon entry of default, the unresponsive defendant is considered to have admitted every "well-pleaded allegation in the complaint."  *United States v. Funds Up to & including the Amount of $56,634 in U.S. Currency on Deposit in Banesco Int'l, Pan., Acct. # XXXXXXXXXXX, Titled in the Name of Inversiones Cedeno C.A.*, 79 F. Supp. 3d 112, 114 (D.D.C. 2015) (quoting *Int'l Painters & Allied Trades Indus. Pension Fund v. R.W. Amrine Drywall Co.,* 239 F. Supp. 2d 26, 30 (D.D.C. 2002)).

In moving for default judgment before the Court, the United States must prove its "entitlement to the relief requested using detailed affidavits or documentary evidence on which the court may rely."  *United States v. 113 Virtual Currency Accts.*, No. 20-cv-606, 2024 WL 940141, at *3 (D.D.C. Mar. 5, 2024) (quoting *Ventura v. L.A. Howard Constr. Co.*, 134 F. Supp. 3d 99, 103 (D.D.C. 2015) (cleaned up)).  Here, that means the United States must prove compliance with the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, which govern pleading requirements for civil forfeiture actions.  Fed. R. Civ. P. Supp. R. G.

### III.    DISCUSSION

Supplemental Rule G requires the United States to comply with certain notice standards and file an adequate verified complaint.  The Court will take these requirements in turn.

### A.  Compliance with Notice Standards

"Generally, forfeiture actions require that the United States publish notice publicly as well as serve notice directly upon 'any person who reasonably appears to be a potential claimant.'"  *113 Virtual Currency Accts.*, 2024 WL 940141, at *3 (quoting Fed. R. Civ. P. Supp. R. G(4)(a), (b)).  Published notice may be provided by publication on an official government forfeiture site for at least thirty straight days.  Fed. R. Civ. P. Supp. R. G(4)(a)(iv)(C).  The notice must: (1) describe

the property with "reasonable particularity"; (2) state the deadline to file a claim and to answer; and (3) name the government attorney to be served. *Id.* G(4)(a)(ii). As for the notice owed to reasonably apparent potential claimants, the United States must send them "notice of the action and a copy of the complaint . . . by means reasonably calculated to reach the potential claimant." *Id.* G(4)(b)(i), (iii)(A). This rule requires only "that the government attempt to provide actual notice; it does not require that the government demonstrate that it was successful in providing actual notice." *United States v. $1,071,251.44 of Funds Associated with Mingzheng Int'l Trading Ltd.*, 324 F. Supp. 3d 38, 47 (D.D.C. 2018).

As mentioned, the United States began posting notice to http://www.forfeiture.gov on March 3, 2025, and continued to do so for thirty consecutive days. Any verified claim in response to this notice had to be filed no later than May 1, 2025. *See* Fed. R. Civ. P. Supp. R. G(5)(a)(ii)(B). The notice listed the current virtual currency addresses holding the Defendant Property, stated that any claimant had sixty days from the date of publication to file a verified claim and answer, and directed such claimants to serve such pleadings on a designated Assistant United States Attorney. ECF No. 6-1. But no claims were filed. And since the United States could not identify any potential claimants, it did not provide direct notice to anyone. The Court holds that the United States properly accomplished notice according to Supplemental Rule G.

**B. Adequacy of the Complaint**

An adequate complaint must be verified, state the grounds for jurisdiction and venue, describe the property "with reasonable particularity," specify the "statute under which the forfeiture action is brought," and "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Fed. R. Civ. P. Supp. R. G(2). To begin, the complaint is verified. Compl. at 19. Next, there is no doubt of this Court's

6

jurisdiction, and any challenge to venue has been waived. *See United States v. Twenty-Four Cryptocurrency Accts.*, 473 F. Supp. 3d 1, 6 (D.D.C. 2020) ("This Court has jurisdiction over "any action or proceeding for the recovery or enforcement of any . . . forfeiture . . . incurred under any Act of Congress." (quoting 28 U.S.C. § 1355(a))). Regarding the reasonable particularity requirement, this is satisfied because the complaint identifies each of the frozen addresses and the amount of USDT they held. And as for identifying the relevant forfeiture statute, the complaint recognizes that 18 U.S.C. § 981(a)(1) subjects to forfeiture any property involved in a transaction traceable to wire fraud and conspiracy to commit wire fraud—including the traceable proceeds of that property.

Lastly, the Court must determine whether the complaint states sufficiently detailed facts to support a reasonable belief that the United States would be able to meet its burden of proof at trial. Forfeiture is authorized under § 981(a)(1) if the Defendant Property is the traceable product of wire fraud. One way a person might commit wire fraud is by using interstate communications systems—such as the internet—for the purpose of "obtaining money or property by means of false or fraudulent pretenses." *Id.* § 1343; *Suarez v. Compass Coffee LLC*, No. 25-cv-89, 2025 WL 3062798, at *8 (D.D.C. Nov. 3, 2025).

Here, the complaint alleges that the APT38 hackers stole about $28 million-worth of USDC and ETH in the November 2022 cyberattack by infiltrating COMPANY-1's computer systems under false pretenses. The complaint then identifies the addresses that sent, held, or received the stolen funds before they reached the five frozen addresses. It further describes the transactions themselves and explains how law enforcement was able to trace the funds despite the laundering methods used. The Court concludes that the allegations in the complaint are sufficiently detailed to support a reasonable belief that the United States could carry its burden at trial.

## IV. CONCLUSION

For the foregoing reasons, the Court grants the government's motion for default judgment. The defendant property is hereby forfeited to the government. The Clerk's office shall enter judgment for the United States, dismissing this case.

Date: _____1-16-24_____

_Royce C. Lamberth_
Royce C. Lamberth
United States District Judge

8

# EXHIBIT G

# AUTHORITY

## El Salvador - Central Authority & practical information

**Central Authority:**

*Supreme Court of Justice / General Secretariat*

| Contact details: | |
|---|---|
| Address: | Edificio de Oficinas Administrativas y Jurídicas de la Corte Suprema de Justicia<br>Primer Nivel,<br>Centro de Gobierno San Salvador<br>República de El Salvador |
| Telephone: | 503 2231 8300 ext. 1368 and 1340 |
| E-mail: | mario.torres@oj.gob.sv / secretaria.uati@oj.gob.sv |
| General website: | www.csj.gob.sv |
| Contact person: | Lic. Mario Gustavo Torres Aguirre,<br>Jefe de la Unidad de Asesoría Técnica Internacional |
| Languages spoken by staff: | Spanish |

| Practical Information: | |
|---|---|
| Forwarding authorities<br>(Art. 3(1)): | Name of the court issuing the request. |
| Methods of service<br>(Art. 5(1)(2)): | Code of Civil and Commercial Procedure, Chapter II, Art. 149 et seq. |
| Translation requirements<br>(Art. 5(3)): | Translation into Spanish (in accordance with the declaration made upon ratification of the Convention).<br>Article 62 of the Constitution of El Salvador.<br>Article 152 of the Code of Civil and Commercial Procedure. |

| | |
|---|---|
| Costs relating to execution of the request for service (Art. 12): | Principle of free access to justice. Article 16 of the Code of Civil and Commercial Procedure. |
| Time for execution of request: | 3 to 6 months. |
| Judicial officers, officials or other competent persons (Art. 10(b) | Declaration '1' made by the State upon ratification of the Convention.<br><br>The channels provided for in domestic law shall be used. Article 149 et seq. of the Code of Civil and Commercial Procedure.<br><br>Upon ratification of the Convention, El Salvador declared that it entirely excludes the application of the provision contained in Article 8(1), i.e., the consular or diplomatic channel (Legislative Decree No. 932 of 9 January 2024. Official Gazette No. 17, Volume 442, of 25 January 2024)<br><br>The transmission of documents by postal and electronic means (e-mail) between Central Authorities is accepted, using the 'Model Form' duly completed and translated into Spanish.<br><br>The form and documentation must be duly translated into Spanish |
| Oppositions and declarations (Art. 21(2)): | Click here to read all the declarations made by El Salvador under the Service Convention. |
| Art. 8(2): | |
| Art. 10(a): | |
| Art. 10(b): | |
| Art. 10(c): | |
| Art. 15(2): | |
| Art. 16(3): | |
| Derogatory channels (bilateral or multilateral agreements or internal law permitting other transmission channels) (Arts. 11, 19, 24 and 25) **Disclaimer:** *Information may not be complete or fully updated – please contact the relevant authorities to verify this information.* | No other mechanism. The Convention applied to date has been the Inter-American Convention on Letters Rogatory / OAS. |
| Useful links: | www.jurisprudencia.gob.sv National legislation and case law. |

| Competent authorities (Arts 6, 9) | Supreme Court of Justice represented by the General Secretariat |
|---|---|
| Other authorities (Art. 18) | N/A |

This page was last updated on: 05 August 2025

## Conventions (incl. Protocols and Principles)

Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters [14]

# EXHIBIT H



←

FINANCE                                                         DECEMBER 15, 2023

# Tether Releases Letters Shared With The U.S. Senate Committee On Banking, Housing, And Urban Affairs And The U.S. House Financial Services Committee

**15 December 2023 -** Tether, the largest company in the cryptocurrency industry, has made public its recent letters to the members of the U.S. Senate Committee on Banking, Housing, and Urban Affairs and the U.S. House Financial Services Committee. These letters detail Tether's commitment to fighting illicit use of stablecoins.

As the creator of the industry's first, largest, most transparent, and liquid stablecoin, Tether has created the financial underpinning of the U.S. dollar in the crypto industry. Tether is committed to building sustainable and resilient infrastructure for the cryptocurrency ecosystem.

Tether's recent letters reaffirm the company's continuing efforts to assist U.S. law enforcement and regulatory authorities in their efforts to combat terrorist financing and other illicit activities.

The November 16th letter (linked here) outlines Tether's Anti-Money Laundering (AML) and Know Your Customer (KYC) policies and standards, and describes its proactive and extensive cooperation with law enforcement agencies worldwide, including the U.S. Department of Justice and the U.S. Secret Service.

The December 15th (linked here) letter lays out Tether's proactive decision to align with the Office of Foreign Assets Control (OFAC) Specially Designated Nationals (SDN) List, extending sanctions controls to the secondary market to ensure comprehensive security measures.The key points highlighted in the letter include:

- Tether's launch of a wallet-freezing policy on December 1, 2023, is a landmark initiative for enhanced security and compliance within the cryptocurrency ecosystem.

- The strategic freezing of wallets associated with the SDN List is a robust move to safeguard users and maintain the integrity of the stablecoin ecosystem.

- Tether's active role in assisting law enforcement agencies, includes partnerships with the U.S. Department of Justice, U.S. Secret Service, and ongoing efforts to collaborate with the Federal Bureau of Investigation. This collaboration aims to combat illegal activities and aid in fund recovery.

- Tether aspires to set new industry standards through its commitment to security, regulatory compliance, and support for law enforcement, hoping to establish these practices as norms within the cryptocurrency industry.

"Tether is grateful for the opportunity to address the concerns raised by U.S. lawmakers, and we are committed to continuing Tether's close work with law enforcement in the U.S. and globally" **stated Paolo Ardoino, CEO of Tether.** "Tether seeks to be a world class partner to the U.S. as we continue to assist law enforcement and expand dollar hegemony globally."

# EXHIBIT I



OTHERS

JANUARY 27, 2026

# Tether Announces the Launch of USA₮, the Federally Regulated, Dollar-Backed Stablecoin, Made in America

**27 January 2026** - <u>Tether</u>, the largest company in the digital asset industry, today announces the official launch of USA₮, the federally regulated, dollar-backed stablecoin developed specifically to operate within the United States' new federal stablecoin framework established under the GENIUS Act. The issuer of USA₮ is Anchorage Digital Bank, N.A., America's first federally regulated stablecoin issuer.

Today's launch marks the formal market introduction of USA₮. It follows the <u>announcement</u> late last year outlining the token's design and naming former White House Crypto Council Executive Director Bo Hines as CEO of Tether USA₮. USA₮ is now available to U.S. users seeking a dollar-backed token built to operate within the U.S.' dedicated federal regime.

USA₮ represents a milestone not only for Tether but for the trajectory of the U.S. dollar in a digital era. As a potential framework for federal oversight emerges, USA₮ enters a market where dollar-backed tokens already play a

central role in global commerce. This launch reinforces the strength of the U.S. dollar at a moment when countries are competing to shape the future of money. It brings together the scale and operational maturity of the world's most widely used stablecoin ecosystem, USD₮, with a framework designed for America's most demanding institutions, signaling a new chapter where the dollar continues to set the standard for trust, transparency, and technological leadership.

While USD₮ continues to operate globally and leads as the world's most widely adopted stablecoin, progressing towards GENIUS Act compliance, USA₮ is purpose-built for the U.S. market and its highly digital payment infrastructure, providing institutions with a digital dollar that is issued through a nationally chartered bank.

USA₮ is issued by Anchorage Digital Bank, and is available to institutions and platforms alike.  USA₮ has been designed to operate within the GENIUS Act's new federal stablecoin framework. U.S.-regulated exchanges and banking partners are being lined up to support broad access to USA₮ across the American financial ecosystem. Cantor Fitzgerald serves as the designated reserve custodian and preferred primary dealer, ensuring secure asset management and clear visibility into reserves from day one.

Anchorage Digital Bank has built scalable infrastructure with on-chain transparency, deeply integrated risk management, and bank-grade compliance. USA₮ is not simply designed to satisfy applicable regulatory requirements, but to function reliably within them - day in and day out, at an institutional scale.

Tether is reinforcing its role as a global macroeconomic participant. Tether Group is the 17th-largest holder of U.S. Treasuries globally, ahead of sovereign holders including Germany, South Korea, and Australia. USD₮ continues to power the digital economy at scale, supporting the widespread international use of the U.S. dollar for payments, commerce, and reserves.

"USA₮ offers institutions an additional option: a dollar-backed token made in America," said **Paolo Ardoino, CEO of Tether**. "USD₮ has proven for more than a decade that digital dollars can deliver trust, transparency, and

utility at a global scale. USA₮ extends that mission by providing a federally regulated product designed for the American market."

"With the launch of USA₮, we see a digital dollar that is designed to meet federal regulatory expectations," said **Bo Hines, CEO of Tether USA₮**. "Our focus is stability, transparency, and responsible governance, ensuring that the United States continues to lead in dollar innovation."

During the first phase of the launch, USA₮ will be available on Bybit, Crypto.com, Kraken, OKX, and Moonpay.

For more information on USA₮, visit USA₮.io

## About USA₮

USA₮ is a U.S.-regulated dollar-backed stablecoin that Tether, the global leader in stablecoin technology, is supporting. Purpose-built to serve the U.S. market and support American regulatory standards, USA₮ is the foundational rail for the next generation of American commerce, trade, and finance.

Tether's support for USA₮ underscores its commitment to driving U.S. dominance and leadership in the evolving digital asset economy. As part of the broader Tether ecosystem, USA₮ will set a new benchmark in the U.S. for utility-driven stablecoins designed to deliver long-term value, strong governance, and real-world applications.

## Important Note:

USA₮ is not legal tender (as described in section 5103 of title 31, United States Code) and is not issued, backed, approved, or guaranteed by the U.S. government. USA₮ is not subject to the insurance protections of the Federal Deposit Insurance Corporation (FDIC), the Securities Investor Protection Corporation (SIPC), or any other government agency. The press release is published by Tether Operations, S.A. de C.V. for informational purposes only.

Tether Operations, S.A. de C.V. is not the issuer of USA₮. The issuer of USA₮ is Anchorage Digital Bank, N.A.

# EXHIBIT J

# Tether launches U.S. stablecoin, appoints former Trump crypto guru Bo Hines as CEO of American expansion

**fortune.com**/crypto/2025/09/12/tether-paolo-ardoino-bo-hines-stablecoin-crypto-trump-anchorage

Ben Weiss, Leo Schwartz                                      September 12, 2025

## Tether to launch U.S. stablecoin, appoints former Trump crypto guru Bo Hines as CEO of American expansion

September 12, 2025, 11:20 AM ET



Paolo Ardoino, CEO of Tether, at the White House signing of the Genius Act.Al Drago—Getty Images

One of crypto's largest, and most controversial, companies is coming to the U.S. On Friday, at an event held at a spy-themed museum in New York City, the stablecoin issuer Tether announced that it was launching a U.S. stablecoin called USAT, a stunning reversal for an operation that just last year appeared to be in the crosshairs of U.S. law enforcement officials.

To launch USAT, Tether has tapped Anchorage Digital, one of the largest crypto custodians that has touted its ability to issue stablecoins compliant with the Genius Act—newly passed legislation in the U.S. that establishes guardrails for the issuance and management of stablecoins. Tether's longtime partner Cantor Fitzgerald will serve as the custodian to hold the new stablecoin's reserves.

Tether's decision to launch a U.S. stablecoin reflects the changing fortunes of the stablecoin giant, which counts Commerce Secretary Howard Lutnick as one of its top advocates. At Friday's event, the company announced that former top White House crypto official Bo Hines would serve as the project's CEO.

"We were under a severe pressure from competitors that wanted to create a monopolistic environment in the United States," said Tether CEO Paolo Ardoino onstage. "The big mistake there was simply to discount the fact that we think Tether is the best product in the market."

Formerly shunned by top politicians, Tether hosted a who's who from Congress and crypto at its Friday event: U.S. representatives Bryan Steil (R-Wis.) and Addison McDowell (R-N.C.) were present, along with top crypto venture capitalists Paradigm managing partner Matt Huang and Multicoin Capital managing partner Kyle Samani.

## Tether's rise

Founded in 2014, Tether is the issuer of an eponymous stablecoin, or a type of cryptocurrency that is pegged one-to-one with an underlying asset, typically the U.S. dollar. As crypto adoption grew and the price of Bitcoin soared, Tether's USDT became the largest stablecoin in crypto and one of the most widely held cryptocurrencies, with a market cap today of nearly $170 billion. Thanks to its tiny staff of just under 300 and billions of dollars in income earned from the yield of its holdings, Tether is also one of the most profitable companies in the world per employee, according to its unaudited financials.

But despite its success, the secretive company has been a lightning rod for criticism. This includes the opaque way that it has managed the reserves that back its stablecoin, as well as its stablecoin's role in global illicit finance, where it's been used for illegal activities from terrorism to money laundering. Tether has strongly rejected the claims, though it has been the target of different law enforcement actions, including a settlement with the New York attorney general and a reported investigation by the U.S. Department of Justice.

Its decision to launch a U.S.-compliant stablecoin comes after Congress passed the Genius Act in July, which paved the way for new challengers, from banks to a crop of new startups, to launch their own tokens. For Tether, which is largely used outside the U.S., the move raises questions as to the utility of its new U.S. offering and what type of traction it will achieve.

More than potential adoption, though, the move reflects Tether's growing influence in the U.S. with the Trump administration. Lutnick became a cheerleader for the company after his financial firm, Cantor Fitzgerald, started managing the bulk of its reserves. And in August, Tether hired former top Trump crypto official Bo Hines to lead its U.S. expansion. They elevated him to CEO on Friday.

Tether's main advantage is its massive moat, with the next largest stablecoin, Circle's USDC, significantly trailing with a market cap of just $72 billion. But with the Genius Act's establishment of a sanctioned path forward for traditional financial institutions to enter the market, potential users will have a wealth of options from which to choose. Some offerings are beginning to experiment with passing yield back to their users, though the Genius Act prohibits issuers like Tether from sharing its interest earnings with customers.

On Tether's newly launched website for its U.S. stablecoin, USAT, the company said that the main use cases would be for remittances, global payments, and online checkouts. The company aims to launch its U.S. stablecoin by the end of the year, said Hines, who plans to establish the headquarters of USAT in Charlotte, N.C.

"We want to dominate," he said, "but we want to do that in the U.S."

*Update, Sept. 12, 2025*: Provided more details from the Tether event on Friday.

**Join us at the Fortune Workplace Innovation Summit** May 19–20, 2026, in Atlanta. The next era of workplace innovation is here—and the old playbook is being rewritten. At this exclusive, high-energy event, the world's most innovative leaders will convene to explore how AI, humanity, and strategy converge to redefine, again, the future of work. Register now.

# EXHIBIT K

# Lutnick's Cantor eyes $2 billion Bitcoin lending program with Tether

**fortune.com**/crypto/2024/11/24/howard-lutnick-cantor-fitzgerald-tether-stablecoin-2-billion-bitcoin-lending

David Pan, Todd Gillespie, Bloomberg                              November 24, 2024

## Lutnick's Cantor in talks with Tether about $2 billion Bitcoin lending project

November 24, 2024, 10:35 AM ET



Howard Lutnick at a Trump campaign rally at Madison Square Garden in New York on Oct. 27. Angela Weiss—AFP/Getty Images

Howard Lutnick is moving to strengthen his alliance with one of the most important and controversial names in the digital-asset business: Tether Holdings Ltd.

Lutnick is in talks to deepen the financial ties between his businesses and the company behind the world's largest stablecoin, according to people familiar with the matter.

Cantor Fitzgerald LP is discussing receiving support from Tether for its planned multibillion-dollar program to lend dollars to clients who put up Bitcoin as collateral, said the people, who asked not to be named as they were not authorized to speak publicly.

Funding for the program will start at $2 billion and is expected to eventually reach into the tens of billions, a separate person told Bloomberg.

Tether currently uses Cantor's custody business to hold the billions of dollars of US Treasuries that support the value of its dominant USDT stablecoin. That custody relationship earns Cantor tens of millions of dollars a year, according to people familiar with the matter.

Lutnick is co-chair of president-elect Donald Trump's transition team and Trump's pick to run the Commerce Department.

Trump has been a recent and vocal proponent of digital assets like Bitcoin, and has promoted a crypto project associated with his sons called World Liberty Financial. The Trump transition team is mulling whether to create a new White House post for crypto policy, Bloomberg reported previously.

While Cantor has been trying to hire staff to launch the program, it hasn't formally started lending. If Tether takes part, the crypto firm would likely be one of multiple financial contributors, one of the people said.

A spokeswoman for Cantor declined to comment. Executives at Tether could not be immediately reached for comment outside of normal business hours.

Read More: Cantor Fitzgerald's Lutnick Says Tether's Reserves Do Exist



Paid Content
[The shift at Cannes Lions 2026 that every C-suite leader should track](#)

From [DEPT](#)

Tether has faced [scrutiny from governments including the US](#) for possible violations of sanctions and anti-money laundering rules. The company has denied the claims.

Lutnick's firm has also struck a deal to invest in Tether, the Wall Street Journal reported on Saturday, adding that Cantor's stake has been valued at as much as $600 million and amounts to about a 5% ownership interest.

As Lutnick moves to run the Commerce Department, he is preparing to hand over his firm's relationship with Tether, which he largely controls, to colleagues, according to two people briefed on the matter. His son, Brandon Lutnick, works at Cantor as a trader and previously interned with Tether in Lugano, Switzerland.

# EXHIBIT L

# Howard Lutnick: Tether's Big Backer

 **coindesk.com**/business/2024/12/10/howard-lutnick-tether-s-big-backer

Nick Baker                                                                December 10, 2024

## The CEO of prominent bond broker Cantor Fitzgerald played a major role in validating Tether this year by vouching for its reserves.

Updated Dec 10, 2024, 2:53 p.m. Published Dec 10, 2024, 10:28 a.m. 1 min read

[Make preferred on](#)

🔇

Howard Lutnick's firm, Cantor Fitzgerald, is a prominent Wall Street bond broker and a member of an exclusive club: It's a primary dealer that gets to trade directly with the Federal Reserve. So when Lutnick — Tether's U.S. Treasuries dealer — said this year that Tether [actually has the money](#) it says is backing its huge USDT stablecoin, that put a final nail in the coffin of conspiracy theories claiming otherwise.

Lutnick's other source of influence is being a supporter of crypto — well, he's specific: just bitcoin and stablecoins — in close orbit around President-elect Donald Trump, serving now as co-chair of Trump's transition team and a [nominee](#) to run the Commerce Department.

It's not clear how responsible Lutnick was for Trump's turnaround on crypto (going from somewhat opposed during his first presidency to full embrace on the campaign trail this year), but if Lutnick whispered the "pro" argument in Trump's ear, it couldn't have hurt.

# EXHIBIT M



Donate ☰

Home / Influence & Lobbying / Lobbying / Clients /

# Client Profile: Tether Holdings

Summary    Hired Firms    Lobbyists    Issues    Agencies    Bills    Report Images

Select year:

**2025**

DONATE

### Search our lobbying database

e.g. Comcast or Jiri Krol 🔍

A special interest's lobbying activity may go up or down over time, depending on how much attention the federal government is giving their issues. Particularly active clients often retain multiple lobbying firms, each with a team of lobbyists, to press their case for them.

# $90,000
**Total Lobbying Expenditures, 2025**

Case 1:16-cv-02429-TSC    Document 59-2    Filed 05/14/26    Page 88 of 251

**Annual Lobbying by Tether Holdings**



NOTE: Figures on this page are calculations by OpenSecrets based on data from the Senate Office of Public Records. Data for the most recent year was downloaded on `April 27, 2026` and includes spending from `January 1 - March 31`. Prior years include spending from `January through December` .

Feel free to distribute or cite this material, but please credit OpenSecrets. For permission to reprint for commercial uses, such as textbooks, contact OpenSecrets: info@opensecrets.org

# EXHIBIT N

| Clerk of the House of Representatives<br>Legislative Resource Center<br>135 Cannon Building<br>Washington, DC 20515<br>http://lobbyingdisclosure.house.gov | Secretary of the Senate<br>Office of Public Records<br>232 Hart Building<br>Washington, DC 20510<br>http://www.senate.gov/lobby |
|---|---|

# LOBBYING REPORT

Lobbying Disclosure Act of 1995 (Section 5) - **All Filers Are Required to Complete This Page**

**1. Registrant Name** ☑ Organization/Lobbying Firm  ☐ Self Employed Individual
LILETTE ADVISORS

**2. Address**
Address1  111 Stewart Avenue            Address2
City  Alexandria       State VA   Zip Code  22301        Country  USA

**3. Principal place of business (if different than line 2)**
City              State        Zip Code            Country

4a. Contact Name        b. Telephone Number  c. E-mail
Mr.     Ankit Desai       5044171933       ankit@liletteadvisors.com

**5. Senate ID#**
401108944-66800

7. Client Name      ☐ Self        ☐ Check if client is a state or local government or instrumentality
Tether Operations, S.A. de C.V.

**6. House ID#**
566880007

## TYPE OF REPORT      8. Year 2025    Q1 (1/1 - 3/31) ☐   Q2 (4/1 - 6/30) ☑   Q3 (7/1 - 9/30) ☐   Q4 (10/1 - 12/31) ☐

9. Check if this filing amends a previously filed version of this report ☐
10. Check if this is a Termination Report ☐    Termination Date _____    11. No Lobbying Issue Activity ☐

### INCOME OR EXPENSES - YOU MUST complete either Line 12 or Line 13

| **12. Lobbying**<br>**INCOME** relating to lobbying activities for this reporting period was: | **13. Organizations**<br>**EXPENSE** relating to lobbying activities for this reporting period were: |
|---|---|
| Less than $5,000  ☐ | Less than $5,000  ☐ |
| $5,000 or more  ☑  $ 100,000.00 | $5,000 or more  ☐  $ _____ |
| Provide a good faith estimate, rounded to the nearest $10,000, of all lobbying related income for the client (including all payments to the registrant by any other entity for lobbying activities on behalf of the client). | **14. REPORTING** Check box to indicate expense accounting method. See instructions for description of options.<br><br>☐ **Method A.** Reporting amounts using LDA definitions only<br><br>☐ **Method B.** Reporting amounts under section 6033(b)(8) of the Internal Revenue Code<br><br>☐ **Method C.** Reporting amounts under section 162(e) of the Internal Revenue Code |

Signature    Digitally Signed By: Ankit Desai          Date    7/16/2025
9:32:06 AM

**LOBBYING ACTIVITY.** Select as many codes as necessary to reflect the general issue areas in which the registrant engaged in lobbying on behalf of the client during the reporting period. Using a separate page for each code, provide information as requested. Add additional page(s) as needed.

15. General issue area code FIN

16. Specific lobbying issues

Advocating on issues related to the regulation of stablecoins in the Genius Act of 2025, S. 394

17. House(s) of Congress and Federal agencies ☐ Check if None

U.S. HOUSE OF REPRESENTATIVES, U.S. SENATE

18. Name of each individual who acted as a lobbyist in this issue area

| First Name | Last Name | Suffix | Covered Official Position (if applicable) | New |
|---|---|---|---|---|
| Ankit | Desai | | | ☐ |

19. Interest of each foreign entity in the specific issues listed on line 16 above ☐ Check if None

Tether Holdings, S.A. de C.V. and Giancarlo Devasini, identified on Registration (LD-1), have ownership interests in Tether Operations, S.A. de C.V. and have a financial interest in these lobbying issues.

**Information Update Page - Complete ONLY where registration information has changed.**

20. Client new address

Address _____

City _____  State _____  Zip Code _____  Country _____

21. Client new principal place of business (if different than line 20)

City _____  State _____  Zip Code _____  Country _____

22. New General description of client's business or activities

_____

# LOBBYIST UPDATE

23. Name of each previously reported individual who is no longer expected to act as a lobbyist for the client

| | First Name | Last Name | Suffix | | First Name | Last Name | Suffix |
|---|---|---|---|---|---|---|---|
| 1 | | | | 3 | | | |
| 2 | | | | 4 | | | |

# ISSUE UPDATE

24. General lobbying issue that no longer pertains

☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐

# AFFILIATED ORGANIZATIONS

25. Add the following affiliated organization(s)

Internet Address:

| Name | Address | | Principal Place of Business (city and state or country) |
|---|---|---|---|
| | Street Address | | |
| | City   State/Province   Zip   Country | | City |
| | | | State            Country |

26. Name of each previously reported organization that is no longer affiliated with the registrant or client

| 1 | 2 | 3 |
|---|---|---|

## FOREIGN ENTITIES

27. Add the following foreign entities:

| Name | Address | Principal place of business (city and state or country) | Amount of contribution for lobbying activities | Ownership percentage in client |
|---|---|---|---|---|
| | Street Address | | | |
| | City   State/Province   Country | | | |
| | | City | | % |
| | | State            Country | | |

28. Name of each previously reported foreign entity that no longer owns, or controls, or is affiliated with the registrant, client or affiliated organization

| 1 | 3 | 5 |
|---|---|---|
| 2 | 4 | 6 |

## CONVICTIONS DISCLOSURE

29. Have any of the lobbyists listed on this report been convicted in a Federal or State Court of an offense involving bribery, extortion, embezzlement, an illegal kickback, tax evasion, fraud, a conflict of interest, making a false statement, perjury, or money laundering?

☑ No ☐ Yes

| Lobbyist Name | Description of Offense(s) |
|---|---|

# EXHIBIT O



U.S. SENATE

LDA

**We're Moving!**

Go to LDA.gov ↗

**After 06/30/2026, this site will no longer be available.**

To update your saved links or systems using our REST API, start using LDA.gov ↗ today.

## 🔍 Search LD-1 & LD-2 Reports

# Registrations & Quarterly Activity

---

### 55 reports matching...

| | |
|---|---|
| Client | Name or Senate ID: Tether |

🔍 Edit Search



U.S. SENATE

LDA

| 100 | / page | Previous | 1 | Next |

| Registrant Name | Client Name | Report Type | Amount Reported |
|---|---|---|---|
| CONTINENTAL STRATEGY, LLC | TETHER OPERATIONS LIMITED | 3rd Quarter - Amendment | $150,000.00 |
| CONTINENTAL STRATEGY, LLC | TETHER OPERATIONS LIMITED | 4th Quarter - Report | $150,000.00 |
| CONTINENTAL STRATEGY, LLC | TETHER OPERATIONS LIMITED | 3rd Quarter - Report | $150,000.00 |
| CONTINENTAL STRATEGY, LLC | TETHER OPERATIONS LIMITED | 2nd Quarter - Report | $150,000.00 |
| CONTINENTAL STRATEGY, LLC | TETHER OPERATIONS LIMITED | Registration | |
| CONTINENTAL STRATEGY, LLC | TETHER OPERATIONS LIMITED | 1st Quarter - Report | $150,000.00 |

U.S. SENATE
LDA

| | | | |
|---|---|---|---|
| **CONTINENTAL STRATEGY, LLC** ↗ | **TETHER OPERATIONS LIMITED** | 1st Quarter - Termination (No Activity) | |
| **DMM CONSULTING LLC** ↗ | **TETHER OPERATIONS LIMITED/ C/O SHRM TRUSTEE (BVI) LTD TRINITY CHAMBERS** | Registration | |
| **DMM CONSULTING LLC** ↗ | **TETHER OPERATIONS LIMITED/ C/O SHRM TRUSTEE (BVI) LTD TRINITY CHAMBERS** | 1st Quarter - Report (No Activity) | $60,000.00 |
| **DMM CONSULTING LLC** ↗ | **TETHER OPERATIONS LIMITED/ C/O SHRM TRUSTEE** | 4th Quarter - Termination (No Activity) | $20,000.00 |

U.S. SENATE
LDA

(BVI) LTD
TRINITY
CHAMBERS

| | | | |
|---|---|---|---|
| **DMM CONSULTING LLC** ↗ | **TETHER OPERATIONS LIMITED/ C/O SHRM TRUSTEE (BVI) LTD TRINITY CHAMBERS** | 2nd Quarter - Amendment (No Activity) | $40,000.00 |
| **DMM CONSULTING LLC** ↗ | **TETHER OPERATIONS LIMITED/ C/O SHRM TRUSTEE (BVI) LTD TRINITY CHAMBERS** | 3rd Quarter - Report (No Activity) | $40,000.00 |
| **FTI GOVERNMENT AFFAIRS** ↗ | **LAW OFFICES OF MICHAEL JASON LEE, APLC (ON BEHALF OF TETHER** | Registration - Amendment | |

U.S. SENATE
LDA

| | | | |
|---|---|---|---|
| | OPERATIONS LIMITED) | | |
| FTI GOVERNMENT AFFAIRS ⧉ | LAW OFFICES OF MICHAEL JASON LEE, APLC (ON BEHALF OF TETHER OPERATIONS LIMITED) | 2nd Quarter - Report | $120,000.00 |
| FTI GOVERNMENT AFFAIRS ⧉ | LAW OFFICES OF MICHAEL JASON LEE, APLC (ON BEHALF OF TETHER OPERATIONS LIMITED) | 1st Quarter - Report | $120,000.00 |

U.S. SENATE
LDA

| | | | |
|---|---|---|---|
| FTI GOVERNMENT AFFAIRS⤤ | LAW OFFICES OF MICHAEL JASON LEE, APLC (ON BEHALF OF TETHER OPERATIONS LIMITED) | 4th Quarter - Report | $120,000.00 |
| FTI GOVERNMENT AFFAIRS⤤ | LAW OFFICES OF MICHAEL JASON LEE, APLC (ON BEHALF OF TETHER OPERATIONS LIMITED) | 4th Quarter - Report | $120,000.00 |
| FTI GOVERNMENT AFFAIRS⤤ | LAW OFFICES OF MICHAEL JASON LEE, APLC (ON BEHALF OF TETHER OPERATIONS LIMITED) | 3rd Quarter - Report | $120,000.00 |

U.S. SENATE
LDA

| | | | |
|---|---|---|---|
| **FTI GOVERNMENT AFFAIRS**↗ | **LAW OFFICES OF MICHAEL JASON LEE, APLC (ON BEHALF OF TETHER OPERATIONS LIMITED)** | 1st Quarter - Termination (No Activity) | |
| **FTI GOVERNMENT AFFAIRS**↗ | **LAW OFFICES OF MICHAEL JASON LEE, APLC (ON BEHALF OF TETHER OPERATIONS LIMITED)** | 2nd Quarter - Report | $120,000.00 |
| **FTI GOVERNMENT AFFAIRS**↗ | **LAW OFFICES OF MICHAEL JASON LEE, APLC (ON BEHALF OF TETHER OPERATIONS LIMITED)** | 3rd Quarter - Report | $120,000.00 |

U.S. SENATE
LDA

| | | | |
|---|---|---|---|
| **FTI GOVERNMENT AFFAIRS**⬀ | **LAW OFFICES OF MICHAEL JASON LEE, APLC (ON BEHALF OF TETHER OPERATIONS LIMITED)** | 1st Quarter - Report | $120,000.00 |
| **FTI GOVERNMENT AFFAIRS**⬀ | **LAW OFFICES OF MICHAEL JASON LEE, APLC (ON BEHALF OF TETHER OPERATIONS LIMITED)** | 1st Quarter - Report | $120,000.00 |
| **FTI GOVERNMENT AFFAIRS**⬀ | **LAW OFFICES OF MICHAEL JASON LEE, APLC (ON BEHALF OF TETHER OPERATIONS LIMITED)** | 4th Quarter - Report | $120,000.00 |

U.S. SENATE
LDA

| | | | |
|---|---|---|---|
| [FTI GOVERNMENT AFFAIRS](#) | LAW OFFICES OF MICHAEL JASON LEE, APLC (ON BEHALF OF TETHER OPERATIONS LIMITED) | 3rd Quarter - Report | $120,000.00 |
| [FTI GOVERNMENT AFFAIRS](#) | LAW OFFICES OF MICHAEL JASON LEE, APLC (ON BEHALF OF TETHER OPERATIONS LIMITED) | 3rd Quarter - Report | $120,000.00 |
| [FTI GOVERNMENT AFFAIRS](#) | LAW OFFICES OF MICHAEL JASON LEE, APLC (ON BEHALF OF TETHER OPERATIONS LIMITED) | 2nd Quarter - Report | $120,000.00 |

U.S. SENATE
LDA

| | | | |
|---|---|---|---|
| [FTI GOVERNMENT AFFAIRS](#)⬀ | LAW OFFICES OF MICHAEL JASON LEE, APLC (ON BEHALF OF TETHER OPERATIONS LIMITED) | Registration | |
| [FTI GOVERNMENT AFFAIRS](#)⬀ | LAW OFFICES OF MICHAEL JASON LEE, APLC (ON BEHALF OF TETHER OPERATIONS LIMITED) | Registration - Amendment | |
| [JUCUNDUS BUSINESS SERVICES LLC](#)⬀ | TETHER OPERATIONS, S.A. DE C.V. | Registration | |
| [JUCUNDUS BUSINESS SERVICES LLC](#)⬀ | TETHER OPERATIONS, S.A. DE C.V. | 1st Quarter - Report | $40,000.00 |

U.S. SENATE
LDA

| | | | |
|---|---|---|---|
| **JUCUNDUS BUSINESS SERVICES LLC** ⬈ | **TETHER OPERATIONS, S.A. DE C.V.** | 4th Quarter - Report | $40,000.00 |
| **JUCUNDUS BUSINESS SERVICES LLC** ⬈ | **TETHER OPERATIONS, S.A. DE C.V.** | 1st Quarter - Report | $40,000.00 |
| **JUCUNDUS BUSINESS SERVICES LLC** ⬈ | **TETHER OPERATIONS, S.A. DE C.V.** | 3rd Quarter - Report | $40,000.00 |
| **JUCUNDUS BUSINESS SERVICES LLC** ⬈ | **TETHER OPERATIONS, S.A. DE C.V.** | 2nd Quarter - Report | $40,000.00 |
| **LILETTE ADVISORS** ⬈ | **TETHER OPERATIONS, S.A. DE C.V.** | 4th Quarter - Report | $80,000.00 |
| **LILETTE ADVISORS** ⬈ | **TETHER OPERATIONS, S.A. DE C.V.** | Registration | |

U.S. SENATE
LDA

| | | | |
|---|---|---|---|
| **LILETTE ADVISORS** | **TETHER OPERATIONS, S.A. DE C.V.** | 2nd Quarter - Report | $100,000.00 |
| **LILETTE ADVISORS** | **TETHER OPERATIONS, S.A. DE C.V.** | 1st Quarter - Report | $80,000.00 |
| **LILETTE ADVISORS** | **TETHER OPERATIONS, S.A. DE C.V.** | 3rd Quarter - Report | $100,000.00 |
| **MILLER STRATEGIES, LLC** | **TETHER HOLDINGS, S.A. DE C.V. (FORMERLY KNOWN AS TETHER OPERATIONS, S.A. DE C.V.)** | 4th Quarter - Termination | $20,000.00 |

U.S. SENATE
LDA

| | | | |
|---|---|---|---|
| **MILLER STRATEGIES, LLC** ↗ | **TETHER HOLDINGS, S.A. DE C.V. (FORMERLY KNOWN AS TETHER OPERATIONS, S.A. DE C.V.)** | 2nd Quarter - Report | $30,000.00 |
| **MILLER STRATEGIES, LLC** ↗ | **TETHER HOLDINGS, S.A. DE C.V. (FORMERLY KNOWN AS TETHER OPERATIONS, S.A. DE C.V.)** | Registration | |
| **MILLER STRATEGIES, LLC** ↗ | **TETHER HOLDINGS, S.A. DE C.V. (FORMERLY KNOWN AS TETHER OPERATIONS, S.A. DE C.V.)** | 3rd Quarter - Report | $30,000.00 |

U.S. SENATE
LDA

| | | | |
|---|---|---|---|
| **MILLER STRATEGIES, LLC** ↗ | **TETHER HOLDINGS, S.A. DE C.V. (FORMERLY KNOWN AS TETHER OPERATIONS, S.A. DE C.V.)** | 1st Quarter - Report | $10,000.00 |
| **PROGRESSIVE PACIFIC PARTNERSHIPS** ↗ | **TETHERS UNLIMITED INC** | Mid-Year Report | |
| **PROGRESSIVE PACIFIC PARTNERSHIPS** ↗ | **TETHERS UNLIMITED INC** | Year-End Termination | |
| **RIDGELINE ADVOCACY GROUP LLC** ↗ | **FTI CONSULTING ON BEHALF OF TETHER OPERATIONS, S.A. DE C.V.** | 1st Quarter - Report | $60,000.00 |

U.S. SENATE
LDA

| | | | |
|---|---|---|---|
| **RIDGELINE ADVOCACY GROUP LLC** | **FTI CONSULTING ON BEHALF OF TETHER OPERATIONS, S.A. DE C.V.** | 1st Quarter - Termination | $60,000.00 |
| **RIDGELINE ADVOCACY GROUP LLC** | **FTI CONSULTING ON BEHALF OF TETHER OPERATIONS, S.A. DE C.V.** | Registration | |
| **RIDGELINE ADVOCACY GROUP LLC** | **TETHER OPERATIONS, S.A. DE C.V.** | 2nd Quarter - Report | $120,000.00 |
| **RIDGELINE ADVOCACY GROUP LLC** | **TETHER OPERATIONS, S.A. DE C.V.** | 3rd Quarter - Report | $120,000.00 |
| **RIDGELINE ADVOCACY GROUP LLC** | **TETHER OPERATIONS, S.A. DE C.V.** | 4th Quarter - Report | $80,000.00 |

U.S. SENATE
LDA

| | | |
|---|---|---|
| **RIDGELINE ADVOCACY GROUP LLC**↗ | **TETHER OPERATIONS, S.A. DE C.V.** | 1st Quarter - Report |
| **RIDGELINE ADVOCACY GROUP LLC**↗ | **TETHER OPERATIONS, S.A. DE C.V.** | Registration |

100    / page    Previous  1  Next

**For information on the Lobbying Disclosure Act (LDA):**

Visit disclosure.senate.gov↗    |    Call the Lobby Line (202) 224-0758

|    Email lobby@sec.senate.gov↗    |    Download API

# EXHIBIT P

# We Help Keep US Dollar Strong Globally

cryptorank.io/news/feed/e205b-bybit-ceo-student-advertisement-accusation

CoinEdition                                                                April 14, 2025

## Tether's Pitch To DC: We Help Keep US Dollar Strong Globally



- **Tether CEO Ardoino met US lawmakers to shape stablecoin regulation**
- **Pitched USDT as tool supporting global US dollar reach & financial inclusion**
- **Warned against MiCA-style rules that could hinder global dollar access**

Tether CEO Paolo Ardoino ended his first visit to the United States, where he met with lawmakers in Washington, D.C., to discuss the future of stablecoin regulation. Ardoino's meetings with Senate and House members centered on crafting laws that consider national security while also promoting global financial inclusion.

Ardoino framed the discussion partly as a response to global efforts challenging US dollar dominance. He argued for stablecoin rules that protect consumers but crucially also support the dollar's adoption internationally – a role he positions Tether's USDT as already playing.

Tether: The U.S. Dollar's Secret Weapon (And Why They're Buying Billions in Bitcoin) | @paoloardoino

0:00 Intro
3:08 Stablecoins Change Everything
6:24 U.S. Dollar vs. BRICS
9:27 Regulation's Hidden Risks
13:53 Monopoly Risks in America
17:22 Could Banks Fail Again?
21:12… pic.twitter.com/IGT46Bo9zY

— The Wolf Of All Streets (@scottmelker) April 14, 2025

…

The post Tether's Pitch To DC: We Help Keep US Dollar Strong Globally appeared first on Coin Edition.

MEXC1,000 USDT bonus awaits!

Read More

Read the article at CryptoPolitan

# EXHIBIT Q

POLITICO

# POLITICO



## POLITICO Influence

Delivered daily, Influence gives you a comprehensive rundown and analysis of all lobby hires and news on K Street.

**EMAIL**

Your Email

**EMPLOYER**

Employer

**JOB TITLE**

Job Title

\* All fields must be completed to subscribe.

**SIGN UP**

By signing up, you acknowledge and agree to our Privacy Policy and Terms of Service. You may unsubscribe at any time by following the directions at the bottom of the email or by contacting us here. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

## Tether taps a Democrat as crypto bill teeters

By **CAITLIN OPRYSKO** | 05/29/2025 07:31 PM EDT

Presented by

*With help from Daniel Lippman*

**TETHER ADDS DEM LOBBYING SUPPORT:** Crypto giant **Tether** is among the many financial interests that have tried but failed to get a landmark crypto bill through Congress and to President **Donald Trump**'s desk — in part because of resistance from Democrats. Hoping for a better result as the bill comes up for a vote in the Senate, the El Salvador-based issuer of the top stablecoin in the world is boosting its Democratic representation on K Street.

— Tether, known as a "crypto darling" on the right, has brought on four lobbying firms so far this year, including **Miller Strategies**, **Ridgeline Advocacy Group** and **Jucundus Business Services** — additions that made its roster of hired guns overwhelmingly Republican.

— Cue a Democratic newcomer. **Lilette Advisors**, the firm started last year by alumni of former President **Joe Biden**, began working for Tether on the GOP-led GENIUS Act beginning on May 6, according to a disclosure filing. **Ankit Desai**, who worked for Biden during his time in the Senate, is listed as the sole lobbyist on the account.

— Days earlier, a group of pro-crypto Democrats abruptly announced their opposition to the bill, which would create the first federal regulatory framework for cryptocurrencies like stablecoins, which are pegged to the dollar.

— Despite bipartisan support for the measure coming out of the Senate Banking Committee, top Democrats including Senate Minority Leader **Chuck Schumer** raised a number of concerns — including its treatment of foreign issuers like Tether, which does not currently serve U.S. customers.

— After tanking a procedural vote on the measure, Democrats won stronger anti-money laundering and foreign issuer provisions in the bill, leading several holdouts to vote to advance the amended version last week. It's set to come up for a final vote after the Memorial Day recess.

**MORE NEW BUSINESS:** Prescription-drug discount provider **GoodRx** has resumed lobbying Washington and added a new outside lobbying shop. **Gary Kline**, who joined GoodRx in April to lead its D.C. office, registered this week as the platform's first in-house lobbyist since 2023, according to disclosure filings.

— GoodRx has also hired **Continental Strategy**'s **Tim Costa** and **Chris Miles** to "advocate and facilitate meetings regarding digital platforms and healthcare costs" as the company gets into online over-the-counter drug sales.

**Happy Thursday and welcome to PI**. Send K Street tips and gossip. You can add me on **Signal**, email me at coprysko@politico.com, and be sure to follow me on **X**: @caitlinoprysko.

**TESLA UNCHAINED:** "**Tesla** late Wednesday criticized the Republican megabill for gutting clean energy tax credits, a message amplified by CEO **Elon Musk** hours after he

announced he was leaving the Trump administration," **POLITICO**'s **James Bikales** writes.

— "'Abruptly ending the energy tax credits would threaten America's energy independence and the reliability of our grid,' Tesla Energy, the company's solar and battery division, wrote on **X**."

— The division, which James writes "has has seen faster growth and higher profits than its vehicle business in recent years," urged senators to include "sensible wind down" of residential solar and clean electricity investment credits from the Inflation Reduction Act in their changes to the House-passed reconciliation bill.

— Musk, who said this week he's withdrawing from his role at DOGE, has previously supported ending all government subsidies — even arguing that Tesla would actually see a boost from the end of EV incentives. He "later amplified [Tesla Energy's] message on his personal X account, along with a post from another user that said 'slashing solar energy credits is unjust.'"

**MORE LAYOFFS AT PURPLE:** Brand reputation and public affairs firm **Purple Strategies** announced another round of layoffs this morning, just months after laying off 10 percent of its staff.

— "Political disruption, business uncertainty, financial pressures, and new rules of influence are reshaping the world," **Kristen Morgante**, Purple's managing partner and COO, said in a post on **LinkedIn**, writing that social media and artificial intelligence have "democratized" the "ability to challenge power," prompting the need for an overhaul of the firm.

— Morgante said that Purple will be sharing "new developments," including new partnerships and predictive data capabilities, but noted that "the very difficult part of this transformation is that it involves parting ways with several of our team members."

— The latest cuts did not come as a huge surprise to some in the firm, one person familiar with the matter told PI. In February, the firm laid off 18 staffers from its content, creative, media planning and buying teams, in what leaders said was meant to better position the company to compete in Washington.

— But the changes foreshadowed as a result of those cuts didn't materialize, while new business slowed, according to the person. It's not clear how many employees were affected by the most recent cuts. Morgante did not respond to a request for comment.

**ICYMI — REMITTANCE TAX TRIGGERS FINTECH PUSHBACK:** "Industry groups representing fintechs, payment businesses and banks are dialing up their public opposition" to a provision in the House-passed reconciliation bill that would slap a new tax on remittances sent abroad by non-U.S. citizens, per **POLITICO**'s **Sam Sutton**.

— "On its face, the measure raises revenue from immigrants who send money out of the country. Trump has suggested he'd like to 'shut down' the outward flow of funds sent by undocumented immigrants, and top Republicans like GOP Policy Committee Chair **Kevin Hern** of Oklahoma have identified those transactions as a way to boost funding for national security projects."

— In a letter to top congressional tax writers this week, the **American Fintech Council** argued the language "would have a 'disproportionate impact on already-marginalized communities seeking to contribute to the U.S. economy' and expressed concerns about how it's inconsistent with existing state-level regulations," Sam reports.

— It "represents an escalation in industry-level pushback to the controversial remittance tax. Many Wall Street and financial industry groups have refrained from airing their specific grievances with Trump's legislative agenda, but the AFC's missive suggests that opposition to major components of the bill will grow in the coming weeks as Senate lawmakers plan substantial revisions to the legislation passed by House Republicans."

— In another letter objecting to the provision sent Wednesday, AFC was joined by six other trade groups including another fintech lobby, the **Financial Technology Association**, and the **Electronic Transactions Association**, whose members include **JPMorgan Chase** and **Visa**.

### JOBS REPORT

— **Lisa Costello** is retiring from her role as vice president of political affairs at the **National Multifamily Housing Council** after 11 years with the trade group.

— **Kevin Barstow** has joined **O'Melveny** as a partner in the health care practice and congressional investigations team. He was most recently senior counsel and assistant to Biden and is an HHS, Commerce Department, House Energy and Commerce and Senate Aging Committee alum.

— **Andy Slavitt** will be co-chair of the **Health Care Payment Learning and Action Network Executive Forum**. Slavitt was acting CMS administrator during the Obama administration and a senior adviser on the Biden White House's Covid response team.

— **Emmy Ruiz** is joining **Somos Votantes** as senior adviser. She previously was senior adviser to the president and director of the office of political strategy and outreach in the Biden White House.

— **NewDEAL** is adding **Natasha Dabrowski** as chief of staff, **Christian Hall** as press secretary and **Alex Chanen** as leader services manager.

— **Vedant Patel** is now a senior vice president in **SKDK**'s public affairs practice. He previously was principal deputy spokesperson at the State Department.

— **Preeya Noronha Pinto** is joining **DLA Piper** as a partner in its health care practice. She previously was at **King & Spalding**, and is a Bush HHS alum.

— **Linda Goler Blount** is now president and CEO of **Community Catalyst**. She previously was president and CEO of the **Black Women's Health Imperative**.

— **Melanie Fonder Kaye** has joined the **National League of Cities** as senior executive and director of digital engagement, marketing and communications. She previously was deputy assistant to the secretary of Defense for strategic engagement and is a **Jill Biden** alum.

### NEW JOINT FUNDRAISERS

New England Democratic Victory Fund (New Hampshire Democratic Party, Rhode Island Democratic State Committee, Maine Democratic Party, Vermont Democratic Party, Massachusetts Democratic State Committee - Fed Fund, Connecticut Democratic State Central Committee)

The Next 50 Victory Committee (The Next 50 PAC, The Next 50 Enterprise Fund, The Next 50 Alumni PAC)

### NEW PACS

None.

### NEW LOBBYING REGISTRATIONS

Bradley Arant Boult Cummings LLP: Montgomery Airport Authority

Catalyst Global Strategies, LLC: The Roosevelt Group (On Behalf Of Air Tractor Inc.)

Collective Strategies & Communications (Formerly Collective Communications LLC): Flash Forest Inc.

Continental Strategy, LLC: Goodrx, Inc.

Corcoran & Associates, Inc. Dba Corcoran Partners: Mutualink, Inc.

Cornerstone Government Affairs, Inc.: Georgia Hospital Association, Inc.

Elevate Government Affairs, LLC: Atomic Machines, Inc.

Elevate Government Affairs, LLC: Cirrus Design Corporation

Elevate Government Affairs, LLC: Spokane Airport Board

Fgs Global (US) LLC (Fka Fgh Holdings LLC): Ccf Community Initiatives Fund

First Day Pr: Blue State Action, Inc.

Lilette Advisors: Tether Operations, S.A. De C.V.

Mcguirewoods Consulting (A Subsidiary Of Mcguirewoods LLP): African American Alliance Of Cdfi Ceos

Mclarty Inbound LLC: Wieland North America, Inc.

Mercury Public Affairs, LLC: Shutterstock

Mercury Public Affairs, LLC: The Kinetic Group Operations LLC

Mindset Advocacy, LLC: Century Aluminum

Mr. Robert Francis Mcdonnell: Tri-City Properties, L.L.C.

Ridge Path Strategies: Business Software Alliance, Inc.

S2R, LLC: Stillwater Mining Co. (D/B/A Sibanye-Stillwater)

Thorn Run Partners: Moore Nanotechnology Systems

Turbovets, Inc.: Turbovets, Inc.

Whitmer & Worrall, LLC: AHIP

Williamson Law + Policy Pllc: Coalition For The USe Of Safe And Efficient Refrigerants

Winning Strategies Washington: Integrity House

**NEW LOBBYING TERMINATIONS**

Eqv Strategic: Boehringer Ingelheim Animal Health USa Inc.

---

# Follow us on X

 **Daniel Barnes @dnlbrns**
**Jacob Wendler @jacob_wendler**

---

## FOLLOW US

   

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

FAQ

Feedback

Headlines

Photos

Press

Request A Correction

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

———————

© 2026 POLITICO LLC

# EXHIBIT R

# Trump's Commerce Secretary Pick Howard Lutnick in Talks With Tether to Support Bitcoin Lending Program: WSJ

**coindesk.com**/business/2024/11/25/tether-in-talks-to-support-cantor-fitzgerald-s-planned-bitcoin-lending-program-wsj

Callan Quinn                                                                November 25, 2024

## Tether in Talks to Support Cantor Fitzgerald's Planned Bitcoin Lending Program: WSJ

### The unlaunched lending initiative will start with $2 billion in funds, which could eventually grow to tens of billions of dollars.

Nov 25, 2024, 3:22 a.m. 2 min read

[Make preferred on](#)

**What to know:**

- Tether may take part in Cantor's multi-billion dollar bitcoin financing program.
- The latter already owns a 5% stake in Tether and custodies its U.S. Treasuries.

Howard Lutnick, chairman of Wall Street trading firm Cantor Fitzgerald, is in discussions with Tether's Giancarlo Devasini about Cantor's multi-billion dollar program that will allow clients to borrow money using bitcoin as collateral, the [Wall Street Journal reported](#) on Sunday.

First [announced](#) in July, the lending initiative will start with $2 billion in funds, which could eventually grow to tens of billions of dollars. Tether's potential inclusion in the project signals a deepening of the relationship between the stablecoin issuer and the trading firm.

Pomp: 75% of crypto companies won't survive; State Street's tokenization bridge
0 seconds of 31 minutes, 57 secondsVolume 0%
Cantor — which has been the custodian for Tether's U.S. Treasuries since 2021 — has also acquired a 5% stake in Tether, which issues the USDT stablecoin, worth around $600 million, according to the same report.

Tether operates the world's most widely used stablecoin. Referenced to the U.S. dollar, it has a market cap of $132.76 billion, according to [CoinMarketCap](#).

But the token has drawn scrutiny for its use by illicit actors, including those involved in scams, money laundering and sanctions evasion. Last month, the [Wall Street Journal](#) reported Tether was under investigation in the U.S. for possible violations of sanctions and anti-money laundering rules.

Tether branded the report "irresponsible" and accused detractors of glossing over its history of working with law enforcement and its efforts to crack down on misuse.

Under the Biden administration, several cryptocurrency firms faced regulatory crackdowns. Trump's administration has indicated it will reverse course, with the president-elect and his family having launched several cryptocurrency projects, most recently World Liberty Financial.

Within Trump's circle are several crypto advocates including Lutnick himself, who has taken on a key role in Trump's team. He is currently serving as co-chair of the transition team and last week became Trump's pick to lead the U.S.Department of Commerce, a role that would position him to influence the U.S. crypto landscape.

Lutnick said last week that if his position is confirmed he will step down from Cantor, as well as his positions at BGC and Newmark.

# EXHIBIT S

# Tether CEO Says He'll Comply With GENIUS to Come to U.S., Circle Says It's Set Now

**coindesk.com**/policy/2025/07/18/tether-ceo-says-he-ll-comply-with-genius-to-come-to-u-s-circle-says-it-s-set-now

Jesse Hamilton                                                                July 19, 2025



**Paolo Ardoino, Tether's chief, said his firm will come to the U.S., is chasing high-level auditing and will adjust reserves, but Jeremy Allaire said Circle is already compliant.**

Jul 18, 2025, 8:22 p.m. 5 min read

[Make preferred on](#)

**What to know:**

- After President Donald Trump delivered the first major crypto law for the U.S. with the newly signed GENIUS Act on stablecoins, the CEO of the world's largest stablecoin issuer, Tether, said he's bringing the full force of his token on-shore in the U.S.
- Rival Circle's CEO said that it's already compliant with the rules set out by the GENIUS Act for U.S. issuers.
- Coinbase CEO Brian Armstrong said that he's hoping the administration's new deadline for a crypto market structure bill by Sept. 30 will come to pass and finish the industry's primary congressional lobbying tasks.

In the minutes after President Donald Trump signed a bill that joins the crypto world's stablecoins to the U.S. financial system, two of the chief stablecoin architects made the case in the Washington summer heat outside the White House that their companies are ready to embrace the new law.

1/4

Before he'd signed the Guiding and Establishing National Innovation for U.S. Stablecoins (GENIUS) Act into law after it swept through both chambers of Congress with major bipartisan votes, Trump basked in cheers and thanked several industry leaders in the East Room audience, including Tether CEO Paulo Ardoino, Circle CEO Jeremy Allaire and Coinbase CEO Brian Armstrong. Outside, the executives talked about next steps.

Ardoino amplified his plans for moving some of his global business into the U.S., where he said the focus will be on institutional users for a new token, but he added that he also intends to have Tether's stablecoin powerhouse USDT comply with the GENIUS Act as a foreign issuer. That'll mean a new auditing regime and changes to the vast reserves the company already maintains, which he says will require "an adjustment" but noted — with a smile — that his company "made $13 billion in profits" last year and will be able to manage it.

"Tether will comply with the GENIUS Act," he said, adding that the company will get to work now meeting the foreign-issuer standards. He said Tether has three years to work on getting into the U.S., and the company intends to manage two different versions of its stablecoins domestically — a jurisdiction it currently steers clear of.

The U.S.-centric coin — a second flavor of Tether that hasn't yet been hatched — is envisioned as serving a very different purpose.

"Institutions are used to super efficient markets, and they will count the single basis point; and so, for that reason, we need to build something that is proper for this new market," he told CoinDesk in the interview. The product built for those institutions will "focus on payments and high, high, high efficiency."

## Circle's Allaire

For Circle — a public company based in the U.S. — CEO Allaire said that the GENIUS Act "really enshrines into law Circle's way of doing business."

"We have always been trusted, transparent; we've been publicly audited for five years," he said.

But he noted that the U.S. landscape for stablecoins has already been rapidly changing in anticipation of the new law, with "major technology companies, major commerce firms, financial institutions" lining up to participate, which he said he welcomes.

"Once you have that federal law, it really is a green light to all these types of institutions to know that they can depend on this technology, build on this technology, integrated into how they store and move money into other innovations that can be done with smart contracts and programabilities," Allaire said.

To do business in the U.S., the GENIUS Act demands that extremely limited, highly liquid assets — mostly U.S. Treasuries — will back issuers' coins dollar-for-dollar, and it requires a stringent auditing process to constantly ensure that the assets are there.

Tether's Ardoino said his company's new chief financial officer, Simon McWilliams, "started to work" to land a "Big Four" audit firm — one of the global leaders in financial auditing — which has only been a possibility because of the recent support from the Trump administration. His company has a special relationship with the administration, too, in which the former CEO of Tether's chief U.S. reserves manager, Cantor Fitzgerald, is Trump's secretary of commerce, Howard Lutnick.

Ardoino's appearance at the White House and direct thanks from the president is a sharp reversal of Tether's U.S. history, in which it settled investigations with the U.S. Commodity Futures Trading Commission and New York Department of Financial Services. But past reports that the company remained under further U.S. investigation never developed into actions against the company or its officers.

Trump boasted repeatedly on Friday that he dug the crypto industry out of legal trouble with his predecessor's administration.

## Coinbase's Armstrong

A company that's developed into a lobbying and political giant in Washington in a short period, Coinbase, was represented in Trump's front row at the White House event, and CEO Brian Armstrong called the new law the "beginning of a big financial revolution in the U.S."

Armstrong has spent a lot of time and effort, though, on the next major legislation pursued by the industry: a bill that sets regulations for crypto markets in the U.S.

"One down; one to go," he said. "We've got to get the market structure bill through, as well. Seven percent of crypto market cap is stabecoins, so that's a very important first step. The other 93% is going to be addressed by that market structure bill."

In the minutes before passing the GENIUS Act, the House of Representatives also voted 294-134 to send its market structure legislation known as the Digital Asset Market Clarity Act to the Senate with a resounding bipartisan result.

Armstrong's company has been one of the primary backers of political action committee Fairshake, a towering super PAC that's spent incredible amounts of money congressional races, supporting candidates who commit to pro-crypto legislation. After success in dozens of races last year, Coinbase's largesse continued with another recent $25 million addition that brought Fairshake's war chest to $141 million well before the genuine start of next year's races.

"We feel like it's important to stand up for our customers' rights, and the job's not done yet," he said. Even after the market structure bill, he said, "I'm sure there'll be other things that come up in the future."

Armstrong said that Trump's chief crypto adviser, David Sacks, has assured the industry that he's serious about a recently discussed deadline for the next congressional effort: September 30.

For his part, President Trump talked about the GENIUS Act as if he'd already accomplished the monumental task of lifting U.S. crypto into place to modernize the financial system.

"Under this bill, the entire ancient system will be eligible for a 21st Century upgrade, using the state-of-the-art crypto technology," the president said before sitting at a table to sign the bill, mobbed by Republican lawmakers and crypto executives.

"Tomorrow is a new day, a new era," Ardoino said after the event. "We are very proud to be here and to be called out directly from the president, because it is the testament of all the good work that our team has done for the last years."

***Read More: [Trump Signs GENIUS Act Into Law, Elevating First Major Crypto Effort to Become Policy](#)***

4/4

# EXHIBIT T

# Warren, Wyden Probe National Security Risks Surrounding Reported Lutnick-Tether Loan

**ⓑ banking.senate.gov**/newsroom/minority/warren-wyden-probe-national-security-risks-surrounding-reported-lutnick-tether-loan



April 30, 2026

*"(A)s Congress considers digital asset market structure legislation, we must ensure that politically connected crypto interests do not receive special treatment and undermine our national security."*

[Letter to Commerce](#) | [Letter to Tether](#)

**Washington, D.C.** – Today, U.S. Senator Elizabeth Warren (D-Mass.), Ranking Member of the Senate Banking, Housing, and Urban Affairs Committee and U.S. Senator Ron Wyden (D-OR), Ranking Member of the Senate Committee on Finance, sent a letter to Commerce Secretary Howard Lutnick, and Chief Executive Officer of Tether, Paolo Ardoino, requesting information about a reported loan from Tether — a foreign company whose stablecoin has been used to finance illicit activity around the world — to a trust benefiting Secretary Lutnick's four children.

According to Bloomberg, the day after Howard Lutnick divested his stake in Cantor Fitzgerald by selling it to his children, a credit document was filed in New York showing that Tether lent an undisclosed amount to "Dynasty Trust A," a trust for which Lutnick's four children are beneficiaries.

"If reports of this loan are accurate, it would raise serious questions about the relationship between Secretary Lutnick and Tether, and the influence of Tether on Mr. Lutnick's policy decisions. We want to ensure that Tether has not sought to bribe or otherwise exert control or influence over Secretary Lutnick," **wrote the Senators.** "This document raises questions about

whether Tether may have helped provide Secretary Lutnick's children with the capital needed to purchase their father's stake in Cantor Fitzgerald, and in return secured an interest in his children's assets. If true, that would be a startling revelation."

**The senators note that Tether has faced significant legal and regulatory scrutiny for its conduct:** "Tether is seen as a 'dream currency' for money launderers… The Department of Justice was reportedly investigating Tether as recently as 2024 for potential violations of sanctions and anti-money laundering rules."

Secretary Lutnick has been described as "Tether's most prominent booster in the U.S." Given the relationship between Lutnick and the company, the lawmakers also raise concerns about the Secretary's role advising the Trump Administration on the GENIUS Act — stablecoin legislation that Tether lobbied heavily in support of and that included provisions favorable to foreign stablecoin issuers.

"The coziness of his relationship with Tether prior to his nomination, and the favorable treatment Tether received in the GENIUS Act, make reports of a loan from Tether to his children's trust even more troubling," **the senators concluded.** "The GENIUS Act may now be the law, but as Congress considers digital asset market structure legislation, we must ensure that politically connected crypto interests do not receive special treatment and undermine our national security."

The Senators are requesting responses from both Secretary Lutnick and Tether by May 13, 2026.

\###

[Previous Article](#)                                                                                    [Next Article](#)

# EXHIBIT U

Learn more about **LSEG**

 Reuters

Subscribe

## Crypto firm Tether says it has frozen $225 mln linked to human trafficking

By **Elizabeth Howcroft**

November 20, 2023 11:56 AM EST · Updated November 20, 2023



[1/2] Tether logo is seen in this illustration taken March 31, 2023. REUTERS/Dado Ruvic/Illustration/File Photo Purchase Licensing Rights

LONDON, Nov 20 (Reuters) - Crypto firm Tether said on Monday that it had frozen $225 million worth of its cryptocurrency which it said had been linked to a human trafficking group in Southeast Asia.

The U.S. Secret Service asked Tether to freeze the tokens during a "months-long investigative effort" by Tether and the crypto exchange OKX, Tether said in a blog post, without giving details about the scope or timescale of the investigation.

Learn about the latest breakthroughs in AI and tech with the Reuters Artificial Intelligencer newsletter. Sign up here.

The Secret Service did not immediately respond to a Reuters request for comment.

Tether and OKX collaborated with the U.S. Department of Justice (DOJ) on the investigation, Tether said without elaborating. A spokesperson for the DOJ did not immediately respond to requests for comment.

The crypto tokens were "linked to an international human trafficking syndicate in Southeast Asia responsible for a global "pig butchering" romance scam," Tether said.

Advertisement · Scroll to continue

The term "pig butchering" typically refers to instances when a scammer builds trust with their victims over social media, messaging and dating apps, then pressures them to invest in bogus crypto or online trading schemes.

Tether did not give further details about the group or how they used the cryptocurrency.

Tether said it was its largest ever freeze of its token.

Hundreds of thousands of people are being trafficked by criminal gangs and forced to work in scam centres and other illegal online operations in Southeast Asia, the United Nations said in a report in August.

Advertisement · Scroll to continue

Feedback



Tether is a so-called stablecoin, pegged to the U.S. dollar. There are $87.9 billion tether tokens in circulation, making it the third biggest cryptocurrency after bitcoin and ether, according to CoinGecko data.

Reporting by Elizabeth Howcroft; Editing by Christina Fincher

Our Standards: **The Thomson Reuters Trust Principles.** ⎘

Suggested Topics:

Technology

Purchase Licensing Rights



**Elizabeth Howcroft**
Thomson Reuters

Elizabeth Howcroft reports on finance and technology, including Europe's "fintech" industry and cryptocurrencies. She was part of the team which won a Loeb award and SABEW award for covering the collapse of crypto exchange FTX in 2022.

  

## Read Next

Business
**Alphabet, Amazon tap overseas debt markets to fund AI infrastructure push**
24 mins ago



World
**Elon Musk, Apple's Cook and Boeing CEO going to China with Trump, official says**
1 hour ago



World
**Netflix sued by Texas for allegedly spying on children, addicting users**
44 mins ago



# EXHIBIT V

 CoinDesk

**Finance**                                                                                    ⬆ Share

# Tether Freezes $225M Linked to Human Trafficking Syndicate Amid DOJ Investigation

The $225 million was related to the "pig butchering" scam.

By Oliver Knight | Edited by Aoyon Ashraf

Updated Mar 8, 2024, 12:21 p.m.   Published Nov 20, 2023, 9:16 a.m.   1 min read

Make **CoinDesk**  preferred on  Google



Tether freezes $225 million worth of its stablecoin (Jorge Salvador/Unsplash)

S tablecoin issuer Tether has frozen $225 million worth of its own stablecoin following an investigation by the U.S. Department of Justice (DOJ) into an international human trafficking syndicate in Southeast Asia.

The investigation was ongoing for months and used blockchain analysis tools provided by Chainalysis. It marks the largest-ever freeze of a stablecoin, a press release said.

On-chain data shows that Tether froze the $225 million across 37 wallets, with the majority of those tokens previously being transferred to OKX, a crypto exchange that also took part in the investigation.



The crime syndicate is related to the "pig butchering" scam, which the Federal Bureau of Investigation (FBI) said cost U.S. citizens $3.3 billion last year.

The frozen tokens were being held in self-custodied wallets and did not belong to Tether customers, the press release added.

"Through proactive engagement with global law enforcement agencies and our commitment to transparency, Tether aims to set a new standard for safety within the crypto space," said Paolo Ardoino, CEO of Tether.

Tether also froze 32 crypto addresses linked to terrorism and warfare in Ukraine and Israel last month.

*UPDATE (Nov. 20, 15:15 UTC):* *Adds paragraph linking to on-chain data.*

---

**More For You**

---

# Anchorage is stepping back from Robinhood and Kraken-backed stablecoin group

By Ian Allison | Edited by Stephen Alpher   1 hour ago



# EXHIBIT W



**Letitia James**

New York State Attorney General

## Consumer Alert:
## Attorney General James Ends Virtual Currency Trading Platform Bitfinex's Illegal Activities in New York

## February 23, 2021

○    ○

*Bitfinex and Tether Must Submit to Mandatory Reporting on Efforts to Stop New York Trading*

*Bitfinex and Tether Deceived Clients and Market by Overstating Reserves,*
*Hiding Approximately $850 Million in Losses Around the Globe*

NEW YORK – New York Attorney General Letitia James today continued her efforts to protect investors from fraudulent and deceptive virtual or "crypto" currency trading platforms by requiring Bitfinex and Tether to end all trading activity with New Yorkers. Millions around the country and the world today use virtual currencies as decentralized digital currencies — unlike real, regulated government currencies, including the U.S. dollar — to buy goods and services, often times anonymously, through secure online transactions. Stablecoins, specifically, are virtual currencies that are always supposed to have the same real-dollar value. In the case of Tether, the company represented that each of its stablecoins were backed one-to-one by U.S. dollars in reserve. However, an investigation by the Office of the Attorney General (OAG) found that iFinex — the operator of Bitfinex — and Tether made false statements about the backing of the "tether" stablecoin, and about the movement of hundreds of millions of dollars between the two companies to cover up the truth about massive losses by Bitfinex. An agreement with iFinex, Tether, and their related entities will require them to cease any further trading activity with New Yorkers, as well as force the companies to pay $18.5 million in penalties, in addition to requiring a number of steps to increase transparency.

"Bitfinex and Tether recklessly and unlawfully covered-up massive financial losses to keep their scheme going and protect their bottom lines," said **Attorney General James**. "Tether's claims that its virtual currency was fully backed by U.S. dollars at all times was a

lie. These companies obscured the true risk investors faced and were operated by unlicensed and unregulated individuals and entities dealing in the darkest corners of the financial system. This resolution makes clear that those trading virtual currencies in New York state who think they can avoid our laws cannot and will not. Last week, we sued to shut down Coinseed for its fraudulent conduct. This week, we're taking action to end Bitfinex and Tether's illegal activities in New York. These legal actions send a clear message that we will stand up to corporate greed whether it comes out of a traditional bank, a virtual currency trading platform, or any other type of financial institution."

**A Stablecoin Without Stability – Tethers Weren't Fully Backed At All Times**

The OAG's investigation found that, starting no later than mid-2017, Tether had no access to banking, anywhere in the world, and so for periods of time held no reserves to back tethers in circulation at the rate of one dollar for every tether, contrary to its representations. In the face of persistent questions about whether the company actually held sufficient funds, Tether published a self-proclaimed 'verification' of its cash reserves, in 2017, that it characterized as "a good faith effort on our behalf to provide an interim analysis of our cash position." In reality, however, the cash ostensibly backing tethers had only been placed in Tether's account as of the very morning of the company's 'verification.'

On November 1, 2018, Tether publicized another self-proclaimed 'verification' of its cash reserve; this time at Deltec Bank & Trust Ltd. of the Bahamas. The announcement linked to a letter dated November 1, 2018, which stated that tethers were fully backed by cash, at one dollar for every one tether. However, the very next day, on November 2, 2018, Tether began to transfer funds out of its account, ultimately moving hundreds of millions of dollars from Tether's bank accounts to Bitfinex's accounts. And so, as of November 2, 2018 — one day after their latest 'verification' — tethers were again no longer backed one-to-one by U.S. dollars in a Tether bank account.

As of today, Tether represents that over 34 billion tethers have been issued and are outstanding and traded in the market.

**When No Bank Backs You, Turn to Shady Entities — Bitfinex Hid Massive Losses**

In 2017 and 2018, Bitfinex began to increasingly rely on third-party "payment processors" to handle customer deposits and withdrawals from the Bitfinex trading platform. In 2018,

while attempting to "move money [more] efficiently," Bitfinex suffered a massive and undisclosed loss of funds because of its relationship with a purportedly Panama-based entity known as "Crypto Capital Corp." Bitfinex responded to pervasive public reports of liquidity problems by misleading the market and its own clients. On October 7, 2018, Bitfinex claimed to "not entirely understand the arguments that purport to show us insolvent," when, for months, its executives had been pleading with Crypto Capital to return almost a billion dollars in assets.

On April 26, 2019 — after the OAG revealed in court documents that approximately $850 million had gone missing and that Bitfinex and Tether had been misleading their clients — the company issued a false statement that "we have been informed that these Crypto Capital amounts are not lost but have been, in fact, seized and safeguarded." The reality, however, was that Bitfinex did not, in fact, know the whereabouts of all of the customer funds held by Crypto Capital, and so had no such assurance to make.

**The OAG Investigation Shines a Light on Unlawful Trading in New York State**

From the beginning of its interaction with the OAG, iFinex and Tether falsely claimed that they did not allow trading activity by New Yorkers. The OAG investigation determined that to be untrue and that the companies have operated for years as unlicensed and unregulated entities, illegally trading virtual currencies in the state of New York.

In April 2019, the OAG sought and obtained an injunction against further transfers of assets between and among Bitfinex and Tether, which are owned and controlled by the same small group of individuals. That action — under Section 354 of New York's Martin Act — ultimately led to a July 2020 decision by the New York State Appellate Division of the Supreme Court, First Department, holding that:

- Bitfinex and Tether — and other virtual currency trading platforms and cryptocurrencies operating from various locations around the world — are still subject to OAG jurisdiction if doing business in New York;
- The stablecoin "tether" and other virtual currencies were "commodities" under section 352 of the Martin Act, and noted that virtual currencies may also constitute securities under the act; and
- The OAG had established the factual predicate necessary to uphold the injunction and require production of documents and information relevant to its investigation in advance of the filing of a formal suit.

**Bitfinex and Tether Banned from Continuing Illegal Activities in New York**

Today's agreement requires Bitfinex and Tether to discontinue any trading activity with New Yorkers. In addition, these companies must submit regular reports to the OAG to ensure compliance with this prohibition.

Further, the companies must submit to mandatory reporting on core business functions. Specifically, both Bitfinex and Tether will need to report, on a quarterly basis, that they are properly segregating corporate and client accounts, including segregation of government-issued and virtual currency trading accounts by company executives, as well as submit to mandatory reporting regarding transfers of assets between and among Bitfinex and Tether entities. Additionally, Tether must offer public disclosures, by category, of the assets backing tethers, including disclosure of any loans or receivables to or from affiliated entities. The companies will also provide greater transparency and mandatory reporting regarding the use of non-bank "payment processors" or other entities used to transmit client funds.

Finally, Bitfinex and Tether will be required to pay $18.5 million in penalties to the state of New York.

In September 2018, the OAG issued its Virtual Markets Integrity Initiative Report, which highlighted the "substantial potential for conflicts between the interests" of virtual currency trading platforms, insiders, and issuers. Bitfinex was one of the trading platforms examined in the report.

This matter was handled by Senior Enforcement Counsel John D. Castiglione and Assistant Attorneys General Brian M. Whitehurst and Tanya Trakht of the Investor Protection Bureau; Assistant Attorneys General Ezra Sternstein and Johanna Skrzypczyk of the Bureau of Internet and Technology; and Legal Assistant Charmaine Blake — all supervised by Bureau of Internet and Technology Chief Kim Berger and Senior Enforcement Counsel for Economic Justice Kevin Wallace. The Investor Protection Bureau is led by Chief Peter Pope. Both the Bureau of Internet and Technology and the Investor Protection Bureau are part of the Division for Economic Justice, which is overseen by Chief Deputy Attorney General Chris D'Angelo and First Deputy Attorney General Jennifer Levy.

# EXHIBIT X

 CoinDesk

CD20  $2,222.04  ▼ 0.38%     BTC  $81,591.89  ▲ 0.16%     ETH  $2,328.72  ▼ 1.45%     XRP  $1.47  ▼ 2.17%     SOL  $97.29

Markets                                                                    ⬆ Share

# NY AG's $850M Probe of Bitfinex, Tether Ends in an $18.5M Settlement

In a closely watched case with wide-ranging implications for the crypto market, Tether has admitted no wrongdoing and will provide reports on USDT's reserve composition for two years.

By Nikhilesh De

Updated Sep 14, 2021, 8:15 a.m.   Published Feb 23, 2021, 7:52 a.m.   5 min read





A closely watched legal case involving Bitfinex and Tether, with major implications for the cryptocurrency industry, has been resolved.

The New York Attorney General's office (NYAG) has settled with Bitfinex over a 22-month inquiry into whether the cryptocurrency exchange sought to cover up the loss of $850 million in customer and corporate funds held by a payment processor.

The NYAG's office announced the settlement Tuesday, formally ending the inquiry that kicked off in April 2019. Under the terms of the settlement, Bitfinex and Tether will admit no wrongdoing but will pay $18.5 million and provide quarterly reports describing the composition of Tether's reserves for the next two years. More significantly, these reports will match information Tether already provided the NYAG about its reserves. The NYAG will bring no charges as part of the settlement.

In a statement, New York Attorney General Letitia James said, "Bitfinex and Tether recklessly and unlawfully covered up massive financial losses to keep their scheme going and protect their bottom lines. Tether's claims that its virtual currency was fully backed by U.S. dollars at all times was a lie."

The settlement may help resolve, one way or another, a question that has long bedeviled the entire $1.6 trillion global cryptocurrency market. By requiring Tether to provide a greater level of transparency than ever about the backing of its USDT stablecoin – a foundational piece of crypto's plumbing – the arrangement could replace whispers and conjecture with regular data. Depending on the level of detail provided, investors could have better tools to evaluate the claim that the company has been printing unbacked tokens to artificially drive up the price of bitcoin, the market's bellwether.

According to the settlement, the NYAG claims Bitfinex and Tether held a portion of Tether's reserves in trust for several months in 2017 and failed to disclose its troubles with Crypto Capital Corp. in a timely manner in its findings of fact. The NYAG also found fault with a blog post Bitfinex published after the inquiry was first announced, where the exchange said the funds held by Crypto Capital have been "seized and safeguarded."

## 'Resolves allegations'

Charles Michael, a partner at law firm Steptoe & Johnson LLC who represented the companies in the inquiry, said the settlement "resolves allegations about public disclosures" around Tether's loan to Bitfinex.

"To the Attorney General's office's credit, after two and a half years of investigation, [its] findings are limited only to the nature and timing of certain disclosures," Michael said. "And contrary to online speculation, there was no finding that Tether ever issued tethers without backing or to manipulate crypto prices."

However, the settlement said, "As of Nov. 2, 2018, tethers were again no longer backed 1-to-1 by U.S. dollars in a Tether bank account, because a substantial portion of the backing in the Deltec account had been transferred to Bitfinex to make up for the funds taken by Crypto Capital, while the corresponding funds transferred from Bitfinex's Crypto Capital account to Tether's Crypto Capital account were impaired by Crypto Capital's actions."

The $18.5 million that the companies are paying as part of the settlement "should be viewed as a measure of our desire to put this matter behind us and focus on our business," Bitfinex and Tether General Counsel Stuart Hoegner said in a statement.

He said Tether "voluntarily" provided the NYAG with information about Tether's reserves, and will continue to do so for two years.

"We proposed that as part of the settlement agreement, we would disclose – both to the Attorney General's Office and to the public – additional information about Tether's reserves on a quarterly basis," Hoegner said.

The disclosures will include the breakdown of cash and cash equivalents that are in the reserves. It's unclear whether this will take the form of attestations or some other type of update, or whether a third-party auditor or law firm will write the reports. The settlement only said the disclosures will "substantially" match what the companies provided the NYAG during its investigation. Bitfinex and Tether must also disclose any information about fund transfers between themselves.

"Putting aside the Attorney General's characterization of these disclosure issues as misrepresentations or violations of any legal obligation, the Attorney General's Office concluded, in essence, that Bitfinex and Tether could have done better in publicly disclosing these events," Michael said.



## 22 months

New York Attorney General Letitia James <u>announced</u> the legal inquiry in the spring of 2019, revealing that Bitfinex had lost access to nearly $1 billion and covered up the losses using funds from its sister firm Tether. Tether, which shares ownership and key executives with the exchange, loaned Bitfinex $550million and extended a line of credit.

The NYAG inquiry secured an injunction to freeze this line of credit, prevent any further fund transfers and force the companies to turn over any documentation about the deal, which both firms objected to in court. A judge ruled in favor of the NYAG, which subsequently won an appeal as well.

Ultimately, the companies turned over more than <u>2.5 million documents</u>, Hoegner said.

"The loan was made to ensure continuity for Bitfinex's customers. It has since been repaid early and in full, including interest. At no point did the loan impact customers, or Tether's ability to process redemptions," Michael said.

The NYAG inquiry did not lessen demand for USDT, the dollar-pegged stablecoin issued by Tether. Since the case began the value of the dollar-pegged tokens in circulation has grown from $2 billion to over $34 billion, according to Tether's transparency page.

The price of bitcoin has more recently gone on a tear, rising to a new all-time high over $58,000.

"We are pleased that our customers have shown loyalty and commitment to our businesses over the past two years, while this investigation was ongoing. ... We look forward to both companies continuing to lead the industry and serve our customers," Hoegner said.

## Missing millions

Since the case entered the public sphere, Bitfinex has tried to recover the funds held by Crypto Capital held by law enforcement officials in Portugal, Poland and the U.S. It's unclear how long it might take for these cases to resolve, given the different jurisdictions and the ongoing cases against Crypto Capital's operators.

Last year, Bitfinex filed for subpoenas in three different states, seeking to depose banks that may have held funds for the payment processor.

At the time, Hoegner told CoinDesk through a spokesperson that the efforts were "aimed squarely at obtaining further information" about Crypto Capital and its funds. "Bitfinex is the victim of a fraud and is asserting its rights to funds taken by Crypto Capital through legal measures initiated in various countries."

The exchange has been granted some of these subpoenas. The Bitfinex settlement is among the largest in crypto history. EOS builder Block.one settled with the SEC for $24 million in 2019 on allegations its $4 billion token sale was an unregistered securities offering. Telegram, at the time an aspiring digital currency issuer, also settled with the SEC for $18.5 million after raising $1.2 billion for the TON network, which was ultimately scrapped.

*UPDATE (Feb. 23, 2021, 13:15 UTC): Updated with additional context.*

---

**More For You**

# Strategy buys 535 bitcoin for $43 million days after signaling potential BTC sales

By James Van Straten | Edited by Sheldon Reback  5 hours ago

# EXHIBIT Y

ATTORNEY GENERAL OF THE STATE OF NEW YORK
INVESTOR PROTECTION BUREAU

———————————————————————

In the Matter of
**Investigation by LETITIA JAMES,**
**Attorney General of the State of New York,** of

iFINEX INC., BFXNA INC., BFXWW INC.,
TETHER HOLDINGS LIMITED, TETHER
OPERATIONS LIMITED, TETHER LIMITED,
TETHER INTERNATIONAL LIMITED

     Respondents.

———————————————————————

**SETTLEMENT AGREEMENT**

1.  The Office of the Attorney General of the State of New York ("OAG")
commenced an investigation pursuant to New York General Business Law § 352 *et. seq.* (the
"Martin Act") and Executive Law § 63(12) regarding fraud in connection with the Bitfinex
trading platform and related matters. On April 24, 2019, the OAG filed a proceeding in Supreme
Court, New York County pursuant to Section 354 of the Martin Act, seeking a court order to
enjoin certain conduct by iFinex Inc., BFXNA Inc., BFXWW Inc. (collectively, "Bitfinex"), and
Tether Holdings Limited, Tether Operations Limited, Tether Limited, and Tether International
Limited (collectively, "Tether"), including the transfer of certain funds between the entities;
enjoining the destruction of documents and communications relevant to the investigation; and
ordering production of certain documents and information. That order was granted. *In re:*
*James v. iFinex, et al.*, Index No. 450545/2019 (Apr. 24, 2019), *aff'd* 2020 N.Y. Slip Op. 03880
(July 9, 2020).

2.  This Settlement Agreement contains the findings of the OAG's investigation and
the relief agreed to by the OAG, Bitfinex, and Tether, whether acting through their respective
directors, officers, employees, representatives, agents, affiliates, or subsidiaries (collectively, the
"Parties").

3.  The OAG finds that the conduct set forth herein violated the Martin Act and
Executive Law § 63(12).

4.  The OAG finds the relief and agreements contained in this Settlement Agreement
appropriate and in the public interest. Therefore, the OAG is willing to accept this Settlement
Agreement pursuant to Executive Law § 63(15), in lieu of commencing a statutory proceeding

for violations of the Martin Act and Executive Law § 63(12), based on the conduct described below.

5.    Bitfinex and Tether neither admit nor deny the OAG's findings set forth below.

## OAG's FINDINGS

### I.    Bitfinex and Tether

6.    Bitfinex operates an online platform for exchanging and trading virtual currency. Users access the Bitfinex trading platform and place orders through its website, available at www.bitfinex.com, through an associated Application Programming Interface ("API"), or via over-the-counter services.  Bitfinex also provides users with the ability to store their virtual currency and transfer their holdings to a different trading platform.  Bitfinex is one of the relatively few virtual currency trading platforms that allows traders to deposit and withdraw so-called "fiat" currency, including U.S. dollars, euros, pounds, and yen.  Traders using the Bitfinex platform can deposit dollars with Bitfinex, convert them to virtual currency at the rates offered by Bitfinex, trade the virtual currency they have purchased, convert their virtual currency holdings back into dollars, and withdraw the funds.  For that reason, it is important that Bitfinex has sufficient U.S. dollars on hand to fill withdrawal orders submitted by traders.

7.    Prior to August 2017, Bitfinex had few geographical restrictions with respect to who could access its trading platform, meaning that New York-based users were able to create accounts, fund them with U.S. dollars, convert into virtual currency, trade, and withdraw funds. In August 2017, Bitfinex announced it would no longer permit U.S.-based users to access the trading platform, but U.S.-based business entities were still permitted to trade.  In August 2018, Bitfinex's announced exclusion of U.S.-based individual users was expanded to include all U.S.-based entities, except those entities or organizations that maintained an incorporation address outside of the United States, and met other qualifications.

8.    The primary function of Tether the company is as the issuer of a virtual currency also called "tether," a so-called "stablecoin," a term used to describe a virtual currency that is always supposed to have the same real-dollar value.  In the case of tethers, one tether is always supposed to be valued at one U.S. dollar.  Tethers are listed on at least several dozen virtual currency trading platforms around the world, trading under the symbol "USDT."

9.    In order to signal to the market that each tether held by users is equal to one U.S. dollar, Tether has long represented that for every outstanding tether issued and trading in the market, the company holds one U.S. dollar ("USD") in reserve "backing" the tether.  From its inception in 2014 until late February 2019, Tether represented that every outstanding tether was "backed" by, and thus should be valued at, one U.S. dollar.  For example, Tether represented to users that "Every tether is always backed 1-to-1, by traditional currency held in our reserves. So 1 USDT is always equivalent to 1 USD."

10.    In late February 2019, Tether changed its representation, stating on its website that "[e]very tether is always 100% backed by our reserves, which include traditional currency and cash equivalents and, from time to time, may include other assets and receivables from loans made by Tether to third parties, which may include affiliated entities (collectively, 'reserves'). Every tether is also 1-to-1 pegged to the dollar, so 1 USDT is always valued by Tether at 1 USD."

11.    Tether represents to users that any holder of tethers can redeem them from Tether the company at the rate of one tether for one U.S. dollar.

12.    Tether is one of the most prominent and widely-traded virtual currencies.  As of the date of this Settlement Agreement, Tether represents that over 31 billion tethers have been issued and are outstanding and traded in the market.

13.    Bitfinex and Tether are owned and operated by a small group of executives and shareholders that are located around the world.  During the time period relevant to the OAG's investigation, and as late as early-to-mid 2018, one of Bitfinex and Tether's senior executives lived in, and conducted his work from, New York.

## II.    In 2017, Bitfinex and Tether Misled the Market About Tether's U.S. Dollar Backing

14.    Prior to 2017, Bitfinex and Tether used several Taiwan-based banks to send and receive wire transfers to fulfill client orders for U.S. dollars, and for other purposes.  Wells Fargo acted as the correspondent bank.  In late March 2017, Wells Fargo elected to no longer process U.S. dollar wire transfers from Bitfinex and Tether accounts, forcing the companies to find alternative banking arrangements.

15.    At the time Wells Fargo stopped servicing the companies, approximately 50 million tethers had been issued and were circulating in the market.  By May 31, 2017, over 108 million tethers had been issued and circulating.

16.    In June 2017, Bitfinex opened an account at a Puerto Rico-based entity named Noble Bank International ("Noble Bank").  Noble Bank was a subsidiary of New York-based Noble Markets LLC.

17.    However, Tether did not open an account at Noble Bank, or any other bank, until September 15, 2017.  Tether deposited the vast majority of its cash holdings (ostensibly backing USDT) into a trust account at the Bank of Montreal in the name of its General Counsel.  The Bank of Montreal account never had more than $61.5 million dollars on deposit.

18.    Because Tether did not have a significant bank relationship in its name from at least March 2017 until September 15, 2017, it could not directly process any fiat deposits for purchases of Tethers by customers on either the Tether website or via the Bitfinex trading platform.  At the same time, neither the Tether website or the Bitfinex trading platform allowed

for the direct purchase or exchange of tethers in exchange for any other virtual currency, including the two most popular virtual currencies, bitcoin and ether.

19.     Between June 1, 2017 and September 15, 2017, Bitfinex's Noble Bank account received USD deposits from only two institutional trading firms, one of which was located in New York.  Neither of those institutional trading firms purchased tethers directly from Bitfinex or Tether during this time period.

20.     Because of Tether's inability to conduct significant banking activity during this time, it could not itself hold dollars sufficient to back the hundreds of millions of new tethers that had entered the market.  Until September 15, 2017, the only U.S. dollars held by Tether ostensibly backing the approximately 442 million tethers in circulation was the approximately $61 million on deposit at the Bank of Montreal.

21.     Between June 1, 2017 and September 15, 2017, Bitfinex held approximately $382 million of Tether's funds in a comingled account, which should have been held by Tether as "backing" for tethers then in circulation but was not.  In certain documents Bitfinex and Tether produced to OAG during its investigation, Tether accounted for this amount as a "receivable" from Bitfinex. Between June 1, 2017 and September 15, 2017, the total number of tethers issued and circulating rose from approximately 108 million to 442 million.

22.     In June 2017, Bitfinex and Tether engaged the U.S.-based firm Friedman LLP to complete an audit of both companies.  Those audits were never completed.

23.     By late summer 2017, online reports suggested that Tether did not have sufficient cash backing for the increasing numbers of tethers in circulation.  To counter those suggestions, in early September 2017, Bitfinex and Tether requested that Friedman conduct a verification of the cash backing of tethers, which Bitfinex and Tether planned to release publicly in order to demonstrate to the market that tethers were fully backed.

24.     Tether notified Friedman that the company did not have a bank account at Noble Bank (or any other institution) but were in the process of opening one.

25.     Tether and Friedman agreed that Friedman would conduct the verification of Tether's assets as of September 15, 2017.

26.     On the morning of September 15, 2017, Tether opened an account at Noble Bank. Later that day, Bitfinex transferred $382,446,847.71 from Bitfinex's account at Noble Bank into Tether's account at Noble Bank.  Friedman conducted its verification of Tether's assets as of 8:00 p.m. EST.

27.    On September 30, 2017, a post to the Tether website was made, entitled "Transparency Update," in which Tether represented the following:

Friedman LLP has been engaged to perform historical balance sheet audit procedures for Tether Limited. However, as the amount of Tethers in circulation has increased substantially in recent months, we have also asked Friedman to analyze our bank balances and our issued and outstanding token balance on an interim basis. Friedman agreed to perform consulting services for us in an effort to provide management with useful information concerning Tether's cash position and Tether tokens issued and outstanding as of an interim date. Friedman was able to provide consulting services for us on an expedited basis, using a procedures date of September 15, 2017. These consulting services do not constitute anaudit [sic] or attestation engagement, which would include a significantly expanded scope of procedures and take substantially more time to complete.

We hope that the community considers the <u>attached memorandum</u> for what it is: a good faith effort on our behalf to provide an interim analysis of our cash position and our issued and outstanding tokens, as part of ongoing efforts to further professionalize the transparency mechanisms of Tether Limited.

28.    The attached memorandum from Friedman contained the following graphic, redacting the account holder's name, and redacting the names of Noble Bank and the Bank of Montreal:

**II.  Findings**

1)

| Bank | Currency | Cash reserves per Client's trial balance as of September 15, 2017 | Cash per bank as of September 15, 2017 | For the benefit of |
|---|---|---|---|---|
| ▬▬▬▬ | USD | $60,919,810 | $60,919,810 | ▬▬▬▬ for the benefit of Tether Limited |
| ▬▬▬▬ | USD | $382,064,782 | $382,064,782 | Tether Limited |
| | EUR | €1,590 | €1,590 | Tether Limited |

2)

| Token | For the period October 6, 2014 through September 15, 2017 8:00 PM EDT | | |
|---|---|---|---|
| | Tether tokens issued and outstanding per the tether.to transparency website (a) | Tether tokens per Client's trial balance | Tether tokens per Omniexplorer.info website (b) |
| USDT | 442,481,760 | 442,481,760 | 442,481,760 |
| EURT | 1,444 | 1,444 | 1,444 |

(a)  Reported as total liabilities on the tether.to transparency website

(b)  As calculated by subtracting Treasury tokens in address 3BbDtxBSjgfTRxaBUgR2JACWRukLKtZdiQ from the total number of tokens created for the period of October 6, 2014 through September 15, 2017 8:00 PM EDT in address 3MbYQMMmSkC3AgWkj9FMo5LsPTW1zBTwXL

29.    The September 30, 2017 "Transparency Update" and the attached memorandum were misleading.  At no point did Tether inform its clients or the market that from at least June 1, 2017 until September 15, 2017, tethers were not in fact not backed "1-to-1" by USD held by

Page **5** of **17**

Tether in a bank account.  Rather, the funds ostensibly backing tethers had been held in an account under the control of its General Counsel, with the balance accounted for as a "receivable" from Bitfinex. No one reviewing Tether's representations would have reasonably understood that the $382,064,782 listed as cash reserves for tethers had only been placed in Tether's account as of the very morning that Friedman verified the bank balance.

### III.    In 2019, Bitfinex and Tether Misrepresented the Status of the Tether Reserves, After Bitfinex Suffered a Massive Loss of Funds

30.    In 2017 and 2018, Bitfinex began to increasingly rely on third-party "payment processors" to handle customer deposits and withdrawals from the Bitfinex trading platform. The primary entity Bitfinex used was a purportedly Panama-based entity known as Crypto Capital Corp. ("Crypto Capital").

31.    An individual known as "Oz Yosef," or "Oz Joseph," or simply "Oz" was Bitfinex's point of contact at Crypto Capital.

32.    By mid-2018, Crypto Capital held over $1 billion of funds that emanated from customer deposits at Bitfinex.

33.    In May 2018, Bitfinex asked "Oz" how Bitfinex could "move money efficiently out of Cryptocapital."  That request came on the heels of a report in April 2018 that the government of Poland had frozen a Crypto Capital bank account holding at least $340 million. In response, "Oz" repeatedly stated that the account freeze was temporary.  In the ensuing months, "Oz" would go on to provide a number of different excuses for why he could not return the funds to Bitfinex (or its clients), including tax complications, hurdles placed by various compliance personnel at various banks, bankers being on vacation, typos in wire instructions, and corruption in the Polish government.

34.    At some point between April 2018 and July 2018, "Oz" informed Bitfinex that a Crypto Capital account in Portugal containing approximately $150 million of Bitfinex client funds had also been frozen.

35.    In July 2018, Bitfinex told "Oz," that over eighty percent of Bitfinex's client deposits were held at bank accounts controlled by Crypto Capital.

36.    Despite having nearly $500 million of customer deposits in Crypto Capital accounts purportedly "frozen," Bitfinex nevertheless continued to direct clients to utilize Crypto Capital to fund their accounts throughout the summer of 2018.

37.    During this time period, Bitfinex began to look for ways to stave off what Bitfinex internally characterized as a "temporary liquidity crisis."

38.    In the summer of 2018, Bitfinex borrowed $400 million from Tether.  On or about August 21, 2018, and continuing through September 2018, Tether made at least four cash

transfers from its account at Deltec Bank to Bitfinex's account at Deltec Bank. To offset those cash transfers, Bitfinex directed "Oz" to transfer funds from the Bitfinex account to the Tether account at Crypto Capital. In October 2018, Bitfinex redeemed 400 million tethers to repay the debt. Those transactions were not disclosed.

39.     Despite efforts to stave off Bitfinex's "liquidity crisis," online reports continued to mount that Bitfinex was unable or unwilling to timely process client withdrawal requests. In response, Bitfinex issued the following statement to the market on October 7, 2018:

> 1. Bitfinex is not insolvent, and a constant stream of Medium articles claiming otherwise is not going to change this. As one of only a very few exchanges operating since 2013, with a small team and low operating costs, we do not entirely understand the arguments that purport to show us to be insolvent without providing any explanation about why. The wallets below represent a small fraction of Bitfinex cryptocurrency holdings and do not take into account fiat holdings of any kind.
>
> - Bitcoin cold wallet 1
> - Ethereum cold wallet 1
> - EOS cold wallet 1
>
> How any rational party can claim insolvency when the opposite is there for all to see is interesting and, once again, perhaps indicative of a targeted campaign based on nothing but fiction.
>
> 2. Both fiat and cryptocurrency withdrawals are functioning as normal. Verified Bitfinex users can freely withdraw Euros, Japanese Yen, Pounds Sterling and U.S. Dollars. Complications continue to exist for us in the domain of fiat transactions, as they do for most cryptocurrency-related organisations. However, we continue to do our utmost to minimise any waiting times associated with fiat deposits and withdrawals.
>
> 3. Stories and allegations currently circulating mentioning an entity called Noble Bank have no impact on our operations, survivability, or solvency.

40.     That statement was misleading. At the time this statement was made, Bitfinex had been beseeching "Oz" for months to process client withdrawals or return the money, which "Oz" was unable or unwilling to do. The statement also misleadingly implied that the company had little or no connection to "an entity called Noble Bank," which at that time had been Bitfinex's bank for over a year.

41.     In October 2018, Bitfinex and Tether severed their relationship with Noble Bank.

42.     On November 1, 2018, Tether made a public statement announcing that it had established a relationship with Deltec Bank & Trust Limited, headquartered in the Bahamas. In that announcement, Tether represented that "USDT in the market are fully backed by US dollars that are safely deposited in our bank accounts." The announcement also linked to a document on Deltec letterhead and addressed to Tether Limited, dated November 1, 2018, which stated:

Dear Sirs:

> We hereby confirm that, at the close of business on October 31, 2018, the portfolio cash value of your account with our bank was US$1,831,322,828.

43.     The next day, November 2, 2018, Tether made the first of five transfers ultimately totaling $475 million from its bank account at Deltec Bank to Bitfinex's account at Deltec Bank. At the same time, a corresponding transfer was made from Bitfinex's account at Crypto Capital to Tether's account at Crypto Capital via ledger entry Bitfinex also "purchased" 150 million tethers by transferring $150 million in funds held at Bitfinex's Crypto Capital account to Tether's account at Crypto Capital. These transfers were not disclosed.

44.     And so, as of November 2, 2018, tethers were again no longer backed 1-to-1 by U.S. dollars in a Tether bank account, because a substantial portion of the backing in the Deltec account had been transferred to Bitfinex to make up for the funds taken by Crypto Capital, while the corresponding funds transferred from Bitfinex's Crypto Capital account to Tether's Crypto Capital account were impaired by Crypto Capital's actions.

45.     Tether's misrepresentation would continue until late February 2019, at which time Tether updated its website to note that "[e]very tether is always 100% backed by our reserves, which include traditional currency and cash equivalents and, from time to time, may include other assets and receivables from loans made by Tether to third parties, which may include affiliated entities (collectively, 'reserves')." Tether did not announce that it had changed its disclosure, and indeed there were no media reports about the change until several weeks later on March 14, 2019.

46.     Throughout November, Bitfinex would continue to ask "Oz" to return the money, to no avail. For example, on November 1, 2018, Bitfinex told "Oz" that Bitfinex "urgently need liquidity to start paying out our small customer as your channel is stuck." On November 21, 2018, Bitfinex told "Oz" that "We have 860m with you. I can't believe we can't even get 20 or 30 M out…where is all the money, it doesn't sum up…350 in Poland, 150 in Portugal." On November 28, 2018, Bitfinex again messaged "Oz," stating that "we are at the end of the month and you haven't been sending out one wire, even 1 usd for the whole month."

47.     Contrary to what was happening behind the scenes, Bitfinex issued a statement on November 11, 2018, stating that Bitfinex's "banking remained stable," while noting that in October 2018 alone Bitfinex "processed over 700 withdrawals representing more than $1 [billion]."

48.     As set forth in further detail in the OAG's application for relief pursuant to Section 354 of the Martin Act, in late 2018 Bitfinex and Tether began to negotiate a line of credit transaction that would allow Bitfinex to further draw upon the Tether reserves. Ultimately, the line of credit transaction closed at the end of March 2019, allowing Bitfinex to draw up to $900 million from the Tether reserves. The $625 million that had been previously transferred from the Tether account in November 2018 was incorporated into the line of credit. Bitfinex collateralized the line of credit with shares of its parent company Digfinex.

49. At no time did Bitfinex or Tether disclose to the market that Tether had transferred at least $625 million to Bitfinex, or that Bitfinex had experienced critical liquidity issues because of loss of approximately $850 million to Crypto Capital.

50. On April 24, 2019, the OAG filed an application in Supreme Court, New York County for an order pursuant to Section 354 of the Martin Act, seeking court-ordered production of documents and information relevant to its ongoing investigation of Bitfinex and Tether, as well as seeking injunctive relief to prevent Bitfinex from further accessing Tether's reserves under the line of credit arrangement. As part of that application, the OAG disclosed to the market for the first time that Bitfinex had lost access to approximately $850 million, and that Bitfinex had made up for the shortfall by transferring hundreds of millions of dollars from Tether.

51. On April 26, 2019, Bitfinex issued a statement, which included a representation that "we have been informed that these Crypto Capital amounts are not lost but have been, in fact, seized and safeguarded."

52. That statement was misleading. At the time that statement was made, Bitfinex did not in fact know the whereabouts of all of the customer funds held by Crypto Capital, and so had no assurance that the funds might ever be made accessible again to Crypto Capital or Bitfinex.

53. As of the date of this Settlement Agreement, Bitfinex cannot represent whether, or when, any of the unrecovered funds might be returned to Bitfinex or its clients.

54. Based on the foregoing facts, OAG finds that Bitfinex and Tether violated New York General Business Law § 352 *et seq.* and Executive Law § 62(12).

## RELIEF

IT IS HEREBY UNDERSTOOD AND AGREED, by and between the Parties:

55. Monetary Relief

    a. *Monetary Relief Amount*: Respondents shall pay to the State of New York a penalty in the amount of $18,500,000 (the "Monetary Relief Amount"). Respondents shall pay the Monetary Relief Amount no later than thirty (30) business days after the effective date of this Settlement Agreement.

    b. Bitfinex and Tether agree that they will not claim, assert, or apply for a tax deduction or tax credit with regard to any foreign or U.S.-domestic tax, directly or indirectly, for any portion of the payment that it shall make pursuant to this Settlement Agreement.

    c. Payments shall be made by attorney check, corporate or certified check, or bank draft, which shall be made payable to the "State of New York", and

shall reference Settlement Agreement No. 21-012; payments shall be addressed to the attention of John D. Castiglione, Senior Enforcement Counsel, Investor Protection Bureau, 28 Liberty Street, New York, New York, 10005. Payments in excess of $50,000 shall be made by wire transfer, with instructions available upon request of Respondents.

Undertakings:

56. Within five (5) days of the receipt of the penalty set forth in paragraph 55, the OAG will move to voluntarily withdraw its application for relief pursuant to Section 354 of the Martin Act (*In re: James v. iFinex, et al.*, Docket No. 450545/2019) and agrees not to bring any claims or causes of action against Bitfinex or Tether, its present and former direct or indirect parents, subsidiaries, or affiliates, or any of its officers, directors, employees, managers or agents that are presently known to the OAG for matters relating to the conduct set forth in the Findings and the Petition (Whitehurst Aff.), *In re James v. iFinex, Inc.*, Index No. 450545/2019 (N.Y. Sup. Ct. April 25, 2019), NYSCEF Doc. No. 1; arising out of Bitfinex or Tether's representations concerning the backing of tethers during the time period January 1, 2014 to the effective date of this Settlement Agreement; transfers of a portion of the cash reserves backing tethers to Bitfinex pursuant to the line of credit agreement; or representations concerning the location or status of funds transferred to Crypto Capital. This provision does not prevent the OAG from exercising its rights to enforce this Settlement Agreement pursuant to other provisions herein.

57. Bitfinex and Tether agree to undertake the following:

a. *Line of Credit Repayment*

The line-of-credit referenced in paragraphs 48–50, above, has been repaid in full as of January 2021.

b. *Mandated Reporting Regarding Bitfinex and Tether's Efforts to Exclude New York Clients*

1. Bitfinex and Tether have implemented, and during the time frame set forth in Paragraph 57(b)(2) will continue to implement, maintain, and improve internal controls and procedures in a manner reasonably designed to ensure the soundness of the companies' prohibitions against use of its products and services by New York persons and entities. For purposes of this Settlement Agreement, "New York persons" are defined as any person known or believed to reside in or regularly conduct trading activity from New York, and "New York entity" is defined as any entity that is incorporated in, has its headquarters in, regularly conducts trading activity in, or is directed or controlled from, New York.

2. Within ninety (90) days of the effective date of this Settlement Agreement, and on a quarterly basis thereafter for two (2) years following the effective

date of this Settlement Agreement, Bitfinex and Tether will provide a written report to OAG regarding their compliance with Paragraph 57(b)(1), which will include, but not necessarily be limited to, discussion of platform policies, operations, investigations, and surveillance, concerning Bitfinex and Tether's prohibition of New York persons and entities.

3. Bitfinex and Tether may apply to the OAG for an extension of the deadlines described above before their expiration and, upon a showing of good cause by Bitfinex and Tether, the OAG may, in its sole discretion, grant such extensions for whatever time period it deems appropriate.

4. OAG may seek production of documents substantiating the existence and effectiveness of the measures set forth in paragraph 57(b)(1).

c. *Trading Activity with New York Persons and Entities*:  Bitfinex and Tether shall discontinue any trading activity with any New York persons or entities (including any New York entity that holds a BitLicense or Trust Account from the New York Department of Financial Services) or is a broker/dealer registered with the State of New York.  This prohibition does not include the provision of services from a company providing the following for Bitfinex or Tether:  blockchain analysis or tracing services; Know Your Customer ("KYC") or Anti-Money Laundering ("AML") services; user risk-scoring or similar services, legal services located in New York related to virtual currency trading activity, or other commercial services unrelated to the purchase, sale, or exchange of virtual currencies.

d. *Over the Counter Trading:*  Respondents agree not to conduct or facilitate over-the-counter trading activity with a New York person or entity.

e. *Mandated Reporting on Certain Business Operations*

Within ninety (90) days of the effective date of this Settlement Agreement, and on a quarterly basis thereafter for two (2) years following the effective date of this Settlement Agreement, Bitfinex and Tether will provide

i. documents substantiating Tether's reserve account(s), in a form substantially similar to what Tether has provided during OAG's investigation;

ii. verification that Bitfinex and Tether have appropriately segregated client, reserve, and operational accounts, including but not necessarily limited to verification that (a) Tether reserves are segregated from operational accounts; (b) Bitfinex and Tether maintain separate accounts; (c) virtual assets for customers and the companies are held at

separate, segregated deposit addresses (if stored in an omnibus wallet); and (d) accounts holding fiat deposits from Bitfinex clients are segregated from company operational accounts, including but not limited to accounts used to pay or distribute to executives or for other company obligations; and

    iii.   documents and information reflecting transfers of funds between and among Bitfinex and Tether.

2. Bitfinex and Tether may apply to the OAG for an extension of the deadlines described above before their expiration and, upon a showing of good cause by Bitfinex and Tether, the OAG may, in its sole discretion, grant such extensions for whatever time period it deems appropriate.

f. *Publication of Tether's Reserves*:  On at least a quarterly basis for a period of two (2) years following the effective date of this Settlement Agreement, Tether will publish the categories of assets backing tether (*e.g.*, cash, loans, securities, etc.), specifying the percentages of each such category, and specifying whether any such category constituting a loan or receivable or similar is to an affiliated entity, in a form substantially similar to that previously presented to the OAG.

g. *Transparency and Opt-Out of Payment Processors*

1. Within ninety (90) days of the effective date of this Settlement Agreement, and on a quarterly basis thereafter for two (2) years following the effective date of this Settlement Agreement, Bitfinex and Tether will provide to OAG a list of payment processors whom they utilize, along with location and contact information for those entities, and information regarding additional due diligence procedures the companies have implemented (or will implement) regarding the use of payment processors;

2. For the period set forth in Paragraph 57(g)(1), Bitfinex and Tether will provide a list of payment processors whom they utilize, along with location and contact information for those entities, to users upon request in connection with a deposit or withdrawal;

3. For the period set forth in Paragraph 57(g)(1), Bitfinex and Tether shall notify a user that Bitfinex or Tether intends to use a payment processor for that user's transaction(s), or to hold that user's funds, prior to the transaction.  Users will be given the ability to opt-out of use of any (or all) payment processors, and will be permitted to use a different method of transfer or holding.

h. *Future Activities in New York*:  In the event that Bitfinex or Tether should in the future seek to service New York persons or entities, they will do so in accordance with applicable law, including any applicable licensing requirements.

58.    Respondent expressly agrees and acknowledges that a default in the performance of any obligation under the above paragraph is a violation of this Settlement Agreement, and that the OAG thereafter may commence a civil action or proceeding, in addition to any other appropriate investigation, action, or proceeding, and that evidence that the Settlement Agreement has been violated shall constitute prima facie proof of the statutory violations described in paragraph 54, pursuant to Executive Law § 63(15).

## MISCELLANEOUS

Subsequent Proceedings:

59.    Respondents expressly agree and acknowledge that the OAG may initiate a subsequent investigation, civil action, or proceeding to enforce this Settlement Agreement, for violations of the Settlement Agreement, or if the Settlement Agreement is voided pursuant to paragraph 68, and agrees and acknowledges that in such event:

a. any statute of limitations or other time-related defenses are tolled from and after the effective date of this Settlement Agreement;

b. the OAG may use statements, documents or other materials produced or provided by Bitfinex and Tether prior to or after the effective date of this Settlement Agreement;

c. any civil action or proceeding must be adjudicated by the courts of the State of New York, and that Bitfinex and Tether irrevocably and unconditionally waive any objection based upon personal jurisdiction, inconvenient forum, or venue;

d. evidence of a violation of this Settlement Agreement shall constitute prima facie proof of a violation of the applicable law pursuant to Executive Law § 63(15).

60.    If a court of competent jurisdiction determines that the Bitfinex or Tether has violated the Settlement Agreement, Bitfinex or Tether shall pay to the OAG the reasonable cost, if any, of obtaining such determination and of enforcing this Settlement Agreement, including without limitation legal fees, expenses, and court costs.

61.    In the event the OAG believes that Respondents have violated this Settlement Agreement, the OAG agree to provide Respondents with written notice of such asserted violation prior to instituting any proceeding resulting from such violation. Within thirty (30) days of receipt of such notice, Respondents shall have the opportunity to respond to the OAG in writing to explain the nature and circumstances of such violation, as well as the actions Respondents

Page **13** of **17**

have taken to address and remediate the situation, which explanation the OAG shall consider in determining whether to pursue enforcement or other proceedings.

Effects of Settlement Agreement:

62.     Bitfinex and Tether shall not make or permit to be made any public statement denying, directly or indirectly the propriety of this Settlement Agreement or the OAG investigation.  Nothing in this paragraph affects Bitfinex or Tether's (i) testimonial obligations or (ii) right to take positions in defense of litigation or other legal proceedings to which the OAG is not a party.  This Agreement is not intended for use by any third party in any other proceeding.

63.     All terms and conditions of this Settlement Agreement shall continue in full force and effect on any successor, assignee, or transferee of Bitfinex or Tether.  Bitfinex and Tether shall include any such successor, assignment or transfer agreement a provision that binds the successor, assignee or transferee to the terms of the Settlement Agreement.  No party may assign, delegate, or otherwise transfer any of its rights or obligations under this Settlement Agreement without the prior written consent of the OAG.

64.     Nothing contained herein shall be construed as to deprive any person of any private right under the law.

65.     This Settlement Agreement is not a final order of any court or governmental authority, and is made without trial or adjudication on any issue of fact or law.

66.     Any failure by the OAG to insist upon the strict performance by Bitfinex or Tether of any of the provisions of this Settlement Agreement shall not be deemed a waiver of any of the provisions hereof, and the OAG, notwithstanding that failure, shall have the right thereafter to insist upon the strict performance of any and all of the provisions of this Settlement Agreement to be performed by Bitfinex or Tether.

Communications:

67.      All notices, reports, requests, and other communications pursuant to this Settlement Agreement must reference Settlement Agreement No. 21-012, and shall be in writing and shall, unless expressly provided otherwise herein, be given by hand delivery; express courier; or electronic mail at an address designated in writing by the recipient, followed by postage prepaid mail, and shall be addressed as follows:

If to Bitfinex, to: General Counsel, iFinex Inc., Trinity Chambers, P.O. Box 4301, Road Town, Tortola, British Virgin Islands, VG1110, legal@bitfinex.com, with a copy to jweinstein@steptoe.com and cmichael@steptoe.com.

If to Tether, to:  General Counsel, Tether Operations Limited, Trinity Chambers, P.O. Box 4301, Road Town, Tortola, British Virgin Islands, VG1110; legal@tether.to, with a copy to jweinstein@steptoe.com and cmichael@steptoe.com.

If to the OAG, to: John D. Castiglione, Senior Enforcement Counsel, Investor Protection Bureau, 28 Liberty Street, New York, New York, 10005, john.castiglione@ag.ny.gov, or in his/her absence, to the person holding the title of Bureau Chief, Investor Protection Bureau.

Representations and Warranties:

68.    The OAG has agreed to the terms of this Settlement Agreement based on, among other things, the representations made to the OAG by Bitfinex, Tether, and their counsel and the OAG's own factual investigation as set forth in Findings, paragraphs 6–54, above.  Bitfinex and Tether represent and warrant that neither they nor their counsel have made any material representations of fact to the OAG that are false. If any material representations of fact by Bitfinex, Tether, or their counsel are later found to be false, this Settlement Agreement is voidable by the OAG in its sole discretion.

69.    No representation, inducement, promise, understanding, condition, or warranty not set forth in this Settlement Agreement has been made to or relied upon by Bitfinex or Tether in agreeing to this Settlement Agreement.

70.    Bitfinex and Tether represent and warrant, through the signatures below, that the terms and conditions of this Settlement Agreement are duly approved.  Bitfinex and Tether further represent and warrant that the signatories to this Settlement Agreement are directors of Bitfinex and Tether.

General Principles:

71.    Nothing in this Settlement Agreement shall relieve Bitfinex or Tether of other obligations imposed by any applicable state or federal law or regulation or other applicable law.

72.    Nothing contained herein shall be construed to limit the remedies available to the OAG in the event that Bitfinex or Tether violate the Settlement Agreement after its effective date.

73.    This Settlement Agreement may not be amended except by an instrument in writing signed on behalf of the Parties.

74.    In the event that any one or more of the provisions contained in this Settlement Agreement shall for any reason be held by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, in the sole discretion of the OAG, such invalidity, illegality, or unenforceability shall not affect any other provision of this Settlement Agreement.

75.    Bitfinex and Tether acknowledge that they have entered this Settlement Agreement freely and voluntarily and upon due deliberation with the advice of counsel.

76.     This Settlement Agreement shall be governed by the laws of the State of New York without regard to any conflict of laws principles.

77.     This Settlement Agreement and all its terms shall be construed as if mutually drafted with no presumption of any type against any party that may be found to have been the drafter.

78.     This Settlement Agreement may be executed in multiple counterparts by the parties hereto.  All counterparts so executed shall constitute one agreement binding upon all parties, notwithstanding that all parties are not signatories to the original or the same counterpart. Each counterpart shall be deemed an original to this Settlement Agreement, all of which shall constitute one agreement to be valid as of the effective date of this Settlement Agreement.  For purposes of this Settlement Agreement, copies of signatures shall be treated the same as originals.  Documents executed, scanned and transmitted electronically and electronic signatures shall be deemed original signatures for purposes of this Settlement Agreement and all matters related thereto, with such scanned and electronic signatures having the same legal effect as original signatures.

79.     The effective date of this Settlement Agreement shall be February 18, 2021.

LETITIA JAMES
Attorney General of the State of New York
28 Liberty Street
New York, NY 10005

By: _____

John D. Castiglione
Senior Enforcement Counsel
Investor Protection Bureau

Brian Whitehurst
Assistant Attorney General
Investor Protection Bureau

iFinex Inc., BFXNA Inc., BFXWW Inc.

By: _____

       Giancarlo Devasini, Director
       Dated: February 17, 2021


Tether Holdings Limited, Tether Operations Limited,
Tether Limited, and Tether International Limited

By: _____

       Jean-Louis van der Velde, Director
       Dated: February 17, 2021

Page **17** of **17**

# EXHIBIT Z

**UNITED STATES OF AMERICA**
**Before the**
**COMMODITY FUTURES TRADING COMMISSION**

|  |  |
|---|---|
| **In the Matter of:** | ) |
|  | ) |
| **Tether Holdings Limited, Tether** | ) |
| **Operations Limited, Tether Limited,** | ) **CFTC Docket No. 22-04** |
| **and Tether International Limited,** | ) |
|  | ) |
| **Respondents.** | ) |
|  | ) |

**ORDER INSTITUTING PROCEEDINGS PURSUANT TO**
**SECTION 6(c) AND (d) OF THE COMMODITY EXCHANGE ACT, MAKING**
**FINDINGS, AND IMPOSING REMEDIAL SANCTIONS**

## I.     INTRODUCTION

The Commodity Futures Trading Commission ("Commission") has reason to believe that from at least June 1, 2016 to February 25, 2019 (the "Relevant Period"), Respondents Tether Holdings Limited, Tether Operations Limited, Tether Limited, and Tether International Limited, all doing business as "Tether" (collectively, "Respondents" or "Tether"), violated Section 6(c)(1) of the Commodity Exchange Act ("Act"), 7 U.S.C. § 9(1) (2018), and Commission Regulation ("Regulation") 180.1(a)(2), 17 C.F.R. § 180.1(a)(2) (2020).  Therefore, the Commission deems it appropriate and in the public interest that public administrative proceedings be, and hereby are, instituted to determine whether Respondents engaged in the violations set forth herein and to determine whether any order should be issued imposing remedial sanctions.

In anticipation of the institution of an administrative proceeding, Respondents have submitted an Offer of Settlement ("Offer"), which the Commission has determined to accept. Without admitting or denying any of the findings or conclusions herein, Respondents consent to the entry of this Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions ("Order"), and acknowledges service of this Order.[1]

---

[1] Respondents consent to the use of the findings of fact and conclusions of law in this Order in this proceeding and in any other proceeding brought by the Commission or to which the Commission is a party or claimant, and agrees that they shall be taken as true and correct and be given preclusive effect therein, without further proof.  Respondents do not consent, however, to the use of this Order, or the findings or conclusions herein, as the sole basis for any other proceeding brought by the Commission or to which the Commission is a party or claimant, other than:  a proceeding in bankruptcy or receivership; or a proceeding to enforce the terms of this Order.  Respondents do not consent to the use of the Offer or this Order, or the findings or conclusions in this Order, by any other party in any other proceeding.

## II.     FINDINGS

The Commission finds the following:

### A.     SUMMARY

Tether introduced the U.S. dollar tether token ("USDt" or "tether token") as a stablecoin in 2014.  The USDt is a commodity as defined by the Act.  At various times during the Relevant Period, Tether misrepresented to customers and the market that Tether maintained sufficient fiat reserves to back every USDt in circulation "one-to-one" with the "equivalent amount of corresponding fiat currency" held in reserves by Tether (the "Tether Reserves"), and that Tether would undergo routine, professional audits to demonstrate that it maintained "100% reserves at all times."  In fact, during the majority of the Relevant Period, Tether failed to maintain fiat currency reserves in accounts in Tether's own name or in an account titled and held "in trust" for Tether (collectively the "Tether Bank Accounts") to back every USDt in circulation.  While Tether represents that it maintained adequate reserves, some of the Tether Reserves were in accounts other than the Tether Bank Accounts, and at times included receivables and non-fiat assets among its counted reserves.  In addition, at least until 2018, Tether utilized a manual process to track the Tether Reserves, which did not capture the real-time status of the Tether Reserves.  Further, from at least 2018 through February 25, 2019, Tether failed to disclose that the Tether Reserves included unsecured receivables, commercial papers, funds held by third-parties, and other non-fiat assets.  Finally, Tether Reserves were not routinely audited.

### B.     RESPONDENTS

**Tether Holdings Limited** was incorporated in the British Virgin Islands on September 5, 2014.  Tether Holdings Limited owns 100% of Tether Operations Limited, Tether Limited, and Tether International Limited.  Tether Holdings Limited has never been registered with the Commission in any capacity.

**Tether Limited** was incorporated in Hong Kong on September 8, 2014.  Tether Limited operated Tether's website and token platform, tether.to from September 8, 2014 through March 15, 2017.  Throughout the Relevant Period, Tether Limited was and continues to be registered with FinCEN as a non-bank financial institution known as a Money Services Business ("MSB").  Tether Limited has never been registered with the Commission in any capacity.

**Tether Operations Limited** was incorporated in the British Virgin Islands on March 15, 2017.  Tether Operations Limited operates Tether's website and token platform, tether.to.  Tether Operations Limited has never been registered with the Commission in any capacity.

**Tether International Limited** was incorporated in the British Virgin Islands on March 15, 2017.  Tether International Limited has never been registered with the Commission in any capacity.

2

## C.    OTHER RELEVANT ENTITIES[2]

**iFinex Inc**. ("iFinex") is a privately-held financial technology company incorporated in the British Virgin Islands on May 21, 2013.  iFinex operates the Bitfinex trading platform.

**BFXNA Inc.** ("BFXNA") was incorporated in the British Virgin Islands on November 4, 2014.  BFXNA is a wholly-owned subsidiary of iFinex.

**BFXWW Inc.** ("BFXWW") was incorporated in the British Virgin Islands on April 28, 2015.  BFXWW is a wholly-owned subsidiary of iFinex.

## D.    FACTS

### 1.    The Tether Token

Since its launch in 2014, Respondents have represented that the tether token is a "stablecoin," a type of virtual currency whose value is pegged to fiat currency.  At launch, Respondents announced, through their Facebook account, that: "Tether means a digital tie between a real-world asset and the digital assets backed by currencies."  Although Respondents offer tether tokens in several national currencies, the dominant tether token is the U.S. dollar tether token, commonly referred to as "USDt."  Throughout the Relevant Period, Respondents repeatedly represented that one USDt may always be redeemed for one U.S. dollar.  Respondents' website represents the purpose and value of the USDt token as:

> Tether is a token backed by actual assets, including USD and Euros.  One Tether equals one underlying unit of the currency backing it, e.g., the U.S. Dollar, and is backed 100% by actual assets in the Tether platform's reserve account.  Being anchored or "tethered" to real world currency, Tether provides protection from the volatility of cryptocurrencies.

Beginning in January 2015, tether tokens have been used to deposit and withdraw funds on the Bitfinex platform. Tether tokens provide a medium of exchange across cryptocurrency trading platforms.  For example, a trader may transfer USDt to Bitfinex or another cryptocurrency exchange and use the tether tokens to purchase or trade digital assets such as bitcoin. BTC/USDT is a frequently traded pair.

Before November 2017, customers could only acquire and redeem tether tokens directly from Respondents.  To do so, typically, customers transferred the corresponding amount of U.S. dollars in order to acquire USDt from Respondents and received the corresponding amount of U.S. dollars in exchange for redeemed USDt, less any applicable fees.  On or around November 19, 2017, Respondents experienced a cyber-attack during which the attackers caused the unauthorized transfer of nearly 31 million USDt tokens that had been authorized but not issued (the "2017 Tether Hack").  No reserve funds were at risk or stolen during the 2017 Tether

---

[2] iFinex, BFXNA and BFXWW collectively did business as "Bitfinex" throughout the Relevant Period. Concurrently with this Order, the Commission is issuing an order against Bitfinex settling separate and distinct violations of Sections 4(a) and 4d(a)(1) of the Act, 7 U.S.C. §§ 6(a), 6d(a)(1) (2018), as well as BFXNA's violation of Part VII. A of the Commission's 2016 Order in *In re BFXNA Inc. d/b/a Bitfinex*, CFTC No. 16-19, 2016 WL 3137612 (June 2, 2016).

Hack.  Following the 2017 Tether Hack, and continuing until on or about November 27, 2018, Respondents ceased directly issuing and redeeming tether tokens, and tether tokens could only be issued or redeemed through Bitfinex.  Thereafter, beginning in or around November 27, 2018, customers could obtain USDt tokens from Bitfinex or Tether.  Today, tether tokens can be obtained from dozens of cryptocurrency exchanges, including several operating in the U.S.

2.    **Respondents' Untrue or Misleading Statements and Omissions: USDt Would Be Fully Backed by US Dollars Held In the Tether Bank Accounts**

Throughout the Relevant Period, Respondents represented that Tether backed every tether token in circulation 1:1 with corresponding fiat currency reserves held by Tether.  Prior to February 25, 2019, Respondents' website consistently represented that tether tokens are "100% Backed: Every tether [token] is always backed 1-to-1 by traditional currency held in our reserves.  So 1 USDT is always equivalent to 1 USD."

Until February 25, 2019, Respondents' Terms of Service similarly represented that:

> Tether Tokens are fully backed by the currency or property used to purchase them at issuance. Tether Tokens are denominated in a range of currencies. For example, if you purchase EURT, your Tethers are fully backed by Euros. If you cause to be issued EURT 100.00, Tether holds €100.00 to back those Tether Tokens. […] Tether Tokens are backed by money, but they are not money themselves. Tether will not issue Tether Tokens for consideration that is other Digital Tokens (for example, bitcoin), and will not redeem Tether Tokens for other Digital Tokens; only money will be accepted upon issuance, and only money will be provided upon redemption.

Respondents' website includes a page entitled 'Transparency Page,' (the "Tether Transparency Page").  A June 20, 2018 announcement on the Tether Transparency Page stated "All Tethers in circulation are fully backed by USD reserves. Full stop.... Reserves have always, and will always, match the number of Tethers in circulation."

Beginning on April 16, 2015 and continuing throughout the Relevant Period, a whitepaper entitled "Tether: Fiat Currencies on the Bitcoin blockchain" (the "Tether Whitepaper") has been available on Tether's website.  Respondents' representations in the Tether Whitepaper include:

> Tethers are fully reserved in a one-to-one ratio, completely independent of market forces, pricing, or liquidity constraints. Tether has a simple and reliable Proof of Reserves implementation and undergoes regular professional audits. Our underlying banking relationships, compliance, and legal structure provide a secure foundation for us to be the custodian of reserve assets and issuer of tethers. . . . Each Tether issued into circulation will be backed in a one-to-one ratio with the equivalent amount of corresponding fiat currency held in reserves by Hong Kong based Tether Limited. As the custodian of the backing asset we are acting as a trusted third party responsible for that asset. . . . Tether Limited has a bank account

which will receive and send fiat currency to users who purchase/redeem
tethers directly with us.

Similarly, in announcing a new banking relationship on November 1, 2018, Tether again
represented that "USDT in the market are fully backed by US dollars that are safely deposited in
our bank accounts."

Respondents also made similar representations in blog posts, interviews, and even public
court filings. For example, in April 2017, in a federal lawsuit filed by Tether Limited, iFinex
and Bitfinex, the companies alleged that "Tether is a digital token and each tether unit issued into
circulation is backed one-to-one by the U.S. Dollar, i.e., customer dollars held by Tether."
*iFinex v. Wells Fargo*, Case No. 3:17-cv-01882 (N.D. Cal. Apr. 5, 2017).

**3.      The Tether Reserves: USDt Was Not At All Times Fully Backed by U.S. Dollars
Held In the Tether Bank Accounts**

In contrast to Respondents' statements, Respondents did not at all times hold sufficient
fiat reserves in the Tether Bank Accounts to back USDt tokens in circulation for the substantial
majority of the Relevant Period. Indeed, for the time period of September 2, 2016 through
November 1, 2018, the aggregate amount of fiat currency held by Tether in the Tether Bank
Accounts was less than the corresponding USDt tokens in circulation on 573 of 791 days,
meaning that, contrary to Respondents' representations, the Tether Reserves were "fully-backed"
by fiat currency reserves held in the Tether Bank Accounts only 27.6% of the time. Instead, at
various times, Tether maintained some of the Tether Reserves in bank accounts other than the
Tether Bank Accounts. Tether represents that, at times, it also included receivables and non-fiat
assets among its counted reserves; and further represents that Tether has not failed to satisfy a
redemption request for tether tokens.

Beginning on or around May 5, 2017, Respondents began depositing some of their cash
holdings, including funds comprising the Tether Reserves, in an account at Bank 1 titled in the
name of the individual serving as Tether's General Counsel, In Trust for Tether Limited (the
"GC Trust Account"). Beginning on or around June 2, 2017, some of the Tether Reserves were
held in Bitfinex's bank accounts and comingled with Bitfinex operational and customer funds,
amounting to approximately $382 million by September 14, 2017. On September 15, 2017,
Respondent Tether International opened an account in its name. On that same day, Bitfinex
transferred $382,064,782 in reserve funds from one of its bank accounts to Tether International's
newly-opened bank account.

During this same period, the number of tether tokens in circulation grew by at least a
hundred million month-to-month: on June 1, 2017, there were at least 109,844,263 tether tokens
in circulation; by July 1, 2017, there were at least 214,852,881 tethers in circulation; by August
1, 2017, there were at least 319,398,873 tether tokens in circulation; and, by September 15, 2017,
there were at least 442,481,760 tether tokens in circulation. During this same time, the amount
held in the GC Trust Account never exceeded $61.5 million.

At various times during the Relevant Period, Respondents relied upon unregulated
entities and certain third-parties to hold some of their funds, including Tether Reserves, and for a

period of time commingled Tether Reserves with funds belonging to Bitfinex and/or Bitfinex customers.  In aggregate, during the Relevant Period Tether and Bitfinex's assets included funds held by or received from third-parties pursuant to at least 51 different arrangements, only 22 of which were documented through loan agreements, trust agreements, or other formal contracts.

On or about October 2017, Respondents opened an account with an unlicensed money transmitting business (the "Payment Processor") registered in Panama.  Bitfinex had opened accounts with the same Payment Processor beginning in or around 2014.  In aggregate, Respondents and Bitfinex had at least twelve accounts with Payment Processor (the "PP Accounts").  The PP Accounts held funds received from customers, including those in the U.S., in connection with tether tokens issuances and funds related to Bitfinex customer transactions. Beginning in August 2018, the PP Accounts also held funds comprising part of the Tether Reserves.  Respondents had no written agreements governing the Payment Processor's handling of the PP Accounts, and Respondents did not receive or have access to all periodic account statements issued by the Payment Processor, but instead maintained an internal ledger of the funds they believed were being held in those accounts.

From at least October 2017 through November 1, 2018, Respondents and Bitfinex directed customers to deposit funds by wiring them to the Payment Processor.  In the first quarter of 2018, for example, customers deposited more than $480 million into the PP Accounts.  By April 2018, media reports began to emerge that authorities seized approximately $371 million in funds held by Payment Processor.  At or around the same time, Bitfinex encountered increasing difficulties withdrawing funds from the PP Accounts.  Internally, Respondent and Bitfinex's CFO characterized the situation as a "liquidity crisis."  Nevertheless, Bitfinex continued to rely upon the Payment Processor to hold funds, and by July 2018, the CFO told PP "over 80% of our money is now with you."  At that time, the PP Accounts held in excess of one billion dollars.  In August 2018, the CFO informed the Payment Processor "we have too much money with you and almost nothing elsewhere."

Respondents transferred funds between Tether and Bitfinex to assist Bitfinex in responding to this "liquidity crisis."  For example, in November 2018, Respondents transferred $625 million from Respondents' bank accounts—funds comprising the Tether Reserves—to Bitfinex to provide Bitfinex with liquidity it needed, unrelated to USDt.[3]  To "offset" this transfer, Bitfinex directed PSP to make a ledger entry reflecting a transfer of $625 million from Bitfinex to Tether.  On November 2, 2018, a similar set of transactions occurred.  At this time, Respondents' and Bitfinex's funds held by the Payment Processor were at least encumbered, but more likely wholly unavailable.  Subsequently, Tether Limited and iFinex entered into a Credit Facility Agreement, finalized in March 2019, that retroactively formalized the November 2018 transfer of $625 million, among others. Respondents represent that in January 2021, iFinex repaid the loan in full.

Beginning in or before August 2018, Tether Reserves were held in non-fiat financial products and other less-liquid assets including commercial paper, and bank repurchase

_____

[3] Respondents and Bitfinex shared common ownership, leadership, management, employees and operational resources.  For example, the same individuals at Tether and Bitfinex serve as Chief Executive Office, Chief Financial Officer, Chief Technology Officer and General Counsel, respectively.  They have also shared common business functions including marketing, audit, legal, compliance, finance, tech and support resources.

agreements.  At various times during the Relevant Period, Respondents also considered anticipated receivables and anticipated wire transfers as assets for purposes of calculating the Tether Reserves.

On February 25, 2019, Respondents amended their disclosures to state that "Tether Tokens are 100% backed by Tether's Reserves," defined as "traditional currency and cash equivalents and, from time to time, may include other assets and receivables from loans made by Tether to third parties, which may include affiliated entities."

### 4.    The Tether Reserves Were Not Audited

No audit of the Tether Reserves occurred during or prior to the Relevant Period. Respondents retained independent third-parties to conduct reviews of the Tether Reserves twice during the Relevant Period.  First, in 2017, Respondents retained an accounting firm to perform a review of the Tether Reserves, as reported on the Tether Transparency Page, against fiat currency held in Tether's name on a single date, September 15, 2017, a date selected by Respondents and known to their principals ahead of the accounting firm's review.  On that date, with the full knowledge of Respondents, Bitfinex transferred $382,064,782 from Bitfinex's bank accounts to Tether's newly-opened bank account.  Second, in 2018, Respondents retained a law firm to compare Tether's holdings in two bank accounts to the USDt in circulation as of June 1, 2018, based on the information provided by Respondents or publicly available on the blockchain. Thereafter, on October 15, 2018, Respondents released a statement claiming that the firm "based on a random date balance inspection and a full review of relevant documentation of bank accounts, confirmed that all tether tokens in circulation as of that date were indeed fully backed by USD reserves."  In 2018, Tether stated publicly that professional audits were not obtainable at that time.  To date, Respondents have not completed an audit of the Tether Reserves.

### 5.    Respondents Failed to Employ an Automated Process to Track Reserves

Tether did not accurately track reserves at all times during the Relevant Period.  In particular, at least until 2018, Respondents did not employ an automated method for tracking Tether Reserves against tether tokens in circulation in real time.  Respondents developed an additional internal, proprietary database (the "Tether Database") after the 2017 Tether Hack. The Tether Database stores data regarding tether token issuances and redemptions, as well as transaction information for customers' deposits and withdrawals.  For much of the Relevant Period, there was no automated process for incorporating bank statements and balances into the Tether Database, and information regarding the amount of fiat currency held in Respondents' accounts as Tether Reserves had to be manually inputted into the Tether Database.  Further, at least until 2018, Respondent's internal accounting system for tracking fiat balances, including bank balances for USDt reserves, primarily consisted of a spreadsheet (the "Reserve Spreadsheet").  The Tether executive team was ultimately responsible for the Reserve Spreadsheet.  The Reserve Spreadsheet required manual updates and was not always kept up to date in real time.  Respondents were aware of the limitations of the Reserve Spreadsheet.  For example, in an internal chat on June 15, 2016, Tether's then-Chief Strategy Officer informed Respondents' CFO and other employees stated that the: "transparency page needs to be dealt with ASAP . . . I am surprised the issuance address is not updated dynamically, btw . . . and how often does the bank balance get updated?"  Following the Relevant Period, Respondents have

7

implemented more automated processes for tracking and updating bank balances and reporting information about the Tether Reserves on the Tether Transparency Page.

## III.   LEGAL DISCUSSION

### A.   USDt is a Commodity in Interstate Commerce

Digital assets such as bitcoin, ether, litecoin, and tether tokens are commodities. As defined under Section 1a(9) of the Act, 7 U.S.C. § 1a(9) (2018), commodities, with limited exceptions, includes all manner of "other goods and articles . . . and all services, rights and interests . . . in which contracts for future delivery are presently or in the future dealt in." *See Bd. of Trade of City of Chicago v. SEC*, 677 F. 2d 1137, 1142 (7th Cir. 1982) ("This language was also meant to encompass futures markets that were expected to be expanded to cover non-traditional goods and services . . .") *vacated on other grounds,* 459 U.S. 1026 (1982). Digital assets are commodities and subject to applicable provisions of the Act and Regulations, including Section 6(c)(1) of the Act and Regulation 180.1(a). *See, e.g.*, *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 217 (E.D.N.Y. 2018) ("Virtual currencies can be regulated by CFTC as a commodity . . . . They fall well-within the common definition of 'commodity' as well as the [Act's] definition of 'commodities' as 'all other goods and articles . . . in which contracts for future delivery are presently or in the future dealt in.'"); *CFTC v. My Big Coin Pay, Inc.*, 334 F. Supp. 3d 492, 495–98 (D. Mass. 2018) (denying motion to dismiss; determining that a non-bitcoin virtual currency is a "commodity" under the Act); *In re Coinflip, Inc.*, CFTC No. 15-29, 2015 WL 5535736, at *2 (Sept. 17, 2015) (consent order) ("bitcoin and other virtual currencies are encompassed in the definition [of Section 1a(9) of the Act] and properly defined as commodities."). The USDt token, a virtual currency stablecoin, is a commodity and subject to applicable provisions of the Act and Regulations.

The Act broadly defines the terms "interstate commerce" and "in interstate commerce." *See* Sections 1a(30) of the Act (defining "interstate commerce") and 2(b) of the Act (providing that, for purposes of the Act, a transaction is "in interstate commerce" if the traded item is part of the current of commerce "from one State" to another), 7 U.S.C. §§ 1a(30), 2(b) (2018). Section 1a(13) of Act defines the term "contract of sale" to include sales, agreements of sale, and agreements to sell. 7 U.S.C. § 1a(13) (2018). Digital assets, like USDt tokens, constitute a commodity in interstate commerce under Section 6(c)(1) of the Act. *McDonnell*, 332 F.Supp.3d at 717, 723 (holding Section 6(c)(1) and Regulation 180.1(a) were violated by fraudulent misrepresentations in connection with digital asset transactions, as those digital assets were commodities in interstate commerce).

### B.   By Intentionally or Recklessly Making Untrue or Misleading Statements and Omissions of Material Facts, Tether Violated Section 6(c)(1) of the Act and Regulation 180.1(a)(2)

Taken together, Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018), and Regulation 180.1(a)(2), 17 C.F.R. § 180.1(a)(2) (2020), prohibit "intentionally or recklessly … mak[ing] any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading" in connection with any swap, or contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any

8

registered entity.  Respondents violated Section 6(c)(1) and Regulation 180.1(a)(2) by intentionally or recklessly making untrue or misleading statements of material facts and by omitting to state material facts necessary in order to make statements made not untrue or misleading.  Those untrue or misleading statements and omissions included: repeated representations that Tether would fully back the USDt token with fiat currency, specifically, the US Dollar, in accounts held in Tether's own name; omissions regarding the actual backing of USDt including non-fiat assets, such as commercial paper; representations that Tether would undergo regular professional audits; and omissions regarding the pre-disclosed timing of one of the two reviews that Tether did undertake.

## IV.    FINDINGS OF VIOLATIONS

Based on the foregoing, the Commission finds that, during the Relevant Period, Tether violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018), and Regulation § 180.1(a)(2), 17 C.F.R. § 180.1(a)(2) (2020).

## V.    OFFER OF SETTLEMENT

Respondents have submitted the Offer in which they, without admitting or denying the findings and conclusions herein:

A.    Acknowledge service of this Order;

B.    Admit the jurisdiction of the Commission with respect to all matters set forth in this Order and for any action or proceeding brought or authorized by the Commission based on violation of or enforcement of this Order;

C.    Waive:

1.    The filing and service of a complaint and notice of hearing;

2.    A hearing;

3.    All post-hearing procedures;

4.    Judicial review by any court;

5.    Any and all objections to the participation by any member of the Commission's staff in the Commission's consideration of the Offer;

6.    Any and all claims that they may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (2018), and 28 U.S.C. § 2412 (2018), and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Regulations, 17 C.F.R. pt. 148 (2019), relating to, or arising from, this proceeding;

7.    Any and all claims that they may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, tit. II, §§ 201–253, 110 Stat. 847, 857–74 (codified as amended at 28 U.S.C. § 2412 and in scattered

9

sections of 5 U.S.C. and 15 U.S.C.), relating to, or arising from, this proceeding; and

8. Any claims of Double Jeopardy based on the institution of this proceeding or the entry in this proceeding of any order imposing a civil monetary penalty or any other relief, including this Order.

D. Stipulate that the record basis on which this Order is entered shall consist solely of the findings contained in this Order to which Respondents have consented in the Offer;

E. Consent, solely on the basis of the Offer, to the Commission's entry of this Order that:

1. Makes findings by the Commission that Respondents violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018), and Regulation § 180.1(a)(2), 17 C.F.R. § 180.1(a)(2) (2020);

2. Orders Respondents to cease and desist from violating Section 6(c)(1) of the Ac, and Regulation § 180.1(a)(2);

3. Orders Respondents to pay, jointly and severally, a civil monetary penalty in the amount of $41 million dollars ($41,000,000), plus any post-judgment interest if the civil monetary penalty is not paid within ten days of the date of entry of this Order; and

4. Orders Respondents and their successors and assigns to comply with the conditions and undertakings consented to in the Offer and as set forth in Part VI of this Order.

F. Represent that Tether has engaged in remediation efforts, including but not limited to: since May 2019 Tether has been segregating operational funds from the Tether Reserves and will continue to do so; and in 2019 Tether implemented more automated processes for tracking and updating bank balances and reporting information about the Tether Reserves on the Tether Transparency Page.

Upon consideration, the Commission has determined to accept the Offer.

## VI.   ORDER

**Accordingly, IT IS HEREBY ORDERED THAT:**

1. Respondents and their successors and assigns shall cease and desist from violating Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018), and Regulation 180.1(a)(2), 17 C.F.R. § 180.1(a)(2) (2020).

2. Respondents shall pay, jointly and severally, a civil monetary penalty in the amount of $41 million dollars ($41,000,000) (the "CMP Obligation"), within ten days of the date of the entry of this Order. If the CMP Obligation is not paid in full within ten days of the date of entry of this Order, then post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Order and shall be determined by using

10

the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2018).

Respondents shall pay the CMP Obligation and any post-judgment interest by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

CFTC
c/o ESC/AMK326; RM 265
6500 S. MacArthur Blvd.
Oklahoma City, OK 73169
(405) 954-6569 office
(405) 954-1620 fax
9-AMC-AR-CFTC@faa.gov

If payment is to be made by electronic funds transfer, Respondents shall contact Marie Thorne or her successor at the above address to receive payment instructions and shall fully comply with those instructions. Respondents shall accompany payment of the CMP Obligation with a cover letter that identifies the paying Respondents and the name and docket number of this proceeding. The paying Respondent(s) shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

3.  Respondents and their successors and assigns shall comply with the following conditions set forth in the Offer:

    1.  Public Statements: Respondents agree that neither they nor any of their successors and assigns, agents or employees under their authority or control shall take any action or make any public statement denying, directly or indirectly, any findings or conclusions in this Order or creating, or tending to create, the impression that this Order is without a factual basis; provided, however, that nothing in this provision shall affect Respondents': (i) testimonial obligations; or (ii) right to take legal positions in other proceedings to which the Commission is not a party. Respondents and their successors and assigns shall comply with this agreement, and shall undertake all steps necessary to ensure that all of their agents and/or employees under their authority or control understand and comply with this agreement.

    2.  Cooperation, in General: Respondents shall cooperate fully and expeditiously with the Commission, including the Commission's Division of Enforcement, in this action, and in any current or future Commission investigation or action related thereto. Respondents shall also cooperate with the Commission in any investigation, civil litigation, or administrative matter related to, or arising from, this action.

11

3.    Partial Satisfaction:  Respondents understand and agree that any acceptance by the Commission of any partial payment of Respondent's CMP Obligation shall not be deemed a waiver of their obligation to make further payments pursuant to this Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

4.    Change of Address/Phone: Until such time as Respondents satisfy in full their CMP Obligation as set forth in this Consent Order, Respondents shall provide written notice to the Commission by certified mail of any change to their telephone number and mailing address within ten calendar days of the change.

5.    Until such time as Respondents satisfy in full their CMP Obligation, upon the commencement by or against Respondents of insolvency, receivership, or bankruptcy proceedings or any other proceedings for the settlement of Respondents' debts, all notices to creditors required to be furnished to the Commission under Title 11 of the United States Code or other applicable law with respect to such insolvency, receivership, bankruptcy or other proceedings, shall be sent to the address below:

Secretary of the Commission
Legal Division
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street N.W.
Washington, DC 20581

**The provisions of this Order shall be effective as of this date.**

By the Commission.

_____
Christopher J. Kirkpatrick
Secretary of the Commission
Commodity Futures Trading Commission

Dated:  October 15, 2021

12

# EXHIBIT AA

# CFTC Orders Tether and Bitfinex to Pay Fines Totaling $42.5 Million

CFTC **cftc.gov**/PressRoom/PressReleases/8450-21



## Release Number 8450-21

### Tether to Pay $41 million Over Claims that Tether Stablecoin was Fully Backed by US Dollars

### Bitfitnex to Pay $1.5 Million for Illegal Transactions While Operating Bitfinex Cryptocurrency Trading Platform and Violation of Prior CFTC Order

**October 15, 2021**

**Washington, D.C.** — The Commodity Futures Trading Commission today issued an order simultaneously filing and settling charges against **Tether Holdings Limited, Tether Limited, Tether Operations Limited,** and **Tether International Limited** (d/b/a Tether) for making untrue or misleading statements and omissions of material fact in connection with the U.S. dollar tether token (USDT) stablecoin. The order requires Tether to pay a civil monetary penalty of $41 million and to cease and desist from any further violations of the Commodity Exchange Act (CEA) and CFTC regulations, as charged.

The CFTC today also issued a separate order simultaneously filing and settling charges against **iFinex Inc., BFXNA Inc.,** and **BFXWW Inc.** (d/b/a Bitfinex) in connection with their operation of the Bitfinex cryptocurrency trading platform. The order finds Bitfinex engaged in illegal, off-

exchange retail commodity transactions in digital assets with U.S persons on the Bitfinex trading platform and operated as a futures commission merchant (FCM) without registering as required. It further finds that, through this same conduct, BFXNA Inc. violated Part VII. A. of the CFTC's June 2, 2016 order. [See CFTC Press Release No. 7380-16]

The order requires Bitfinex to pay a $1.5 million civil monetary penalty. It also prohibits Bitfinex from further violations of the CEA, as charged, and requires Bitfinex to implement and maintain additional systems reasonably designed to prevent unlawful retail commodity transactions.

"This case highlights the expectation of honesty and transparency in the rapidly growing and developing digital assets marketplace," said Acting Chairman Rostin Behnam. "The CFTC will continue to take decisive action to bring to light untrue or misleading statements that impact CFTC jurisdictional markets."

"As demonstrated by today's actions against Tether and Bitfinex, the CFTC is committed to carrying out its statutory charge to promote market integrity and protect U.S. customers," said Acting Director of Enforcement Vincent McGonagle. "The CFTC will use its strong anti-fraud enforcement authority over commodities, including digital assets, when necessary. The CFTC will also act to ensure that certain margined, leveraged or financed digital asset trading offered to retail U.S. customers must occur on properly registered and regulated exchanges.  Moreover, as the Bitfinex order reflects, the CFTC will take decisive action against those who choose to violate CFTC orders."

**Tether Case Background**

The Tether order finds that since its launch in 2014, Tether has represented that the tether token is a stablecoin with its value pegged to fiat currency and 100% backed by corresponding fiat assets, including U.S. dollars and euros. However, the Tether order finds that from at least June 1, 2016 to February 25, 2019, Tether misrepresented to customers and the market that Tether maintained sufficient U.S. dollar reserves to back every USDT in circulation with the "equivalent amount of corresponding fiat currency" held by Tether and "safely deposited" in Tether's bank accounts. In fact Tether reserves were not "fully-backed" the majority of the time. The order further finds that Tether failed to disclose that it included unsecured receivables and non-fiat assets in its reserves, and that Tether falsely represented that it would undergo routine, professional audits to demonstrate that it maintained "100% reserves at all times" even though Tether reserves were not audited.

As found in the order, Tether held sufficient fiat reserves in its accounts to back USDT tether tokens in circulation for only 27.6% of the days in a 26-month sample time period from 2016 through 2018. The order also finds that, instead of holding all USDT token reserves in U.S. dollars as represented, Tether relied upon unregulated entities and certain third-parties to hold funds comprising the reserves; comingled reserve funds with Bitfinex's operational and customer funds; and held reserves in non-fiat financial products. The order further finds that Tether and Bitfinex's

combined assets included funds held by third-parties, including at least 29 arrangements that were not documented through any agreement or contract, and that Tether transferred Tether reserve funds to Bitfinex, including when Bitfinex needed help responding to a "liquidity crisis."

In addition, the order finds that Tether failed to complete routine, professional audits during the relevant time period. According to the order, Tether retained an accounting firm to perform a review of Tether reserves on a date Tether selected in advance, and Bitfinex transferred over $382 million to Tether's bank account in advance of that review. The order recognizes that Tether has not completed an audit of the Tether reserves.

**Bitfinex Case Background**

The Bitfinex order finds that from at least March 1, 2016 through at least December 31, 2018, Bitfinex offered, entered into, executed, and confirmed the execution of illegal, off-exchange financed retail commodity transactions with U.S. persons that were not eligible contract participants (ECPs) under the CEA.

The Bitfinex order further finds that Bitfinex operated as an FCM without CFTC registration by accepting orders for, acting as a counterparty to, and accepting funds or property, including bitcoin and USDt tokens, in connection with those same retail commodity transactions. According to the order, the substantial majority of margin trading was financed through Bitfinex's peer-to-peer funding program through which Bitfinex customers who held fiat or cryptocurrency in their Bitfinex account would "lend" those funds to other Bitfinex customers who would then use those funds to buy, sell, and trade on the Bitfinex platform. The order also finds that, during the relevant period, Bitfinex force-liquidated certain customer positions and acted as the counterparty to certain transactions.  In so doing, Bitfinex violated the terms of the 2016 order, which had directed Bitfinex to cease and desist from offering, entering into, executing, or confirming the execution of illegal, off-exchange financed retail commodity transactions, and from accepting orders and receiving funds in connection with retail commodity transactions.

In connection with this order, Bitfinex must comply with certain undertakings by December 31, 2021, including implementing, as necessary, and maintaining systems and procedures reasonably designed to prevent non-ECP U.S. persons from engaging in retail commodity transactions.

The CFTC thanks and acknowledges the assistance of the Securities Commission of The Bahamas, British Virgin Islands Financial Services Commission, Ontario Securities Commission, Superintendencia del Mercado de Valores de Panama, Comissão do Mercado de Valores Mobiliários (the Portuguese Securities Market Commission), and the Financial Services Authority Seychelles .

The Division of Enforcement staff members responsible for this case are Candy Haan, Bryan Hsueh, Cristina Covarrubias, Benjamin Jackman, Ray Lavko, Elizabeth N. Pendleton, Scott R. Williamson, and Robert T. Howell, as well as former enforcement staff members Michael Frisch, Jeffrey Gomberg, Brigitte C. Weyls, and Susan Gradman.

The CFTC also strongly urges the public to verify a company's registration with the Commission before committing funds. If unregistered, a customer should be wary of providing funds to that entity. A company's registration status can be found using NFA BASIC.

\*\*\*\*\*\*\*

Customers can report suspicious activities or information, such as possible violations of commodity trading laws, to the CFTC Division of Enforcement via a toll-free hotline 866-FON-CFTC (866-366-2382) or file a tip or complaint online or contact the CFTC Whistleblower Office. Whistleblowers are eligible to receive between 10 and 30 percent of the monetary sanctions collected paid from the CFTC Customer Protection Fund financed through monetary sanctions paid to the CFTC by violators of the CEA.

**-CFTC-**

# EXHIBIT AB

# WILLKIE FARR & GALLAGHER LLP



CLIENT ALERT

# CFTC Enforcement Actions Against Tether, Kraken and Bitfinex Reassert Agency's Broad Jurisdiction in Crypto

October 19, 2021

## AUTHORS

**Neal E. Kumar** | **J. Christopher Giancarlo** | **Justin L. Browder** | **Serge B. Agbre**
**Alexandra Calabro**

The Commodity Futures Trading Commission ("CFTC") continues to push an aggressive enforcement regime against participants in the steadily growing digital asset markets.  In recent weeks, the CFTC has published separate speaking order settlements against major institutions involved in digital asset markets, including Tether, Kraken and Bitfinex.[1]  Importantly, these settlements demonstrate a long term trend at the CFTC to pursue enforcement actions in the digital asset markets because the investigations associated with these settlements appear to originate from prior CFTC administrations.

These settlements also bring to light the complicated web of CFTC jurisdiction over the commodities markets.  The Tether settlement highlights the CFTC's limited jurisdiction to pursue fraud and manipulation in the commodities market.  Importantly, the Tether settlement also represents the first CFTC settlement addressing a so-called stablecoin, and serves

---

[1]  *In re Tether Holdings Limited, et al.*, Order Instituting Proceedings Pursuant to Sections 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions, CFTC Docket No. 22-4 (Oct. 15, 2021) ("Tether Order"); *In re Payward Ventures, Inc. (d/b/a/ Kraken)*, Order Instituting Proceedings Pursuant to Sections 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions, CFTC Docket No. 21-20 (Sept. 28, 2021) ("Kraken Order"); *In re iFinex Inc., et al.*, Order Instituting Proceedings Pursuant to Sections 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions, CFTC Docket No. 22-05 (Oct. 15, 2021) ("Bitfinex Order").

---

## CFTC Enforcement Actions Against Tether, Kraken and Bitfinex Reassert Agency's Broad Jurisdiction in Crypto

to lay down a marker that the CFTC considers one of the major stablecoins in the digital asset market to be a commodity under the CFTC's jurisdiction rather than a security regulated by the Securities and Exchange Commission ("SEC"). On the other hand, both the Kraken and Bitfinex settlements showcase the CFTC's jurisdiction to regulate fully certain retail commodity transactions that trade on margin.

In total, these enforcement actions resulted in penalties amounting to approximately $43.75 million, with the Tether settlement representing nearly all of the total amount at $41 million.[2]

### Tether Settlement

In 2014, Tether introduced a stablecoin called the U.S. dollar tether token ("USDt"), which is pegged to the U.S. dollar.[3] The CFTC defined a "stablecoin" as a type of virtual currency whose value is derived from a fiat currency.[4] Although Tether offered a number of tether tokens, the dominant offering was the USDt. In reaching its decision in the Tether Order, the CFTC determined that stablecoins, like those offered by Tether, fall within the definition of a "commodity" under the CEA on the basis that courts have ruled that digital currencies fall within the definition of a commodity.[5]

Since 2014, Tether "represented that one USDt may always be redeemed for one U.S. dollar."[6] Prior to November 2017, USDt could only be acquired and redeemed through Tether's platform. At some point in November 2017, Tether's systems were the target of a cyber-attack which resulted in the unauthorized transfer of nearly 31 million units of USDt. For a period of time following the cyber-attack, Tether ceased issuing and redeeming USDt, and tokens could be acquired or redeemed only through Tether's affiliate, Bitfinex. Since November 2018, USDt could be acquired from either Tether or Bitfinex, among a number of other cryptocurrency exchanges.[7]

In the Tether Order, the CFTC alleged that since introducing the currency in 2014, Tether made numerous public representations that the USDt, as well as its other tether tokens, were directly linked to fiat currency. One such assertion, in the form of a whitepaper published on Tether's website, stated that "[e]ach Tether issued into circulation will be backed in a one-to-one ratio with the equivalent amount of corresponding fiat currency held in reserves by Hong Kong-based

---

[2]     In the Tether Order, Tether was issued a civil penalty of $41 million. In the other orders, Kraken and Bitfinex were issued a civil penalties of $1.25 million and $1.5 million, respectively.

[3]     The following entities are collectively referred to herein as "Tether": Tether Holdings Limited, Tether Operations Limited, Tether Limited, and Tether International Limited.

[4]     Tether Order at 3.

[5]     Tether Order at 8 ("Digital assets are commodities. . . . The USDt token, a virtual currency stablecoin, is a commodity and subject to the applicable provisions of the Act and Regulations."); *see also CFTC v. McDonnell*, 287 F. Supp. 3d 213, 217 (E.D.N.Y. 2018); *CFTC v. My Big Coin Pay, Inc.*, 334 F. Supp. 3d 492, 495–98 (D. Mass. 2018).

[6]     Tether Order at 3.

[7]     *Id.* at 4.

---

## CFTC Enforcement Actions Against Tether, Kraken and Bitfinex Reassert Agency's Broad Jurisdiction in Crypto

Tether Limited."[8]  Another statement, made in the context of a newly announced banking relationship, affirmed that the "[USDt] in the market are fully backed by US dollars that are safely deposited in [Tether's] bank accounts."[9]

However, according to the Tether Order, the company did not in fact hold sufficient fiat currency reserves to back each tether token in circulation.  For a majority of the time period between June 1, 2016 and February 25, 2019, the total amount of fiat currency held by Tether was significantly below that which Tether purported to hold.  In particular, from September 2, 2016 through November 1, 2018, the Tether Order alleged that USDt was only fully backed by actual fiat currency 27.6% of the time.[10]  The Tether Order did not provide additional detail regarding the average ratio of USDt to USD during the relevant period.

The Tether Order alleged that Tether also relied upon unregulated entities and third parties to hold customer funds.  For example, Tether commingled funds with its affiliate, Bitfinex, transferred certain funds to "an unlicensed money transmitting business (the 'Payment Processor') registered in Panama," and provided funds to Bitfinex to assist Bitfinex with liquidity issues it experienced on a separate platform.[11]  Tether's reserves were also held in non-fiat financial products and other types of assets such as commercial paper and bank repurchase agreements. Additionally, Tether counted anticipated receivables and wire transfers as part of the reserves tied to its stablecoin.

The Tether Order further alleged that Tether did not track the funds it was holding in reserve.  Although Tether developed a specialized database following the 2017 cyber-attack to track the amount of fiat currency held in reserve against USDt, for much of the relevant period, "there was no automated process for incorporating bank statements and balances into the Tether Database, and information regarding the amount of fiat currency held in [Tether's] accounts as Tether Reserves had to be manually inputted into the Tether Database."[12]  Until 2018, much of Tether's internal accounting related to tracking the tokens in circulation revolved around a manually updated spreadsheet.  This manual process led to a significant amount of information remaining untracked.

On February 25, 2019, Tether amended its website disclosure to no longer state that its tokens were fully backed by fiat currency.  The revised disclosure explained that USDt were backed by "traditional currency and cash equivalents and, from time to time, may include other assets and receivables from loans made by Tether to third parties, which may include

---

[8]     *Id.*

[9]     *Id.* at 5.

[10]    *Id.*

[11]    *Id.* at 6.

[12]    *Id.*

## CFTC Enforcement Actions Against Tether, Kraken and Bitfinex Reassert Agency's Broad Jurisdiction in Crypto

affiliated entities."[13] Following the relevant period, Tether also implemented more automated accounting and tracking systems.

Based on these events, the CFTC  alleged that Tether intentionally or recklessly made materially  false or misleading statements (or omissions) of fact concerning CFTC-jurisdictional commodity sales.[14]  The CFTC ordered Tether to pay a civil monetary penalty of $41 million based upon the CFTC's anti-market manipulation regulations.

**Kraken and Bitfinex Settlements**

Although the CFTC's jurisdiction over commodity markets is limited to anti-fraud and anti-manipulation authority, when participants trade commodities on margin or leverage, the CFTC fully regulates the margined or leveraged trading activity as futures contracts, unless an exception applies.  If the margined or leveraged trading activity is fully regulated as futures trading, then the trading activity is subject to the requirement, among others, that the contracts be executed on a futures exchange referred to as a designated contract market.[15]  Furthermore, entities that facilitate trading in the fully regulated margined or leveraged contracts may need to register with the CFTC.  For example, participants that execute orders and accept margin funds on behalf of market participants may need to register with the CFTC as a futures commission merchant ("FCM").

There are two primary exceptions to the CFTC fully regulating commodity contracts traded on margin or leverage as futures contracts.  First, trading on margin or leverage is not regulated as a futures contract if the parties to the trading activity are "eligible contract participants" or "eligible commercial entities," which are definitions designed to identify sophisticated market participants, but exclude retail participants.[16]  Entities or persons that are not eligible contract participants or eligible commercial entities are often referred to as retail customers.  Second, the CFTC does not regulate commodity trading on margin or leverage, even if the parties to the trading are retail customers, so long as the trading in the contracts " result[s] in actual delivery within 28 days or such longer period as the [CFTC] may determine."[17]  On March 24, 2020, the CFTC issued interpretive guidance further explaining the meaning of actual delivery of virtual currencies for purposes of the actual delivery exception.[18]

---

[13]   *Id.* at 7.

[14]   Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018), and Regulation 180.1(a)(2), 17 C.F.R. § 180.1(a)(2) (2020).

[15]   *See* Section 2(c)(2)(D) of the Commodity Exchange Act ("CEA").

[16]   *See* CEA Sections 1a(17) & (18).

[17]   *See* CEA Section 2(c)(2)(D)(ii)(III)(aa).

[18]   For a summary of the CFTC's March 24, 2020 interpretation, please refer to Willkie's previous client alert dated March 30, 2020 (available here).

## CFTC Enforcement Actions Against Tether, Kraken and Bitfinex Reassert Agency's Broad Jurisdiction in Crypto

### *Kraken Settlement: $1.25 Million Penalty with Undertakings*

According to the Kraken Order,  from June 2020 to July 21, 2021, Kraken operated a digital asset platform that allowed retail customers to purchase and sell digital assets, including bitcoin, *on margin*.[19]  Kraken "offered potential and existing U.S. customers the ability to enter into margined retail commodity transactions on its exchange" during the relevant period.[20]  In determining whether a customer qualified for margin, Kraken required the customer to meet certain contractual prerequisites, but did not assess whether the customer was an ECP, ECE, or a retail customer.  Customers had the option to settle transactions with their own funds or to trade on margin, "for which Kraken was the sole provider."[21]

Margined transactions were conducted through Kraken's central limit order book and execution facility, and "Kraken maintained physical or constructive custody of all digital assets or fiat currency purchased using margin for the duration of a customer's open margined position."[22]  Customers who traded on margin were only obligated to repay Kraken upon closing their open margined position.  A position remained open until a customer "submitted a closing trade, [or] repaid the margin, or Kraken initiated a forced liquidation, based on the occurrence of certain triggering events."[23]  Customers were required to repay Kraken within 28 days, and if a customer failed to repay Kraken within that time frame, Kraken could unilaterally force the margined position to be liquidated.  Additionally, Kraken could force liquidation if the value of the collateral dropped below certain thresholds.[24]

The Kraken Order explained that certain transactions conducted on the Kraken platform did not comply with the "actual delivery" exception to the CFTC's mandatory exchange trading requirement because Kraken maintained possession and control of the "entire quantity of the assets purchased using margin," and therefore customers were not able to use the assets "freely in commerce away from the execution facility until the customer satisfied the repayment obligation."[25]  Consequently, Kraken could not rely on the actual delivery exception to shield it from the CFTC regulating the contracts as futures contracts under the CEA.

Because the products traded through Kraken were subject to regulation as futures contracts, the Kraken Order also found that Kraken violated the CEA for failing to register as an FCM.  Specifically, Kraken accepted orders for and entered into retail commodity transactions with customers, and also accepted money or property (or extended credit in lieu thereof) to

---

[19]    Specifically, the name of the entity at issue in the Kraken Order is Payward Ventures, Inc. (d/b/a Kraken).

[20]    Kraken Order at 2.

[21]    *Id.*

[22]    *Id.*

[23]    *Id.* at 3.

[24]    *Id.*

[25]    *Id.*

---

## CFTC Enforcement Actions Against Tether, Kraken and Bitfinex Reassert Agency's Broad Jurisdiction in Crypto

margin these transactions.  As a result, Kraken met the definition of an FCM, and violated the CEA for failure to register as an FCM during the relevant period.

Kraken agreed to pay a civil monetary penalty of $1.25 million.[26]  The Kraken Order also imposed an undertaking for Kraken to "implement and maintain systems and procedures reasonably designed to prevent margined or leveraged trading on Respondent's trading platform by U.S. residents who are not eligible ECPs."[27]  Specifically, the Kraken Order required Kraken to implement such systems by June 23, 2021, and all existing open margined positions held by U.S. residents who are not ECPs were required to be closed by July 21, 2021.[28]  The CFTC noted that Kraken had cooperated with its investigation, including voluntarily responding to requests for information in a timely fashion, proactively reaching out to the CFTC for guidance on complying with the CEA and CFTC regulations, implementing remediation efforts, and taking steps to close the unlawful U.S.-based margin trading business.[29]

### *Bitfinex Settlement: $1.5 Million Penalty with Undertakings*

According to the Bitfinex Order, from at least March 1, 2016 through at least December 31, 2018 Bitfinex operated a digital asset trading platform that allowed its customers to enter into and execute a variety of digital currency related commodity transactions on margin.[30]  Bitfinex offered trades on either a leveraged or margined basis on both long and short positions to these customers.[31] To facilitate the trades, Bitfinex utilized a peer-to-peer funding program where Bitfinex customers would offer fiat or digital currencies in their own accounts to allow other customers to meet margin requirements.

To trade with margin, Bitfinex required its customers to hold a percentage of the value of their open positions in a "Margin Wallet," which held both fiat and digital currencies.  A customer's margined position remained open "until the customer submit[ted] a closing trade, or Bitfinex initiate[d] a forced" liquidation, which typically occurred when the equity held in the Margin Wallet dipped below the required maintenance margin.[32]  When initiating a forced liquidation, Bitfinex acted as the customer's counterparty to that transaction.

---

[26]    *Id.* at 6.

[27]    *Id.* at 7.

[28]    *Id.*

[29]    *Id.* at 2–3.

[30]    Bitfinex Order at 3.

[31]    The Bitfinex entities consist of BFXNA Inc. ("BFXNA"), BFXWW Inc. ("BFXWW") and iFinex Inc. ("iFinex").

[32]    *Id.* at 3.

## CFTC Enforcement Actions Against Tether, Kraken and Bitfinex Reassert Agency's Broad Jurisdiction in Crypto

Although Bitfinex asserted that it had safeguards in place to prevent unauthorized customers from opening an account, the CFTC found that during the relevant period, numerous U.S. retail customers were able to access and use the platform:[33]

- First, although Bitfinex claimed that it implemented an automated system requiring customers to verify their place of residence before withdrawing fiat currency or digital currencies through its platform, Bitfinex customers, including those in the United States could click through and simply ignore the platform's "Terms of Service" and continue to access the Bitfinex platform.  Those customers, who had not verified their place of residence, were able to deposit cryptocurrencies and enter into retail commodity transactions on the Bitfinex platform.

- Second, Bitfinex was aware that many U.S.-based customers used VPNs to mask their internet protocol (IP) address, allowing them to conceal the fact that they were residing in the United States and thus make use of Bitfinex's services.

- Third, even though Bitfinex developed an "Individual On-boarding Procedure" that outlined its Know-Your-Customer program, that procedure allowed U.S. citizens that were "Bitfinex Personnel" (i.e., current employees or contractors) to trade on the Bitfinex Platform.

The Bitfinex Order explained that by facilitating commodity transactions involving U.S. retail customers, Bitfinex was required to comply with Section 4(a) of the CEA.  Under Section 4(a), any relevant transaction must be "made on or subject to the rules of a board of trade that has been designated or registered by the CFTC as a contract market for the specific commodity."  Because Bitfinex was not registered as an exchange under the applicable regulation, the commodity transactions it enabled through its platform constituted illegal, off-exchange transactions in violation of Section 4(a) of the CEA.[34]

Additionally, under a 2016 settlement with the CFTC in *In re BFXNA Inc. d/b/a Bitfinex*, CFTC No. 16-19, 2016 WL 3137612 (June 2, 2016), Bitfinex was required to "cease and desist" from offering, entering into or otherwise intermediating the execution of financed retail commodity transactions to U.S. retail customers unless said transactions were made subject to a CFTC-registered contract market.[35]  By continuing to offer the same leveraged, margined, or financed commodity transactions in violation of the Commission's regulations, the CFTC alleged that Bitfinex violated Part VII.A of the 2016 order.[36]

---

[33]    *Id.* at 5.

[34]    Bitfinex Order at 7.

[35]    *Id.*

[36]    *Id.*

## CFTC Enforcement Actions Against Tether, Kraken and Bitfinex Reassert Agency's Broad Jurisdiction in Crypto

Finally, the CFTC found that by accepting funds and orders for, acting as a counterparty to, and accepting money or property for margined retail commodity transactions, Bitfinex operated as an FCM without obtaining the required registration.[37]

Bitfinex agreed to pay a civil monetary penalty of $1.5 million.[38]  Similar to the Kraken Order, the Bitfinex Order imposed an undertaking for Bitfinex to take steps to prevent future unlawful trading by adopting systems that would prevent U.S. retail customers from engaging in improper transactions on its platform.  These measures must be implemented by the end of 2021.[39]

**Implications**

The CFTC's settlements with Tether, Kraken, and Bitfinex, along with the recent consent order entered into by the U.S. Southern District of New York for a permanent injunction and $100 million fine against five companies running "BitMEX" in connection with charges brought by the CFTC, highlight the agency's unabated focus on  digital asset platforms.[40]  The Tether Order, in particular, represents one of the first formal actions undertaken by the U.S. regulators against sponsors of stablecoins.  Although the issue of regulatory jurisdiction over stablecoins is one that heretofore has not been authoritatively addressed, it is likely to be more widely discussed as the United States Financial Oversight Council is soon scheduled to address the financial stability implications of stablecoins.

Although the CFTC is clearly staking out an increased enforcement presence in the digital asset trading space, at least one Commissioner has expressed reservations about the scope of the CFTC's enforcement role in the absence of clear industry guidance. In a recent statement,  Commissioner Stump questioned whether future settlements in the same vein as Tether and Bitfinex will lead to consumer protections or whether the CFTC is just "push[ing] the limits of [its] enforcement authority in order to claim a piece of the jurisdictional pie."[41]  Commissioner Stump proposed that if the CFTC is going to continue holding entities such as these accountable for CEA violations, it must also provide reasonable guidance to allow entities to run their businesses in compliance with the CEA and the CFTC's regulations.

---

[37]    Bitfinex Order at 6.

[38]    Bitfinex Order at 8.

[39]    *Id.* at 9–10.

[40]    Willkie recently published a client alert on the BitMEX consent order.  *See* CFTC Pushes Enforcement on Overseas Crypto Platform (Sept. 16, 2021), available here.

[41]    Concurring Statement by Commissioner Dawn D. Stump Regarding Tether and Bitfinex Settlement (October 15, 2021), available here.

---

**CFTC Enforcement Actions Against Tether, Kraken and Bitfinex Reassert Agency's Broad Jurisdiction in Crypto**

Willkie has a dedicated team of attorneys with extensive knowledge and experience in all aspects of the Commodity Exchange Act and the CFTC regulatory regime.  We would be pleased to assist on your matters.

| | | | |
|---|---|---|---|
| **Athena Eastwood** | **J. Christopher Giancarlo** | **Neal E. Kumar** | **Rita M. Molesworth** |
| 202 303 1212 | 212 728 3816 | 202 303 1143 | 212 728 8727 |
| aeastwood@willkie.com | jcgiancarlo@willkie.com | nkumar@willkie.com | rmolesworth@willkie.com |
| **Paul J. Pantano Jr.** | **Deborah A. Tuchman** | **Conrad G. Bahlke** | **Margo Bailey** |
| 202 303 1211 | 212 728 8491 | 212 728 8233 | 202 303 1178 |
| ppantano@willkie.com | dtuchman@willkie.com | cbahlke@willkie.com | mbailey@willkie.com |
| **Lisa Eskenazi** | **Serge B. Agbre** | **Steven C. Matos** | **Michael Hartz** |
| 212 728 3349 | 202 303 1173 | 212 728 8757 | 202 303 1161 |
| leskenazi@willkie.com | sagbre@willkiecom | smatos@willkie.com | mhartz@willkie.com |

Copyright © 2021 Willkie Farr & Gallagher LLP.

This alert is provided by Willkie Farr & Gallagher LLP and its affiliates for educational and informational purposes only and is not intended and should not be construed as legal advice. This alert may be considered advertising under applicable state laws.

Willkie Farr & Gallagher LLP is an international law firm with offices in Brussels, Chicago, Frankfurt, Houston, London, Los Angeles, Milan, New York, Palo Alto, Paris, Rome, San Francisco and Washington. The firm is headquartered at 787 Seventh Avenue, New York, NY 10019-6099.  Our telephone number is (212) 728-8000 and our fax number is (212) 728-8111.  Our website is located at www.willkie.com.

# EXHIBIT AC

# CFTC Releases Annual Enforcement Results

**cftc.gov**/PressRoom/PressReleases/8613-22



## Release Number 8613-22

**October 20, 2022**

Washington, D.C. — The Commodity Futures Trading Commission today released the agency's enforcement results for Fiscal Year 2022 that demonstrates its continued commitment to protecting customers and ensuring market integrity. In FY 2022, the CFTC obtained orders imposing over $2.5 billion in restitution, disgorgement and civil monetary penalties either through settlement or litigation. In the agency's efforts to prevent fraud, manipulation, reporting, supervision and misconduct related to digital assets, the CFTC filed 82 enforcement actions and continued to devote significant resources to litigating complex cases and achieved several litigation successes during the fiscal year.

"In the face of unprecedented financial market conditions directly impacting American consumers, emerging technological disruption, and growing retail investor participation, the CFTC continues its unwavering commitment to a robust enforcement program ensuring the markets we oversee are open, transparent, fair and competitive," said Chairman Rostin Behnam. "This FY 2022 enforcement report shows the CFTC continues to aggressively police new digital commodity asset markets with all of its available tools. I personally thank the Enforcement Division's hardworking and dedicated leadership team and staff."

"As evidenced by the FY 2022 enforcement results, whether measured by the number of new enforcement actions filed or the many hard-fought successful litigations, the Enforcement Division staff's dedication to protecting customers, ensuring the integrity of the markets, and holding market participants and registrants accountable is unwavering." said Acting Director of Enforcement Gretchen Lowe. "The Enforcement Division demonstrated its professionalism, expertise and skill through the breadth, complexity and importance of the investigations conducted, the cases filed, and the successes achieved."

Below are performance highlights from FY 2022. In addition, Addendum A includes a table summary of the FY 2022 actions; a list of all FY 2022 actions; and a list of those FY 2022 actions that involved digital asset-related conduct.

**Division of Enforcement Performance Highlights**

The Division of Enforcement (DOE) FY 2022 performance is reflected in the enforcement actions it filed and the litigation and cooperative enforcement successes it achieved.

The CFTC's 82 enforcement actions included the following, among others:

*Digital Asset-Related Actions*

In Fiscal Year 2022, the Commission brought 18 actions involving conduct related to digital assets, representing more than 20% of all actions filed during FY 2022. Through those actions, the Commission charged manipulation of the Digitex Futures native token; charged a decentralized autonomous organization (DAO); addressed failures to register or seek designation as a designated contract market (DCM), swap execution facility (SEF) or futures commission merchant (FCM); and took on fraud, including a $1.7 billion fraudulent scheme.

- The CFTC charged defendants, who operated a digital asset exchange under the trade name "Digitex Futures," with illegally offering futures transactions on a platform other than a DCM and also with attempting to manipulate the price of the Digitex Futures native token and failing to implement a Customer Identification and Anti-Money Laundering program. [Press Release 8605-22]
- The CFTC charged defendants with commodity pool fraud, among other violations, arising from defendants' acceptance of at least 29,421 Bitcoin—with a value of over $1,733,838,372—from approximately 23,000 non-ECPs from the United States. [Press Release 8549-22]
- The CFTC charged a DCM with, directly and through others, making false or misleading statements of material facts, or omitting to state material facts, to the CFTC during an evaluation of the potential self-certification of a bitcoin futures contract. The proposed bitcoin futures contract was to be settled by reference to the spot bitcoin price on the relevant day as determined by an auction held on Gemini's digital asset trading platform (Gemini Bitcoin Auction). [Press Release 8540-22]

- The CFTC charged respondents who designed, deployed, marketed, and made solicitations concerning a blockchain-based software protocol that accepted orders for and facilitated margined and leveraged retail commodity transactions (functioning similarly to a trading platform). The Commission found they unlawfully engaged in activities that could only lawfully be performed by registered FCMs and failed to adopt a customer identification program as part of a Bank Secrecy Act compliance program, as required of FCMs. [Press Release 8590-22]
- The CFTC found the cryptocurrency trading platform, Bitfinex, engaged in illegal, off-exchange retail commodity transactions in digital assets with U.S persons and operated as an FCM without registering as required.
- The CFTC also found Tether Holdings Limited, and others, made untrue or misleading statements and omissions of material fact in connection with the U.S. dollar tether token (USDT) stablecoin. The order requires Tether to pay a civil monetary penalty of $41 million. [Press Release 8450-21]
- The CFTC charged defendants with illegally offering leveraged and margined retail commodity transactions in digital assets, such as Ether, DAI, and others; engaging in activities only registered FCMs can perform; and failing to adopt a customer identification program as part of a Bank Secrecy Act compliance program, as required of FCMs. [Press Release 8590-22]

*Manipulative and Deceptive Conduct and Spoofing*

- In its largest benchmark manipulation case to date, the CFTC found that an energy and commodities trading firm, engaged in manipulation and foreign corruption in the U.S. and global oil markets, including manipulation or attempted manipulation of four U.S. based S&P Global Platts physical oil benchmarks and related futures and swaps. The CFTC ordered the firm to pay $1.186 billion, which consists of the highest civil monetary penalty ($865,630,784) and highest disgorgement amount ($320,715,066) in any CFTC case. [Press Release 8534-22]
- CFTC charged defendants engaged in cross-market and single market spoofing involving CBOT soybean futures and options on soybean futures. [Press Release 8514-22]
- The CFTC brought several actions finding spoofing by respondents in a number of different markets, including gold and silver futures, CME Natural Gas (NG) and Reformulated Blendstock for Oxygenate Blending Gasoline futures, and Treasury futures. [Press Releases 8568-22, 8577-22, 8595-22, and 8595-22]

*Recordkeeping and Supervision*

The CFTC found the swap dealer and futures commission merchant (FCM) affiliates of 12 financial institutions committed recordkeeping and supervision violations and imposed a total of $796 million in civil monetary penalties. Specifically, the 12 orders find the swap dealer and/or FCM in question, for a number of years, failed to stop its employees, including those at senior levels, from communicating both internally and externally using unapproved communication methods, including messages sent via personal text, WhatsApp or Signal. [Press Releases 8470-21 and 8599-22]

*Violations by Registered Entities*

- The CFTC found a registered DCM committed multiple violations, including failure to conduct controls testing and sufficient internal and external penetration testing; failure to conduct adequate enterprise technology risk assessments; options and swaps reporting violations; false statements to the Commission; and violation of a DCM Core Principle that among other things, contains requirements relating to the reliability, security, and adequate scalable capacity of operations and automated systems. [Press Release 8603-22]
- The CFTC found a registered DCM failed to obtain required written acknowledgment letters from a depository stating the depository was informed that funds deposited are customer funds being held in accordance with the Commodity Exchange Act (CEA) and restrict the use of such funds, among other things. [Press Release 8443-21]
- The CFTC found a registered SEF failed to comply with the CFTC 15-second delay requirement for certain required transactions on a SEF order book. [Press Release 8601-22]

*Misappropriation of Material Non-Public Information*

- The CFTC charged an employee with misappropriating confidential natural gas block trade order information from his employer and directing natural gas block trades to a brokerage firm in exchange for a share of the brokerage commissions charged to his employer for these trades. The complaint also charged the employee with making false statements to the CFTC.  [Press Release 8490-22]
- The CFTC charged an introducing broker (IB) and associated person (AP) with misappropriation of block order information and unauthorized trading. The CFTC alleged the IB brokered trades without customers' knowledge or consent; while the AP traded on the opposite side of brokerage customers, intentionally offered non-true market prices, and misled customers to believe they were negotiating and trading against third parties. [Press Release 8451-21]
- The CFTC charged defendants for receiving tipped confidential block trade order information belonging to an energy company from a trader at that company, and in turn trading on the basis of this information, including entering into non-arm's length, fictitious block trades in natural gas futures on the basis of this information. The CFTC alleged the scheme generated over $1.5 million in trading profits, which the defendant shared with both the energy company trader and the broker involved in the scheme. [Press Release 8468-21]

*Swaps Reporting and Swap Dealer Business Conduct*

- The CFTC found a provisionally registered swaps dealer (SD) committed swaps reporting failures; failed to comply with SD Business Conduct Standards when it failed to disclose to its swaps counterparties certain material information; and committed a failure-to-supervise violation. [Press Release 8501-22]
- The CFTC found a provisionally registered SD committed swaps reporting violations; adjusted daily mark disclosures being made to the relevant swap counterparties, contrary to the requirements of the CEA and CFTC regulations; and committed a failure-to-supervise violation. [Press Release 8552-22]

*Other Enforcement Actions: Fraud, Registration, Reporting, Wash Trading, Position Limit Violations*

- The CFTC charged a hedge fund and its CFO with engaging in a scheme to provide false or misleading material information and failing to provide such material information to swap counterparties of a private fund it managed, resulting in the swap counterparties collectively losing over $10 billion. [Press Release 8520-22]
- In a sweep, the CFTC filed five enforcement actions charging five entities with operating as unregistered FCMs. The CFTC alleges that all the respondents claim to be one of the leading platforms offering binary options, forex and spreads and further claim to be regulated by the CFTC. [Press Release 8589-22]
- The CFTC alleged defendants defrauded at least 14,0000 retail forex customers worldwide and misappropriated at least $4.7 million of customer funds. [Press Release 8477-21]
- The CFTC found that a state-owned entity and its affiliate engaged in violations involving ICE Cotton No. 2 futures, including wash trading violations, position limit violations, and reporting failures. [Press Release 8592-22]

*Litigation Victories*

The CFTC's FY 2022 litigation success is further reflected in the following results:

- After a 5-day trial, the CFTC won a jury verdict against a portfolio manager finding he engaged in fraud when he misrepresented how he managed risk in the fund. [Press Release 8515-22]
- After a 5-day trial, the CFTC won a verdict finding a block trade broker and AP liable for secretly taking the other side of their customers' orders without consent 65 times and disclosing their customers' confidential order information, and finding the broker liable for failure-to-supervise and recordkeeping violations. The jury awarded a total of $7.5 million in civil monetary penalties. [Press Release 8574-22]

- Two defendants, charged in connection with a fraudulent forex and digital asset scheme, settled mid-trial as the CFTC presented its evidence against the defendants. The settlement order requires the defendants to pay $1.2 million in restitution and a $600,000 civil monetary penalty. [Press Release 8510-22]
- The CFTC won on summary judgment in an enforcement action, charging defendants with engaging in a fraudulent scheme involving an options trading program. The U.S. District Court ordered defendants to pay restitution and disgorgement totaling more than $6 million. [Press Release 8190-20]

*Cooperation with Criminal and Regulatory Authorities*

To effectively protect markets, participants, and customers, the CFTC continued its emphasis on coordination and parallel actions with criminal authorities and regulatory partners domestically and internationally. This was critical to deterring violators, punishing misconduct, preserving market integrity, and protecting market participants.

Illustrative of these efforts was the filing of a joint enforcement action by the CFTC and 27 state securities regulatory agencies that are members of the North American Securities Administrators Association (NASAA) charging a precious metals dealer and its owner for orchestrating a $68 million fraudulent scheme targeting elderly persons nationwide. [Press Release 8489-22]

*Whistleblower Program*

The Whistleblower Program's importance to the DOE continued to grow in terms of leads, successful enforcement actions, and whistleblower awards. In FY 2022, the CFTC's Whistleblower Program made history by issuing a record-breaking award of nearly $200 million to a single whistleblower, the largest whistleblower award ever granted under the Dodd-Frank Act by either the CFTC or Securities and Exchange Commission. With that award and others issued during FY 2022, the total sanctions ordered in all whistleblower-related enforcement actions surpassed the $3 billion milestone. [Press Release 8453-21]

*DOE Task Forces*

The CFTC also continued to utilize specialized DOE task forces in complex and developing program areas to ensure consistency, identify best practices, and develop new approaches and ideas based on lessons learned. These task forces focused on seven substantive areas: 1) Spoofing and Manipulative Trading; 2) Digital Assets; 3) Insider Trading and Protection of Confidential Information; 4) Bank Secrecy Act; 5) Swaps; 6) Corruption; and 7) Romance Scams.

[See Addendum A under Related Links]

**-CFTC-**

# EXHIBIT AD

# Tether: We've onboarded FBI, Secret Service to our platform

By Zack Abrams

STABLECOINS • DECEMBER 16, 2023, 2:32PM EST

🕐 UPDATED: DECEMBER 16, 2023, 2:41PM EST

 Make us preferred on Google          Share



QUICK TAKE

- In a recent letter shared with U.S. legislators, Tether's CEO has elaborated on his methods to prevent unsavory individuals from using the company's USDT stablecoins, including by onboarding the Secret Service and FBI to the company's platform.

- Tether froze wallets on the U.S. sanctions list last week, and claims to have frozen 435 million USDT so far.

We'd love your feedback.
Take a 30-second survey to help improve The Block.

Start Survey ↗

Tether, the company behind the USDT stablecoin, has published letters the company sent to the U.S. Senate Committee on Banking, Housing, and Urban Affairs and the U.S. House Financial Services Committee outlining its "commitment to security and close working relationships with law enforcement."

In the more recent letter, Tether CEO Paolo Ardoino, who recently took the helm of the company, emphasized Tether's recent decision to disable Tether's tokens in all wallets on the Office of Foreign Assets and Controls (OFAC) sanction list. Tether claims to have helped the Department of Justice, U.S. Secret Service, and Federal Bureau of Investigation (FBI) freeze 326 wallets controlling 435 million USDT so far, though its latest frozen wallets seemingly contain far fewer tokens than that sum.

Ardoino also announced that Tether "recently onboarded the United States Secret Service into our platform and is in the process of doing the same" for the FBI.

The letters were addressed to Senator Cynthia Lummis, known as a friendly figure to crypto in the Senate, and was also sent to the chairs and ranking members of the aforementioned committees.

Disclaimer: The Block is an independent media outlet that delivers news, research, and data. As of November 2023, Foresight Ventures is a majority investor of The Block. Foresight Ventures invests in other companies in the crypto space. Crypto exchange Bitget is an anchor LP for Foresight Ventures. The Block continues to operate independently to deliver objective, impactful, and timely information about the crypto industry. Here are our current financial disclosures.

© 2026 The Block. All Rights Reserved. This article is provided for informational purposes only. It is not offered or intended to be used as legal, tax, investment, financial, or other advice.

 **Which party will win the Senate in 2026?**

| | | | |
|---|---|---|---|
| Republican Party | **53.5%** | Yes | No |
| Democratic Party | **46.5%** | Yes | No |

$2.3m Vol.    🔥 $8k    🕐 5 months                    View Polymarket ↗

# EXHIBIT AE

CryptoSlate

Search CryptoSlate

News

Markets

Learn

Reviews

Directory

More

⌂ ▸ **NEWS** ▸ **REGULATION**

**US** ▸ 🪙 **Tether**

# Tether has frozen $435M USDT for U.S. DOJ, FBI, and Secret Service

Tether CEO said the world's largest stablecoin issuer wants to become a "world class partner" to the U.S. to "expand dollar hegemony."

**AUTHOR**
**Monika Ghosh**

**Dec. 17, 2023**
at 1:28 am GMT

3 min read

𝕏  f  ✈  in  ✉



Cover art/illustration via CryptoSlate. Image includes combined content which may include AI-generated content.

Make 🅲 **CryptoSlate** preferred on **Google**

The world's largest stablecoin issuer has frozen 326 wallets containing $435 million worth of Tether (**USDT**) for the U.S. authorities, the company

highlighted in a **letter** on Dec. 15. The assets were frozen to assist law enforcement authorities, including the U.S. Department of Justice (DOJ), the Federal Bureau of Investigation (FBI), and the Secret Service.

The letter, addressed to Senator Cynthia M. Lummis and Congressman J. French Hill, followed another **letter** to the politicians on Nov. 16. Both letters were sent in response to Lummis and Hill's letter to Attorney General Merrick Garland on Oct. 26, which outlined their concerns about the use of stablecoins for illicit activities, such as money laundering and terrorist financing.

Making both letters public, Tether CEO Paolo Ardoino **noted** that the company aims to become a "world class partner" to the U.S. to "expand dollar hegemony globally."

## Tether's commitment to prevent illicit use of USDT

In its latest letter, Tether highlighted that it implemented a "wallet-freezing policy" on Dec. 1  to assist law enforcement agencies in combatting illicit use of stablecoins. Calling it a "historic milestone," Tether said that the "straightforward yet impactful" policy involves freezing all wallets listed on the Office of Foreign Assets Control's (OFAC) Specially Designated Nationals (SDN) list.

Tether noted:



**"By expanding our sanctions controls to the secondary market, we are setting a precedent in the industry, leading with foresight and vigilance."**

Tether added that it recently onboarded the Secret Service onto its platform and is currently working to onboard the FBI. The stablecoin issuer has also helped the DOJ "thwart bad actors and aid victims' recovery."

In its 4-page November letter, Tether had listed all its ongoing efforts to prevent the use of USDT for nefarious means. This included having a "strong" know-your-customer (KYC) and anti-money laundering (AML) program that is at par with those found at "sophisticated financial institutions," according to the letter.

Tether's KYC/AML program also underwent a Title 31 examination conducted by the Internal Revenue Service (IRS) on behalf of the Financial Crimes Enforcement Network (FinCEN). Tether is registered as a Money Service Business with FinCEN.

Tether said it works with third-party services like Chainalysis and WorldCheck to conduct due diligence and background checks on potential customers. It also uses the services to run continuous news and information checks on existing customers to ensure up-to-date information, according to the letter.

Tether emphasized that its thousands of customers mostly include accredited individuals, trading firms, and institutions. Due to its limited number of customers, compared to the millions of customers handled by some crypto exchanges, Tether performs "much more thorough due diligence" on all its clients.

Additionally, the stablecoin issuer is working with Chainalysis to secure a comprehensive independent analysis of USDT transactions across major blockchains, as well as exploring more real-time monitoring capabilities.

Furthermore, Tether said it uses Chainalysis' Reactor Tool, which is used by several government agencies, to monitor transactions and identify high-risk or suspicious activity. For instance, transactions involving mixers or sanctioned wallets are flagged as high-risk.

## Extensive cooperation with global law enforcement agencies

According to the November letter, Tether has worked with 19 jurisdictions globally and assisted with ongoing investigations, in some cases proactively offering information to law enforcement.

Tether froze 800 million USDT in secondary market addresses that were mostly associated with hacks and thefts, as per the letter. The company said it helped the DOJ with 68 different requests by freezing 188 wallets holding 70 million USDT.

Tether collaborated with Israel's anti-terrorist financing agency, the NBCTF, to identify and freeze wallets associated with Hamas and other terrorist organizations. Tether said its relationship with the NBCTF started before the

October attack and that it will continue to work with the agency to prevent illicit use of USDT.



MENTIONED IN THIS ARTICLE

**Tether**      **Tether Limited**

POSTED IN

US      Regulation      Stablecoins      Tether

AUTHOR                              VIEW PROFILE →

**Monika Ghosh**

Former Reporter • CryptoSlate

In 2020, Monika immersed herself in crypto, maintaining skepticism yet firmly believing blockchain could address key issues like financial disparity and transparency. A book-lover, she's also a passionate food enthusiast.

X @TheMonsoonChild      in LinkedIn

EDITOR                              VIEW PROFILE →

**News Desk**

Editor • CryptoSlate

CryptoSlate is a comprehensive and contextualized source for crypto news, insights, and data. Focusing on Bitcoin, macro, DeFi and AI.

X @cryptoslate      in LinkedIn

CONTEXT
# Related coverage

# EXHIBIT AF

# Tether's Paolo Ardoino Says USDT Stablecoin Issuer 'Has Been Through Hell', Is Cheered On at Cantor Conference

coindesk.com/business/2025/03/12/tether-s-paolo-ardoino-says-stablecoin-issuer-has-been-through-hell-is-cheered-on-at-cantor-conference

Helene Braun, Krisztian Sandor                                           March 12, 2025



## Tether's Paolo Ardoino Says Stablecoin Issuer 'Has Been Through Hell', Is Cheered On at Cantor Conference

**Ardoino spoke at the Cantor Fitzgerald Global Technology Conference on Wednesday as he continued his first trip to the United States.**

Mar 12, 2025, 5:37 p.m. 3 min read

[Make preferred on](#)



Tether CEO Paolo Ardoino on stage at the Cantor Fitzgerald Global Technology Conference in New York on March 12, 2025 (Helene Braun/CoinDesk)

## What to know:

- Paolo Ardoino, the public face of crypto company Tether, was cheered on at the Cantor Fitzgerald Global Technology Conference in New York.
- "We've been through hell," Ardoino told attendees at the conference, referring to Tether being under scrutiny from U.S. authorities. It settled charges with the CFTC and NYDFS in 2021.
- Despite being an offshore stablecoin issuer, Tether has multiple ties to the U.S., including being a major U.S. debt buyer, its investment in video sharing platform Rumble, its close ties with Cantor Fitzgerald and onboarding U.S. agencies such as the FBI and Secret Service to its platform to combat illicit activities.

Attendees clapped and cheered when Paolo Ardoino, the public face of perhaps most influential company in crypto, entered the stage at the Cantor Fitzgerald Global Technology Conference in New York on Wednesday.

Ardoino stood out from the crowd, not for his wealth but for his choice of attire. While others dressed to impress, he opted for a laid-back look — a light blue Ralph Lauren polo and gray khakis — despite likely having the deepest pockets in the room.

0 of 31 minutes, 57 secondsVolume 0%
"This is my first trip to America," he started off saying. "It's beautiful. I feel very welcomed."

Ardoino indeed avoided the country for a long time. The Italy-born computer scientist until recently mainly focused Tether's operations on developing regions, with financial freedom as the stated goal.

Another reason could be that Tether has been under scrutiny from industry leaders as well as U.S. authorities for some time, including the Department of Justice (DOJ), the Commodities and Futures Trading Commission (CFTC), and the New York State Department of Financial Services (NYFSD).

That's changed. Ardoino has been on a tour of the U.S. over the past week, posting photos of himself on the U.S. Capitol Building steps in Washington D.C. on Thursday and participating in a fireside chat with Strike CEO Jack Mallers at a Tuesday event organized by the Bitcoin Policy Institute.

The company, which according to Ardoino is run by only 150 employees across 50 countries, settled charges with the CFTC and an NYDFS inquiry in 2021. There have been numerous reports of an ongoing Department of Justice investigation into the stablecoin issuer as well over the past few years.

"We've been through hell," Ardoino told attendees at the conference. "People were saying that if I came to the U.S. I'd be arrested ... They will try to scare you off."

> "We're still here, right?"

After a rundown of Tether's previous success in the stablecoin business — the company reportedly made a $13 billion profit in 2024 and its stablecoin, USDT, holds over 60% of market share among stablecoins — Ardoino went on to present current projects that the company is working on, including its efforts in education, AI and real-world asset (RWA) tokenization.

"The outlook for this year is wonderful as well," Ardoino said.

Ardoino's U.S. journey came at a time when the U.S. legislature is moving forward to regulate the $200 billion and rapidly growing stablecoin market. Tether is dominating the asset class with its $143 billion USDT cryptocurrency, followed by U.S.-based competitor Circle with its $58 billion USDC token.

While Tether is an offshore company — it recently announced its intention to establish its headquarters in El Salvador — and has yet to show interest in formally entering the U.S. crypto market, its ties to the U.S. are multifaceted.

The firm is one of the biggest buyers of U.S. debt, holding nearly $100 billion worth of U.S. Treasuries and government-backed securities as a reserve asset for its USDT token. If it were a country, it would be among the top 20 U.S. debt holders. Treasury Secretary Scott Bessent said

during a White House digital asset summit on Friday that stablecoins are key to preserving the U.S. dollar as the dominant reserve currency in the world, a line of argument that Ardoino touted multiple occasions before.

The company also gained a powerful ally in the Trump administration in Commerce Secretary Howard Lutnick, former CEO of Cantor Fitzgerald, the Wall Street investment firm that manages Tether's U.S. Treasury holdings. The Wall Street Journal reported that Cantor is also invested in Tether's holding company, while Lutnick said during his confirmation hearing that Cantor holds Tether convertible bonds but has no equity stake.

Ardoino, in an interview with CoinDesk last year, said that the firm also onboarded U.S. agencies such as the FBI and Secret Service to its platform in an effort to combat illicit activities.

On the investment front, Tether became a major shareholder with a $775 million investment in U.S.-listed video sharing platform Rumble, popular among U.S. conservative and right-wing users. With Tether's backing, Rumble CEO Chris Pavloski laid out plans to introduce a crypto wallet and support payments with USDT, BTC and Tether's gold-backed token XAUT.

Pavloski repeatedly called Ardoino while he was on stage Wednesday.

# EXHIBIT AG

# Check out the DC Blockchain Summit 2025 Summary.

**C** cryptoworth.com/media/dc-blockchain-summit-2025



2025

[Read the Summary](#)[Watch the Recap](#)

## Session Summaries from DC Blockchain Summit 2025

### Morning Sessions from DC Blockchain Summit 2025

These sessions explored U.S. competitiveness, regulatory clarity, and cryptographic innovation. Key discussions highlighted the role of stablecoins in maintaining dollar dominance, digital mining's impact on AI growth, and blockchain-based verification systems unlocking trillion-dollar opportunities.

**CODY CARBONE, THE DIGITAL CHAMBER - PRESIDENT: "We Still Haven't Gotten the Victories"**

Cody set an upbeat tone, emphasizing how far crypto has come politically—yet reminding everyone, "We still haven't gotten the victories that we need." He applauded the **presence of 25+ members of Congress**, a sitting governor, and even "the president's kid," signifying a new level of mainstream legitimacy. **The policy window is wide open**; now is the time to press for clarity in Washington and secure long-term industry growth.

- Over 25 members of Congress are participating.
- Industry has been "kicked down for years".
- The shift in "vibe" is dramatic compared to 2022.
- Urges continued advocacy and follow-ups in D.C.

**SERGEY NAZAROV, CHAINLINK — Co-founder**: "The U.S. Must Dominate Web3 Asset Origination."

Sergey believes the U.S. can dominate Web3 finance if it becomes the premier hub for on-chain asset origination, because "if the assets are originated in the U.S.….everyone gets their digital assets [here]." Expect accelerated tokenization of everything from treasuries to real estate—

stablecoins alone rely on U.S.-backed assets for **well over 90%** of their underlying value. Cross-chain security, proof of reserves, and data-rich tokens will define the next wave of reliable digital assets.

- Stablecoins derive **well over 90%** of their underlying value from U.S.-issued assets.
- "Infinite minting" risk demands robust proof-of-reserve methods.
- Secure cross-chain transfers are critical to prevent bridge hacks.
- Real-time asset **data** ("golden records") **reduces fraud and boosts transparency**.

**ARI REDBORD, TRM LABS — Global Head of Policy: "$150M Frozen: T3FCU Is Setting a New Standard in Crypto Forensics."**

Ari emphasized the unprecedented success of T3FCU in combating illicit crypto activity globally, noting that **"we are talking about $150 million frozen and seized by T3 working with law enforcement over just the last seven months."** TRM's investigative capabilities, paired with Tron's infrastructure and Tether's compliance controls, provide a scalable model for securing digital assets.

- **$150 million** in frozen funds over 7 months.
- Recent case: **$27 million seized** with Europol and
- TRM tracks Tether transactions on the Tron blockchain in real time.
- Close collaboration with U.S., EU, and global law enforcement.

**PAOLO ARDOINO, TETHER — CEO: "Stablecoins Are a Superior Tool for Law Enforcement."**

Paolo highlighted how stablecoins offer unparalleled traceability compared to cash, asserting that **"blockchain is the worst tool to be used by criminals because you can track every single transaction."** Tether's collaboration with TRM Labs and Tron enables rapid action to freeze funds and assist law enforcement in preventing illicit activity on a global scale.

- Average time to impose a freeze: **20 minutes to 1 hour**
- Tether's U.S. Treasury holdings make it the **7th largest purchaser** globally in 2024.
- Stablecoins could drive **U.S. dollar hegemony** by replacing cash in international transactions.
- Tether collaborates with law enforcement globally, enabling **real-time transaction tracking** to identify bad actors.

**REP. BRYAN STEIL, U.S. HOUSE — Chair of the Digital Assets Subcommittee: "Stablecoin Legislation Could Lock in U.S. Leadership."**

Rep. Steil emphasized the urgency of codifying crypto legislation to provide regulatory certainty, preventing future administrations from reversing progress. **"We need to lock in and codify a lot of this work so that we have building blocks for generations to come."** His focus remains on consolidating the **STABLE Act** and the **market structure bill** to foster domestic innovation and maintain U.S. competitiveness.

- The **STABLE Act** and the **GENIUS Act** are 80% aligned—consolidation is underway.
- U.S. House markup on stablecoin legislation expected **within the next week.**
- **"Regulatory clarity will help companies move the ball forward."** said Avery Ching, APTOS - CEO .
- The market structure bill (FIT 21) will be reintroduced with updates after April hearings.
- Steil warned that **lack of legislative codification** risks future regulatory reversals.

### PETER TODD, OPENTIMESTAMPS — Founder: ["Trustless Systems Only Succeed with Legal Protections."](#)

Peter highlighted that trustless systems, like Bitcoin, can only thrive when **"the legal framework ensures these systems are viable."** He warned that even the best technologies, like the Lightning Network, can't gain traction if providers are hesitant due to regulatory uncertainty.

- Canada's **bank account seizures during COVID** exposed financial vulnerability.
- Lightning wallets like **Phoenix** avoid U.S. app stores due to regulatory fears.
- Visa/MasterCard models mimic **central bank digital currencies (CBDCs)** in practice.
- Without self-custody, **DeFi reverts to centralized account-based systems,** as Rep. Davidson warned.

### HUNTER SIMS, CAMBRIDGE CENTRE FOR ALTERNATIVE FINANCE — Director: ["Digital Miners Are Pivoting to AI to Leverage Infrastructure Expertise."](#)

Hunter emphasized that mining companies are diversifying into **high-performance computing (HPC) for AI** to leverage their expertise in data centers and power management. **"This strategic shift positions miners to capture AI compute demand, but CapEx requirements remain a significant barrier."**

- **Core Scientific** committed 590 MW to AI compute via CoreWeave partnership.H
- PC CapEx is **8x for infrastructure as a service** and **33x for compute as a service.**
- 52% of global mining power now comes from **renewable sources.**
- U.S. policy incentives and **grid stability** will shape future industry dynamics.

**TIGRAN GAMBARYAN, BINANCE — Head of Financial Crime Compliance: "Compliance at Scale: Binance's Global Balancing Act."**

Tigran outlined how Binance built compliance frameworks to operate across **multiple jurisdictions with differing regulations. "The challenge was building compliance systems that made regulators comfortable while adapting to evolving global regulations."**

- **Public-private collaboration** with Chainalysis shaped early crypto compliance frameworks.
- Binance's compliance team **customized offerings across regions** (e.g., France vs. UAE).
- **Transaction monitoring and regulatory comfort** were prioritized despite inconsistencies in global regulations.
- **Industry-wide support and advocacy** played a pivotal role in Tigran's release from Nigerian detention

**DONALD TRUMP JR., WORLD LIBERTY FINANCIAL — Web3 Ambassador: "Simplifying Crypto for Mainstream Adoption."**

Don Jr. highlighted the **need to simplify crypto interfaces** and bring utility to the masses by enhancing ease of use. He shared personal experiences about being "debanked" and emphasized that **stablecoins can democratize financial systems** by offering faster, more secure cross-border transactions.

- **Bringing Utility to Crypto:** Making crypto as intuitive as traditional banking to drive mass adoption.
- **Demystifying Blockchain for Consumers:** Stablecoins backed by U.S. Treasuries offer **security and trust** for retail and institutional users.
- **Promoting Financial Fairness:** Blockchain technology can reduce inefficiencies and **increase access to financial services.**

**TIM SHEEHY, U.S. SENATE – Senator (R-MT): Stable Regulations Will Retain Digital Asset Innovation in the U.S.**

Senators Tim Sheehy, Kirsten Gillibrand, Bernie Moreno, and Congressman Troy Downing **emphasized the importance of keeping blockchain innovation onshore** by ensuring regulatory clarity and improving U.S. infrastructure. The panel highlighted that **a stable regulatory framework** will encourage companies to **incorporate in the U.S.**, ensuring that **U.S.-regulated digital assets set global standards**. Key legislative priorities include finalizing **stablecoin regulations** by Easter 2025 and passing a **market structure bill** by August 2025, providing **jurisdictional certainty** for digital asset issuers.

- **Stable Regulatory Environment:** Establishing clear rules for stablecoins and digital assets will **attract global innovation** and prevent companies from moving offshore.
- **Legislative Timeline:** Stablecoin regulations are expected by **Easter 2025**, with a **market structure bill** targeted for completion by **August 2025**.
- **Jurisdictional Certainty:** New frameworks will clearly define when digital assets transition between **security and commodity classifications**, preventing regulatory ambiguity.
- **Energy Infrastructure is Essential:** Meeting growing computational demands from blockchain and AI technologies requires **expanding and modernizing U.S. energy grids**, with a focus on **nuclear and modular reactors** for reliable power.
- **Public-Private Collaboration:** Regulatory sandboxes and self-regulatory organizations (SROs) could **enable agile oversight** and foster innovation while protecting consumers.

## Afternoon Sessions from DC Blockchain Summit 2025

The DC Blockchain Summit's afternoon block tackled **state-level stablecoin initiatives**, federal coordination, and **long-term regulatory clarity**. Wyoming's Gov. Gordon outlined the first government-backed stable token, while Bo Hines (White House) and Tyler Williams (Treasury) highlighted **new digital asset priorities**. Hester Peirce unveiled the **SEC's Crypto Task Force**, ushering in collaborative rulemaking. Finally, Rep. Emmer and others underscored the **bipartisan commitment to grow America's crypto ecosystem** without stifling innovation.

**MARK GORDON, STATE OF WYOMING – Governor:** Wyoming's **[StableToken Sets a New Standard for Public Sector.](#)**

Governor Mark Gordon and Anthony Apollo, Executive Director of the Wyoming Stable Token Commission, discussed Wyoming's leadership in blockchain innovation, focusing on the **upcoming launch of the first fiat-backed, fully reserved stable token issued by a U.S. public entity. Wyoming's** approach prioritizes transparency, compliance, and multi-chain operability. The commission selected Layer Zero as the token development and distribution partner, with test tokens currently live on Ethereum, Solana, Avalanche, and other chains. Proceeds from interest generated by T-bills backing the token will directly benefit Wyoming's school foundation fund.

- **StableToken as a Public Utility:** Wyoming's StableToken introduces a secure, transparent, and fully backed settlement mechanism with a minimum 102% reserve ratio.
- **Multi-Chain Deployment and Distribution:** Layer Zero's omnichain technology enables multi-chain operability across Ethereum, Solana, Avalanche, and other blockchains.
- **Public Finance and Treasury Impact:** Interest generated from T-bills backing the token will fund Wyoming's public education system.
- **Potential Model for Regulatory Compliance:** Wyoming's public RFP process offers a transparent template for regulatory oversight and future stablecoin audits.
- **Broader Implications:** Wyoming's innovation sets a precedent for secure, compliant stablecoin issuance by public entities.

**BILL HAGERTY, U.S. SENATE – Senator (R-TN):** [Operation Chokepoint 2.0 is Over, But Regulatory Weaponization is Still a Threat](#)

Senator Bill Hagerty and Caitlin Long, CEO of Custodia Bank, discussed the lingering effects of **Operation Chokepoint 2.0, where regulators discouraged banks from serving crypto companies**, citing reputational risks. Hagerty highlighted the need for legislative and executive action to prevent future regulatory overreach, emphasizing that maintaining capital market leadership requires supporting financial innovation. Long shared Custodia Bank's **ongoing legal battle for Fed** master account access and revealed that they were debanked five times in 18 months despite a clean compliance record. Both emphasized that restoring banking access for crypto companies is crucial to ensuring U.S. leadership in digital assets.

- **Weaponization of Financial Regulation:** Operation Chokepoint 2.0 discouraged banks from servicing crypto companies through informal supervisory pressure, which continues to impact the industry.
- **Legislative Clarity to Protect Banking Access:** Hagerty's proposed legislation aims to eliminate reputational risk considerations and establish clear regulatory guidelines for stablecoins and digital assets.
- **Custodia Bank's Legal Battle:** Caitlin Long highlighted Custodia's ongoing legal fight for Fed master account access, exposing inconsistencies in the Fed's application process.
- **Bifurcated Stablecoin Framework:** Hagerty's bill introduces two regulatory lanes — one for banks regulated by the Fed and another for non-banks regulated by the OCC.
- **Energy Infrastructure for Blockchain Growth:** Hagerty underscored the need for robust energy infrastructure to support blockchain innovation, citing Bitcoin mining's role in cost-justifying grid expansion.

**RICHARD TENG, BINANCE – CEO:** [Risks of Falling Behind Without Embracing Global Crypto Standards](#)

Drawing from his experience as a former regulator at the Monetary Authority of Singapore (MAS) and Abu Dhabi Global Markets (ADGM), Teng emphasized that **global markets are moving rapidly to embrace crypto** while the U.S. risks falling behind.

- **Global Regulatory Leadership:** Teng highlighted Singapore's and UAE's success in balancing regulatory oversight with financial growth, stressing that the U.S. needs a clear, innovation-friendly framework.
- **Institutional Adoption as Key Growth Driver:** Institutional interest in crypto, including corporate treasuries and sovereign wealth funds, drives market growth. The U.S. must align its regulations to attract these investments.
- **Binance's Compliance Overhaul:** Following its 2023 settlement, Binance now employs 1,400 compliance professionals, representing 25% of its global workforce, demonstrating its commitment to regulatory excellence.
- **U.S. Market Potential:** Teng emphasized that Binance's absence from the U.S. denies American investors access to the largest and most liquid crypto exchange, potentially stifling U.S. innovation.

**U.S. SEN. CYNTHIA LUMMIS, U.S. SENATE – Senator (R-WY):** [The Bitcoin Reserve as a Solution to U.S. Debt and Fiscal Stability.](#)

Senator Cynthia Lummis stressed that the **U.S. national debt**, now exceeding $36 trillion, **threatens long-term economic stability**. She introduced the Bitcoin Act of 2025, mandating the **establishment of a Strategic Bitcoin Reserve** to reduce national debt and secure America's financial future. Drawing parallels with Wyoming's use of mineral wealth to balance budgets, Lummis underscored Bitcoin's role as a scarce, immutable asset capable of preserving U.S. sovereignty and economic strength.

- **Debt Reduction Potential**: A Bitcoin reserve could cut national debt by half over 20 years, relieving taxpayers and securing future budgets.
- **Neutral Budget Impact**: The reserve can be built without taxpayer dollars by leveraging gold certificate revaluations, Federal Reserve remittances, and U.S. energy assets.
- **Bitcoin as Digital Gold**: Bitcoin serves as a superior store of value, comparable to the U.S. Strategic Oil and Gold Reserves, but with higher long-term upside.
- **Generational Responsibility**: Creating a Bitcoin reserve prevents passing unsustainable debt to future generations and restores fiscal balance.
- **Urgency to Act**: Without immediate action, the U.S. risks being left behind in the digital economy, leading to missed opportunities and long-term economic stagnation.

**BO HINES, WHITE HOUSE – Executive Director, Presidential Council of Advisers for Digital Assets**: [Accelerating and Building the Infrastructure for Digital Asset Growth](#)

Bo Hines outlined the Trump administration's aggressive agenda to **establish the U.S. as the global leader in digital assets** through regulatory clarity, institutional adoption, and innovative policy frameworks. He highlighted the administration's commitment to dismantling **Operation Chokepoint 2.0** and promoting industry growth by fostering a **regulatory environment** that encourages innovation. Hines emphasized that the administration's focus is on aligning stakeholders across government, ensuring that legislation such as stablecoin regulation and market structure reform reaches President Trump's desk before the August 2025 recess.

- **Restoring U.S. Leadership:** The administration aims to reverse the regulatory hostility of the past four years and onshore digital asset innovation.
- **Stablecoin and Mrket Structure Priorities:** Bipartisan and bicameral collaboration is driving legislative progress, with a goal to finalize regulatory frameworks by August 2025.
- **Strategic Bitcoin Reserve:** Establishing the reserve reinforces U.S. economic strength and global competitiveness in the digital economy.
- **Open-Door Policy:** Industry stakeholders are encouraged to provide input, ensuring that policies reflect real-world challenges and opportunities.
- Tyler Williams, representing the **U.S. Treasury,** underscored **Stablecoin and Market Structure Legislation:** Treasury is working closely with Congress to ensure seamless implementation of legislative priorities.
- **AML and OFAC Compliance:** Treasury's oversight includes ensuring that digital asset transactions comply with anti-money laundering and sanctions regulations.

# EXHIBIT AH

Connect Wallet   5+

**Digital Assets**      News      Crypto Prices      NFT Prices      Learn      More

ADVERTISEMENT



EDITORS' PICK     FORBES DIGITAL ASSETS

# Stablecoin Giant Tether To Invest Billions In Bitcoin Mining

By <u>Liam Wright</u>, Former Contributor. ⓘ Editor-in-Chief of CryptoSlate and host of the Slatecas... ⌄

Published May 30, 2025, 07:23am EDT, Updated May 30, 2025, 11:59am EDT

   0       Add Us On Google   ⓘ



Bitcoin mining on computer screen. Digital crypto currency, cyber money and digital banking concept 3d illustration with glitch effect.
GETTY

Tether CEO Paolo Ardoino announced the stablecoin company's newest focus at the Bitcoin 2025 conference in Las Vegas this week: the company intends to surpass every other bitcoin mining operator by hashrate, the computational power that bitcoin miners use to validate bitcoin transactions. Ardoino promised the company will invest billions of dollars into the bitcoin mining sector over the next few years.

On the Las Vegas main stage this past Thursday, Ardoino remarked that Tether will soon become the "largest bitcoin miner in the world."

He went on to explain that profits from the $120 billion USDT reserve will continue to be reinvested "heavily" into bitcoin. The company currently holds over 100,000 BTC on its balance sheet, acquired using profits beyond its stablecoin reserves.

Back in 2023, Tether committed an initial $500 million crypto mining build-out across Uruguay, Paraguay and El Salvador, a program that includes new substations and minority stakes in established mining farms. That round was the first tranche of a "multi-billion" reinvestment pipeline, which has since continued.

Engineering plans now target 450 megawatts of installed capacity by Q4 2025, enough to push the firm toward 1% of global hashrate. This would dramatically increase the company's influence over the global bitcoin network.

## Billions In Funding For Tether's Bitcoin Miners

The company's war chest is substantial, as public filings show Tether's bitcoin stockpile is worth roughly $10.5 billion at current prices. Now Ardoino has pledged to continue to direct up to 15% of net realized operating profits toward additional coin purchases and hardware.

MORE FOR YOU

**'Project Hail Mary' Arrives On Streaming This Week As Film Tops $655 Million At Box Office**

**'Not Available For All'—Apple Changes iPhone Messaging This Week**

**U.S. Officials Say 'Very, Very Low' Hantavirus Risk To Public As Sick Patient Arrives In Atlanta (Latest Updates)**

Locating farms beside hydropower resources in Paraguay, wind in Uruguay, and geothermal energy hotspots in El Salvador, allows Tether to pitch renewable generation to regulators tracking Markets in Crypto-Assets-style sustainability metrics while reducing power-purchase risk. The firm has also diversified through investments in other bitcoin mining companies, such as its $100 million investment into Bitdeer.

Internal projections put Tether's goal above its main competitors, including Marathon Digital's reported 25 EH/s and Riot Platforms' 21 EH/s, shifting the competitive map for public miners that rely on capital markets rather than cash reserves.

**Crypto Confidential: Forbes' definitive guide to crypto and blockchain, delivered to your inbox every Saturday.**

| Email Address | Sign Up |
|---|---|

By signing up, you agree to receive this newsletter, other updates about Forbes and its affiliates' offerings, our Terms of Service (including resolving disputes on an individual basis via arbitration), and you acknowledge our Privacy Statement. Forbes is protected by reCAPTCHA, and the Google Privacy Policy and Terms of Service apply.

## Tether's Bullish Bet On Bitcoin

Ardoino appears confident in this vision, he told the Vegas bitcoin crowd that "by the end of this year, we may become the largest Bitcoin mining company in the world - surpassing all listed companies."





Read More

00:01                                                                                                            03:12

He confirmed Tether's rationale for bitcoin mining is routed in its desire to participate actively in the network.

> Bitcoin mining is our hedging strategy for our own assets. We are not only holders of Bitcoin, but also participants in network security. We use our computing power to protect the security of this network.

The stablecoin issuer, "born from Bitcoin," believes the top digital asset is "perfect" and that gold is now the "primitive bitcoin." Ardoino opined, bitcoin is not 'digital gold' because gold "does not compete with bitcoin, it competes with fiat currency."

Still, execution questions remain as ASIC supply is tight , vulnerable to hardware supply chain disruptions, and power-purchase agreements in Latin America can be politically fragile.

However, auditors won't have to consider depreciating miners sitting alongside U.S. Treasuries in the reserve mix, as Tether does not use bitcoin to protect the USDT peg. Instead, the company invests stablecoin profits into bitcoin.

Editorial Standards          Reprints & Permissions

# EXHIBIT AI

BITCOIN ALPHA IN YOUR INBOX EVERY WEEKDAY     FREE NEWSLETTER





HOME › CONFERENCE › PAOLO ARDOINO CONFIRMED AS A BITCOIN 2026 SPEAKER

CONFERENCE

# Paolo Ardoino Confirmed as a Bitcoin 2026 Speaker

 By **Jenna Montgomery**    April 7, 2026



Paolo Ardoino has been officially confirmed as a speaker at Bitcoin 2026. As CEO of Tether (the issuer of the world's largest stablecoin) and CTO of Bitfinex, Ardoino sits at the center of two of the most influential companies in the Bitcoin ecosystem and arrives in Las Vegas with one of the most expansive views of where Bitcoin is headed.

Ardoino graduated from the University of Genoa's Computer Science program in 2008 and began his career as a researcher on a military project focused on high-availability, self-recovering networks and cryptography. He joined Bitfinex as a senior software developer in 2014 and became CTO in 2016. In 2017, he also became CTO of Tether. He was named CEO of Tether in December 2023. Following the passage of the GENIUS Act, Ardoino was a guest at the White House to witness the signing of the landmark stablecoin legislation into law.

Under his leadership, Tether has grown well beyond its origins as a stablecoin issuer. At the 2025 Bitcoin Conference in Las Vegas, Ardoino announced that Tether holds more than 100,000 Bitcoin as a company, alongside more than 50 tons of gold. Tether has also launched an open-source Bitcoin mining operating system, built on a self-hosted peer-to-peer architecture, designed to scale from small home installations to industrial-grade deployments managing hundreds of thousands of machines. Tether is also a majority backer of Twenty One Capital (NYSE: XXI), the Bitcoin-native public company led by Jack Mallers, also a confirmed Bitcoin 2026 speaker.

Ardoino has led Tether to invest in renewable energy and sustainable Bitcoin mining in Uruguay, and the company has expanded into AI infrastructure, telecommunications, and peer-to-peer communications platforms. His appearance at Bitcoin 2026 comes as Tether's footprint across the Bitcoin ecosystem continues to grow across nearly every layer from stablecoin infrastructure and mining to capital markets and education. Bitcoin 2026 takes place April 27–29 at The Venetian Resort in Las Vegas.

## Bitcoin 2026 is Returning to Las Vegas

**Bitcoin 2026** will take place **April 27–29** at **The Venetian, Las Vegas**, and is expected to be the biggest Bitcoin event of the year.

Focused on **the future of money**, Bitcoin 2026 will bring together Bitcoin builders, investors, miners, policymakers, technologists, and newcomers from around the world. The event will feature a wide range of **pass types**, including **general admission passes designed specifically for those new to Bitcoin**, alongside premium passes for professionals, enterprises, and institutions.

With multiple stages, immersive experiences, technical workshops, and headline keynotes, Bitcoin 2026 is designed to serve both first-time attendees and long-time Bitcoiners shaping the next era of global adoption.

## Past Bitcoin Conferences in the U.S.

Bitcoin's flagship conference has scaled dramatically over the past five years:

- **2021 – Miami**: 11,000 attendees
- **2022 – Miami**: 26,000 attendees
- **2023 – Miami**: 15,000 attendees
- **2024 – Nashville**: 22,000 attendees
- **2025 – Las Vegas**: 35,000 attendees

## 🎟️ Get Your Bitcoin 2026 Pass

Bitcoin Magazine readers can save **10%** on Bitcoin 2026 tickets using code '**ARTICLE10**' at **checkout**.

Stay at The official hotel of Bitcoin 2026, The Venetian, and **get a guaranteed low rate plus 15% off your pass**. Be **in the middle** of where the fun is all happening, and where **the networking never ends.**

And **don't** forget:

**Volunteer at Bitcoin 2026** and get **Pro Pass access** plus exclusive perks.

All students **ages 13+** can apply for a **Student Pass** and get **free general admission** access to Bitcoin 2026.

📍 **Location:** The Venetian, Las Vegas
📅 **Dates:** April 27–29, 2026

For more information and **exclusive offers**, visit the Bitcoin Conference on X **here**.

# EXHIBIT AJ

☰ TOP MENU

May 11, 2026

# www.BitcoinSeats.com

Bitcoin Latest News | Price Today | How To Get Free Bitcoin

☰ MAIN MENU                                                      🔍

BITCOIN LATEST NEWS

# Paolo Ardoino Confirmed as a Bitcoin 2026 Speaker

April 7, 2026  -  by Jenna Montgomery  -  Leave a Comment

Bitcoin Magazine

Paolo Ardoino Confirmed as a Bitcoin 2026 Speaker

Paolo Ardoino has been officially confirmed as a speaker at Bitcoin 2026. As CEO of Tether (the issuer of the world's largest stablecoin) and CTO of Bitfinex, Ardoino sits at the center of two of the most influential companies in the Bitcoin ecosystem and arrives in Las Vegas with one of the most expansive views of where Bitcoin is headed.

Ardoino graduated from the University of Genoa's Computer Science program in 2008 and began his career as a researcher on a military project focused on high-availability, self-recovering networks and cryptography. He joined Bitfinex as a senior software developer in 2014 and became CTO in 2016. In 2017, he also became CTO of Tether. He was named CEO of Tether in December 2023. Following the passage of the GENIUS Act, Ardoino was a guest at the White House to witness the signing of the landmark stablecoin legislation into law.

Under his leadership, Tether has grown well beyond its origins as a stablecoin issuer. At the 2025 Bitcoin Conference in Las Vegas, Ardoino announced that Tether holds more than 100,000 Bitcoin as a company, alongside more than 50 tons of gold. Tether has also launched an open-source Bitcoin mining operating system, built on a self-hosted peer-to-peer architecture, designed to scale from small home installations to industrial-grade deployments managing hundreds of thousands of

machines. Tether is also a majority backer of Twenty One Capital (NYSE: XXI), the Bitcoin-native public company led by Jack Mallers, also a confirmed Bitcoin 2026 speaker.

Ardoino has led Tether to invest in renewable energy and sustainable Bitcoin mining in Uruguay, and the company has expanded into AI infrastructure, telecommunications, and peer-to-peer communications platforms. His appearance at Bitcoin 2026 comes as Tether's footprint across the Bitcoin ecosystem continues to grow across nearly every layer from stablecoin infrastructure and mining to capital markets and education. Bitcoin 2026 takes place April 27–29 at The Venetian Resort in Las Vegas.

BREAKING: TETHER CEO PAOLO ARDOINO TO SPEAK AT BITCOIN 2026 IN LAS VEGAS

"We are a company that was born with Bitcoin. We are all Bitcoiners at heart."
pic.twitter.com/42KoevBKhN

— The Bitcoin Conference (@TheBitcoinConf) April 7, 2026

# Bitcoin 2026 is Returning to Las Vegas

Bitcoin 2026 will take place **April 27–29** at **The Venetian, Las Vegas**, and is expected to be the biggest Bitcoin event of the year.

Focused on **the future of money**, Bitcoin 2026 will bring together Bitcoin builders, investors, miners, policymakers, technologists, and newcomers from around the world. The event will feature a wide range of **pass types**, including **general admission passes designed specifically for those new to Bitcoin**, alongside premium passes for professionals, enterprises, and institutions.

With multiple stages, immersive experiences, technical workshops, and headline keynotes, Bitcoin 2026 is designed to serve both first-time attendees and long-time Bitcoiners shaping the next era of global adoption.

# Past Bitcoin Conferences in the U.S.

Bitcoin's flagship conference has scaled dramatically over the past five years:

**2021 – Miami**: 11,000 attendees

**2022 – Miami**: 26,000 attendees

**2023 – Miami**: 15,000 attendees

**2024 – Nashville**: 22,000 attendees

**2025 – Las Vegas**: 35,000 attendees

# Get Your Bitcoin 2026 Pass

Bitcoin Magazine readers can save **10%** on Bitcoin 2026 tickets using code '**ARTICLE10**' at **checkout**.

Stay at The official hotel of Bitcoin 2026, The Venetian, and **get a guaranteed low rate plus 15% off your pass**. Be **in the middle** of where the fun is all happening, and where **the networking never ends.**

And **don't** forget:

**Volunteer at Bitcoin 2026** and get **Pro Pass access** plus exclusive perks.

All students **ages 13+** can apply for a **Student Pass** and get **free general admission** access to Bitcoin 2026.

**Location:** The Venetian, Las Vegas
**Dates:** April 27–29, 2026

For more information and **exclusive offers**, visit the Bitcoin Conference on X **here**.

# Why Attend Bitcoin 2026?

Bitcoin 2026 is the definitive gathering for anyone serious about the future of money. With **500+ speakers**, **multiple world-class stages**, and programming spanning **Bitcoin fundamentals, open-source development, enterprise adoption, mining, energy, AI, policy, and culture**, the conference brings every corner of the Bitcoin ecosystem together under one roof.

# EXHIBIT AK

# Bitfinex chief strategy officer departs

reuters.com/article/technology/bitfinex-chief-strategy-officer-departs-idUSKBN1JI2XN

Anna Irrera                                                                June 22, 2018



Photo illustration of Bitfinex cryptocurrency exchange website taken September 27, 2017. REUTERS/Dado Ruvic/Illustration Purchase Licensing Rights, opens new tab

NEW YORK (Reuters) - Bitfinex Chief Strategy Officer Phil Potter is leaving the cryptocurrency trading platform, the executive and the exchange told Reuters on Friday.

Potter will be replaced in the interim by Chief Executive JL van der Velde, the company said.

"As Bitfinex pivots away from the U.S., I felt that, as a U.S. person, it was time for me to rethink my position as a member of the executive team," Potter said in a statement.

Advertisement · Scroll to continue

He referred to "new opportunities" in the days ahead but did not elaborate.

Owned by a British Virgin Islands company, Bitfinex is the fourth-largest cryptocurrency exchange in the world by trading volume. It enables traders to buy and sell virtual currencies such as bitcoin and ether.

The exchange shares management with Tether, a company that issues a cryptocurrency that is pegged to the U.S. dollar.

Tether critics have raised concerns over the past year about whether it actually holds $1 in reserve for every token issued, as it claimed.

Earlier this month a University of Texas research paper alleged Tether's token could have been used to manipulate bitcoin's price last year during its meteoric rise.

Advertisement · Scroll to continue

Bitfinex has denied these claims.

This week a Washington-based law firm co-founded by former FBI director Louis J. Freeh said in a report released by Tether the company had enough U.S. dollar reserves as of June 1 to back its virtual coins in circulation. The report was not a full audit.

Global regulators have ramped up their scrutiny of cryptocurrency markets following a rally in prices last year. The U.S. Commodity Futures Trading Commission and the Department of Justice are reportedly investigating whether the price of bitcoin is being manipulated.

In December the CFTC sent a subpoena to Tether and Bitfinex.

Potter, an American who once worked at Morgan Stanley, was one of three main Bitfinex managers, including the CEO and a chief financial officer based in Europe.

Reporting by Anna Irrera in New York; Editing by Cynthia Osterman and Matthew Lewis

Our Standards: [The Thomson Reuters Trust Principles., opens new tab](#)

# EXHIBIT AL

 **Philip Potter**                                                    Save

**Summary**

## Overview ✏

**Number of Current Board & Advisor Roles**
1

**Number of Founded Organizations**
3

**Primary Job Title**
Founder, Managing Partner & CSO

**Primary Organization**
 WELARA

**Location**
New York, New York, United States

**Regions**
Greater New York Area, East Coast, Northeastern US

**Gender**
Male

**Facebook**
View on Facebook ↗

**LinkedIn**
View on LinkedIn ↗

**Twitter**
View on Twitter ↗

Philip Potter is based out of New York, New York and is the Founder, Managing Partner and Chief Strategy Officer of WELARA. Philip previously worked at Tether.io as a Founder and Chief Strategy Officer. Philip Potter attended Yale University.

## Jobs ✏

Number of Current Jobs

2

Number of Past Jobs

4

 Philip Potter

Save

Summary

Chief Strategy Officer at Tether.

 WELARA
Founder, Managing Partner & CSO
Sep 2023

 SELF ID
Co-Founder, CSO & Interim CFO
Sep 2021

| Organization Name ⌄ | Title At Company ⌄ | Start Date ⌄ | ↓⁼ E |
|---|---|---|---|
| Tether | Founder & Chief Strategy Officer | Mar 2014 | |
| Bear Stearns | Associate Director | 1998 | |
| Morgan Stanley | Derivates Analyst | 1996 | |
| Bitfinex | Chief Strategy Officer | 2013 | |

## Board and Advisor Roles ✎

Number of Current Board & Advisor Roles

1

Philip Potter is the Board Member at Biocanic.



Biocanic
Board Member


Philip Potter

Save

Summary

## Related Hubs

| Hub Name | CB Rank (Hub) |
|---|---|
| Aristotle University of Thessaloniki Alumni Founded Companies | 65,160 |
| University of Essex Alumni Founded Companies | 64,788 |
| Universidad Nacional de Córdoba Alumni Founded Companies | 75,957 |
| University of Connecticut School of Business Alumni Founded Companies | 80,053 |
| University of Regina Alumni Founded Companies | 82,551 |
| St. John's College Alumni Founded Companies | 84,367 |
| University of North Carolina at Wilmington Alumni Founded Companies | 75,707 |
| Missouri University of Science and Technology Alumni Founded Companies | 68,453 |
| Karolinska Institutet Alumni Founded Companies | 65,434 |
| Thomas Edison State University Alumni Founded Companies | 86,291 |

Show More

## Education

Philip Potter studied at Yale University.

Yale University

 

## Philip Potter

Save

Summary

## Recent News and Activity

✏️

Number of News Articles

1

News • May 3, 2019

© 2026 Crunchbase Inc. All Rights Reserved.